# EXHIBIT A

|  |  |  |
|---|---|---|
| STEVEN SURABIAN, and STEVEN SURABIAN TRUSTEE FOR THE RICHARD SURABIAN IRREVOCABLE TRUST, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civ. No. 1:11-cv-10053-DPW |
| v. | ) ) | |
| HSBC BANK USA, NA as TRUSTEE FOR SEQUOIA MORTGAGE TRUST 2004-6, | ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S AMENDED MOTION TO DISMISS PLAINTIFFS' COMPLAINT

The defendant, HSBC Bank USA, NA as Trustee for Sequoia Mortgage Trust 2004-6 ("HSBC"), hereby respectfully moves to dismiss the plaintiffs' complaint. In support of this motion, HSBC states as follows:

1.    In their complaint, plaintiffs allege that HSBC unlawfully foreclosed on the property located at 85 Pond Street in South Yarmouth, Massachusetts and that they suffered "loss of personal property", "loss of rent" and "emotional distress" as a result.

2.    Dismissal of plaintiffs' complaint is appropriate because none of plaintiffs' allegations state a claim upon which relief may be granted.

3.    Plaintiffs' claim that the foreclosure was unlawful fails because he makes no other allegation in support of this claim other than that "there was no mortgage". Such unsupported and conclusory statements cannot survive a motion to dismiss under the standard set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

4.  In a related vein, plaintiffs' "loss of personal property" claim must also be dismissed because there is no allegation that HSBC caused the plaintiffs' alleged loss of personal property and is further contradicted by the allegations in plaintiffs' own complaint.

5.  As to plaintiffs' "loss of rent" claim, this claim fails because they had no ownership stake in the property (and thus no entitlement to rental income) for the time period that they seek to recover rent payments.

6.  Finally, plaintiffs' emotional distress claim must be dismissed because courts have made abundantly clear that Steven Surabian's supposed cause of the emotional distress here – a bank's exercise of its right to foreclose after the borrower's default – does not constitute the extreme and outrageous conduct needed to establish an emotional distress claim.

7.  In addition to the foregoing, all claims brought on behalf of the Richard Surabian Irrevocable Trust must be dismissed as the Trust has no ownership interest in 85 Pond Street.

In further support of this motion, HSBC makes reference to the attached Memorandum of Law.

WHEREFORE, HSBC Bank USA, NA as Trustee for Sequoia Mortgage Trust 2004-6 respectfully requests that the plaintiffs' complaint be dismissed pursuant to Fed. R. Civ. Pro. 12(b)(6).

> HSBC BANK USA, NA, as TRUSTEE OF THE
> SEQUOIA MORTGAGE TRUST 2004-6,
> By its attorneys,
>
> _/s/ Young B. Han_
> Richard E. Briansky, BBO# 632709
> rbriansky@princelobel.com
> Young B. Han, BBO# 664126
> yhan@princelobel.com
> **PRINCE, LOBEL, GLOVSKY & TYE LLP**
> 100 Cambridge Street, Suite 2200
> Boston, MA 02114
> Tel: 617.456.8000

## CERTIFICATE OF SERVICE

I, Young B. Han, certify that a true and accurate copy of the foregoing document was filed through the Court's ECF system this 12th day of April, 2011. I further certify that a true and accurate copy of the foregoing document was sent by first class mail, postage prepaid to the plaintiff at the following address:

Steven Surabian
1230 Rt. 28
South Yarmouth, MA 02664

Steven Surabian, Trustee for the
Richard Surabian Irrevocable Trust
P.O. Box 397
West Hyannisport, MA 02672

*/s/ Young B. Han*
Young B. Han

|  |  |
|---|---|
| STEVEN SURABIAN, and STEVEN SURABIAN TRUSTEE FOR THE RICHARD SURABIAN IRREVOCABLE TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>HSBC BANK USA, NA as TRUSTEE FOR SEQUOIA MORTGAGE TRUST 2004-6,<br><br>Defendant. | Civ. No. 1:11-cv-10053-DPW |

## AMENDED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

The defendant, HSBC Bank USA, NA as Trustee for Sequoia Mortgage Trust 2004-6 ("HSBC"), hereby submits the following Memorandum of Law in Support of its Motion to Dismiss plaintiffs' complaint.

By this action, plaintiffs allege that HSBC unlawfully foreclosed on the property located at 85 Pond Street in South Yarmouth, Massachusetts and that they suffered "loss of personal property", "loss of rent" and "emotional distress" as a result. Dismissal of plaintiffs' complaint is appropriate pursuant to Fed. R. Civ. Pro. 12(b)(6) because none of plaintiffs' allegations state a claim upon which relief may be granted.

Plaintiffs' claim that the foreclosure was unlawful fails because he makes no other allegation in support of this claim other than that "there was no mortgage". Such unsupported and conclusory statements are insufficient to defeat a motion to dismiss under the Rule 12(b)(6) standard set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In a related vein,

plaintiffs' "loss of personal property" claim must also be dismissed because there is no allegation that HSBC caused the plaintiffs' alleged loss of personal property and is further contradicted by the allegations in plaintiffs' own complaint. As to plaintiffs' "loss of rent" claim, this claim fails because they had no ownership stake in the property (and thus no entitlement to rental income) for the time period that they seek to recover rent payments. Finally, plaintiffs' emotional distress claim must be dismissed because courts have made abundantly clear that Steven Surabian's supposed cause of the emotional distress here – a bank's exercise of its right to foreclose after the borrower's default – does not constitute the extreme and outrageous conduct needed to establish an emotional distress claim.

In addition to the foregoing, all claims brought on behalf of the Richard Surabian Irrevocable Trust must be dismissed as the Trust has no ownership interest in 85 Pond Street.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs' verified complaint was removed to this court on January 10, 2011 (the "Complaint"). See DE# 1.

On April 23, 2004, Steven Surabian and his daughter, Stephanie Surabian, executed a promissory note in the original principal amount of $201,750.00 payable to GreenPoint Mortgage Funding, Inc. (the "Note"). See Promissory Note, attached as Exhibit D to the Complaint, appended to this Motion as Exhibit 1; Exhibit 1 at ¶ 1. To secure the Note, Steven and Stephanie Surabian granted a mortgage to Mortgage Electronic Registration Systems, Inc. ("MERS") (the "Mortgage") for the property located at 85 Pond Street in South Yarmouth, Massachusetts (the "Property"). See Mortgage, Exhibit 1 at Exhibit E, appended thereto.

On May 19, 2006, the Surabians conveyed the Property to Steven Surabian, individually. Exhibit 1 at ¶¶ 1-2.

By Assignment of Mortgage dated December 21, 2009, MERS assigned the Mortgage to HSBC. Id. at ¶ 4; Assignment of Mortgage, attached as Exhibit C to the Complaint. HSBC thereafter initiated foreclosure proceedings on the Property and a foreclosure deed was recorded on June 7, 2010. Id. at ¶ 20. Approximately three weeks later, on June 28, 2010, Steven Surabian attempted to transfer 85 Pond Street into the Richard Surabian Irrevocable Trust. Id. at ¶ 3.

Plaintiffs allege: (1) that HSBC wrongfully foreclosed on the Property; (2) a claim for "loss of personal property" for property reportedly stolen from the Property; (3) that HSBC is liable for plaintiffs' tenant's failure to pay rent; and (4) that Steven Surabian suffered emotional distress. See Id., generally.[1]

The plaintiffs' only allegation in support of why HSBC's foreclosure was "unlawful" appears to be that "there was no Mortgage". See Id. at ¶ 6.

In support of the "loss of personal property" claim, the Complaint alleges as follows:

> 31.    On or about July 28, 2010, the Plaintiff noticed the door to the garage with their property was left unlocked then Plaintiffs noticed over $8,000.00 of their property missing.

> 32.    Defendant admits to their agent secured (sic) the property on July 27, 2010 and changed the locks.

Exhibit 1 at ¶¶ 31-32. This is contradicted by plaintiffs' own allegations that a former tenant (and not HSBC) had changed the locks on July 28, 2010 and again by plaintiffs' allegation that the "locks were changed July 22, 2010" (and not on July 27, 2010). Id. at ¶¶ 27, 28.

As to the "loss of rent" claim, plaintiffs assert that they are entitled to rental income of $2,600.00 that they did not receive because of HSBC's eviction of the tenant residing at 85 Pond

---

[1] While only some of the plaintiffs' counts in the Complaint are explicitly set forth, the causes of action appear to be captioned as: "unlawful foreclosure", "loss of personal property", "loss of rent" and "emotional distress". See Id. generally.

Street. Id. at ¶¶ 24-25, 29. After the foreclosure proceedings began, HSBC allegedly "harassed" the tenant residing at 85 Pond Street into not paying rent, forcing Steven Surabian to send a 30-day Notice to Quit on July 16, 2010. Id. at ¶ 24. The tenant was evicted and forced to quit on or about July 22, 2010. Id. at ¶ 27.

Finally, with regard to the emotional distress claim, the plaintiffs assert that the emotional distress stems from HSBC's foreclosure of 85 Pond Street and Mr. Surabian's participation in lawsuits arising therefrom. Id. at ¶¶ 33-44.

## ARGUMENT

I.    Plaintiffs' complaint should be dismissed pursuant to Fed. R. Civ. Pro. 12(b)(6) as it fails to state a claim upon which relief may be granted.

The plaintiffs allege that HSBC's foreclosure was "unlawful" for no stated reason other than that "there was no Mortgage". Exhibit 1 at ¶ 6. Most significantly, this allegation is simply incorrect. The assignment of the Mortgage, which is appended to plaintiffs' own Complaint, specifically sets forth that the Mortgage, recorded with the Barnstable County Registry of Deed at Book 18489, Page 333, was assigned from MERS, the original mortgagee, to HSBC, on December 21, 2009. See Assignment of Mortgage, attached as Exhibit C to the Complaint. HSBC accordingly has valid rights under the Mortgage and had standing to institute the foreclosure proceedings that it did. See U.S. Bank Nat. Ass'n v. Ibanez, 458 Mass. 637 (2011). Further, this bald, unsupported assertion is insufficient to survive a Rule 12(b)(6) motion. In making their allegations, the plaintiffs possess an "obligation to provide the grounds of [his] entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008); see also Flomenbaum v. Commonwealth, 451 Mass. 740, 751 n.12 (2008) (noting that recent changes to motion to dismiss standard impose "stricter" requirements on plaintiffs than previous standard). This obligation "requires more than

labels and conclusions." Twombly, 550 U.S. at 555. It requires factual allegations that "raise a right to relief above the speculative level." Iannacchino, 451 Mass. at 636. Additionally, Surabian's status as a *pro se* litigant does not relieve him of the obligation to comply with the Rules of Civil Procedure. Pomales v. Celulares Telefonica, Inc., 342 F.3d 44, 50 n.1 (1st Cir. 2003). Plaintiffs' unsupported allegation, even aside from the fact it is wholly untrue, is insufficient to survive a Rule 12(b)(6) motion. Estate of Bennett v. Wainwright, 548 F.3d 155, 162 (1st Cir. 2008) (noting that on a motion to dismiss, a court should "reject unsupported conclusions or interpretations of law").

Plaintiffs' claim for "loss of personal property" fails because nowhere in the Complaint is it alleged that HSBC committed the destruction of plaintiffs' personal property or that HSBC is otherwise responsible for the damage caused. Further, the "loss of personal property" claim is contradicted by conflicting and inconsistent allegations contained in the plaintiffs' own Complaint. Specifically, Count III of the complaint, titled, "Plaintiffs (sic) Verified Complaint for Loss of Property," sets forth as follows:

> 31. On or about July 28, 2010, the Plaintiff noticed the door to the garage with their property was left unlocked then Plaintiffs noticed over $8,000.00 of their property missing.

> 32. Defendant admits to their agent secured (sic) the property on July 27, 2010 and changed the locks.

Exhibit 1 at ¶¶ 31-32.

First, nothing in Count III, or any other allegation contained in the Complaint, actually alleges that HSBC committed the destruction of plaintiffs' property or that HSBC had any responsibility to secure the plaintiffs' property after it had foreclosed and taken possession of 85 Pond Street. In addition, Count III is contradicted by plaintiffs' allegations elsewhere in the Complaint. For example, paragraph 28 of the Complaint alleges that on July 28, 2010, the

plaintiffs' former tenant (and not HSBC) changed the locks and left the door to the garage unlocked. In paragraph 27, the Complaint alleges that the locks were changed on July 22, 2010 (and not July 27, 2010). Such contradictory and conflicting allegations cannot withstand a motion to dismiss. Nationwide Mut. Ins. Co. v. Morning Sun Bus. Co., 2011 WL 381612, *6 (E.D. N.Y.) ("Where plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss.") (citation omitted) (a copy of this opinion is attached hereto as Exhibit 2); Air Sunshine, Inc. v. Carl, 2010 WL 4861457, *2 (D. P.R.) ("In the context of a motion to dismiss, courts look to only well-pled allegations that are plausible on their face; therefore, [] contradictory allegations [are to be] ignored by the court for purposes of [a Rule 12(b)(6)] motion.") (a copy of this opinion is attached hereto as Exhibit 3); See also Watkins v. Omni Life Science, Inc., 692 F. Supp. 170, 178 (D. Mass.) (contradictory affidavits attached to complaint insufficient to survive a Rule 12(b)(6) motion). Plaintiffs' claim for "loss of personal property" must accordingly be dismissed.

Plaintiffs' claim relating to the alleged loss of rental income must also fail as the plaintiffs did not have an ownership interest in the property for the time period for which they are claiming rental payments. According to the Complaint, the foreclosure occurred on May 7, 2010 and was recorded on June 7, 2010. Exhibit 1 at ¶ 20. The Complaint sets forth that the tenant paid monthly rent of $1,300.00 and the tenant quit the premises on or about July 22, 2010. Id. at ¶ 27. The plaintiffs seek $2,600.00 for two months of back rent. Id. at 29. Plaintiffs' entitlement to rent, however, ceased when their ownership interest ceased on May 7, 2010. Any claim for rent payments after May 7, 2010 must be dismissed.

Finally, the claim for emotional distress cannot survive either. Emotional distress claims require, among other things, the defendant to have acted intentionally and in a manner "extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community." Aguoji v. Harvard University, 77 Mass. App. Ct. 1115 (2010). A bank's exercise of its right to foreclose after the borrower's default does not constitute extreme and outrageous conduct needed for establish an emotional distress claim as a matter of law. In In re Fernandes, No. 10-17925-FJB, 2011 WL 322017 (Bankr. D. Mass. Jan. 31, 2011) (Bailey, J.) (a copy of this case is attached as Exhibit 7), the United States Bankruptcy Court for the District of Massachusetts, applying Massachusetts law, dismissed a claim for intentional infliction of emotional distress based on a bank's actions to foreclose. The Court found that, as a matter of law, the bank's exercise of "what it believed was its right to foreclose in the face of protestations to the contrary by the mortgagor...cannot constitute the 'extreme and outrageous conduct' that is a required element of this tort." Id. at *3. Similarly, in Davenport v. Litton Loan Servicing, LP, 2010 WL 3218592 (N.D. Ca. 2010) (a copy of this case is attached as Exhibit 8), the borrower asserted a claim for intentional infliction of emotional distress against her mortgage servicing company premised on her allegation that the servicer foreclosed with considering her request for a loan modification. In granting the servicer's motion to dismiss, the Court ruled:

> Common sense dictates that home foreclosure is a terrible event and likely to be fraught with unique emotions and angst. Where a lending party in good faith asserts its right to foreclose according to contract, however, its conduct falls shy of "outrageous," however wrenching the effects on the borrower. . . .

Id. at *16; see also Lachenmaier v. First Bank Systems. Inc., 246 Mont. 26, 35 (1990) ("the Bank in this case connect be said to have acted 'beyond all possible bounds of decency' where it merely exercised a legal right to foreclose on the mortgage and notes. 'The actor is never liable...when he has done no more than to insist upon his legal rights in a permissible way, even

though he is well aware that such insistence is certain to cause emotional distress.'") (quoting Restatement 2d of Torts, § 46, comment g); <u>Weiler v. United Sav. Ass'n of Texas</u>, 887 S.W.2d 155, 159 (Tex. App. Ct. 1994) ("Clearly, a foreclosure sale that complies with the terms of the loan agreements and applicable law would not justify a claim for intentional infliction of emotional distress. Even if the creditor's conduct is extreme and outrageous, he does not commit the tort if he does not more than insist on his legal rights in a permissible way."); <u>East River Sav. Bank v. Steele</u>, 169 Ga. App. Ct. 9, 10 (1983) (alleged wrongful foreclosure does not constitute intentional infliction of emotional distress). For these reasons, the plaintiffs' emotional distress claim must be dismissed pursuant to Fed. R. Civ. Pro. 12(b)(6).

> II.    <u>Steven Surabian, as trustee for the Richard Surabian Irrevocable Trust, does not have standing to bring this lawsuit.</u>

As noted above, HSBC foreclosed on the Property on May 7, 2010. <u>Exhibit 1</u> at ¶ 20. The foreclosure deed was recorded on June 7, 2010. <u>Id.</u> Steven Surabian did not attempt to transfer the Property into the Richard Surabian Irrevocable Trust until June 28, 2010 – 21 days after the foreclosure deed was recorded. <u>Id.</u> at ¶ 3. The Richard Surabian Irrevocable Trust has no ownership stake in the Property and thus the Trust has no standing to bring this complaint.

## CONCLUSION

WHEREFORE, HSBC Bank USA, NA as Trustee for Sequoia Mortgage Trust 2004-6 respectfully requests that the plaintiffs' complaint be dismissed.

HSBC BANK USA, NA, as TRUSTEE OF THE
SEQUOIA MORTGAGE TRUST 2004-6,
By its attorneys,

_/s/ Young B. Han_____
Richard E. Briansky, BBO# 632709
rbriansky@princelobel.com
Young B. Han, BBO# 664126
yhan@princelobel.com
**PRINCE, LOBEL, GLOVSKY & TYE LLP**
100 Cambridge Street, Suite 2200
Boston, MA 02114
Tel: 617.456.8000

## CERTIFICATE OF SERVICE

I, Young B. Han, certify that a true and accurate copy of the foregoing document was filed through the Court's ECF system this 12th day of April, 2011. I further certify that a true and accurate copy of the foregoing document was sent by first class mail, postage prepaid to the plaintiff at the following address:

Steven Surabian
1230 Rt. 28
South Yarmouth, MA 02664

Steven Surabian, Trustee for the
Richard Surabian Irrevocable Trust
P.O. Box 397
West Hyannisport, MA 02672

_/s/ Young B. Han_____
Young B. Han

**1**

COMMONWEALTH OF
MASSACHUSETTS
BARNSTABLE, SS.

SUPERIOR COURT
DOCKET NO.

---

STEVEN SURABIAN, and
STEVEN SURABIAN TRUSTEE FOR
THE RICHARD SURABIAN
IRREVOCABLE TRUST,
               Plaintiffs,

vs.

HSBC BANK USA, NA AS TRUSTEE
FOR SEQUOIA MORTGAGE TRUST
2004-6,
               Defendant.

VERIFIED COMPLAINT

UNLAWFUL FORECLOSURE

UNLAWFUL EVICTION

EMOTIONAL DISTRESS

LOSS OF PROPERTY

JURY DEMAND

---

Steven Surabian mailing address is 1230 Rt. 28, South Yarmouth, MA 02664.

Steven Surabian Trustee for the Richard Surabian Irrevocable Trust address is P. O. Box 397, West Hyannisport, MA 02672.

HSBC Bank USA, Na as Trustee for Sequoia Mortgage Trust 2004-6 , refereed now as HSBC Bank address , 2929 Walden Avenue , Depew , NY  14043 , per the Massachusetts Foreclosure Deed By Corporation.

NOW comes the Plaintiffs' Verified Complaint for the unlawful Foreclosure by the

Defendant of The Plaintiffs Property located at 85 Pond Street, South Yarmouth, MA 02664 and

loss of property.

## COUNT 1

1. The plaintiff Steven Surabian along with Stephanie LaFlash-Surabian was the owner of record of the property located at 85 Pond Street, South Yarmouth, MA 02664 County of Barnstable, on April 23, 2004, the same being recorded with the Barnstable County Registry of Deeds at Book 18489, page 331; the said property shall her in after be referred to as "plaintiff's property".

2. On May 19ᵗʰ 2006 Steven Surabian along with his daughter Stephanie LaFlash-Surabian by way of a Quitclaim Deed with Quitclaim Covenants having a property address of 85 Pond Street,

South Yarmouth, Massachusetts granted to Steven Surabian said property. This Quitclaim Deed was not recorded although it was Notarized. See Exhibit "A".

3. On June 28th, 2010, Steven Surabian as the surviving joint tenant granted to Steven Surabian, as Trustee of the Richard Surabian Irrevocable Trust with quitclaim Covenants, the land together with buildings the property at 85 Pond Street, South Yarmouth, MA 02664. See Exhibit "B".

4. HSBC Bank on the 21st day of December, 2009 acquired an Assignment of an alleged Mortgage from Mortgage Electronic Registration Systems, Inc.. See Exhibit "C".

5. On or about December 21, 2009, Defendant, HSBC Bank started to call an harass the Plaintiff and the Plaintiffs tenant, Ruth (Tina) Hunter.

6. Plaintiff repeatedly informed HSBC Bank that there was no Mortgage.

7. On March 25, 2010, after three months of harassment by HSBC Bank, Steven Surabian Filed A Verified Complaint, Jury Demand , against HSBC Bank in Massachusetts Superior Court Docket No.BACV2010-00181. See Exhibit "D with attached Exhibits".

8. April 22, 2010 was a scheduled hearing for a preliminary injunction as appears in the March 25, 2010 Complaint. See Exhibit "E".

9. On April 16, 2010 without answering the Complaint the Defendant moved to Federal Court. See Exhibit "F"

10. The Defendant did not inform the Federal Court of the Scheduled Motion for a Preliminary Injunction. See Exhibit " F      ".

11. The Defendant claim that on April 22, 2010 that they mailed Defendant's Motion To Dismiss or, In The Alternative, Motion For More Defined Statement . See Exhibit "G".

12. No proof was submitted to the Court as to when the Plaintiff received that Motion..

13. On May 7, 2010 Plaintiff mailed to the Defendant and the Court, Plaintiff's answer to Defendant's Motion To Dismiss or Alternative A More Defined Statement. See Exhibit "H".

14. Exhibit "H(A)" dated May 3, 2010, from Harmon Law Offices, P.C. informing Occupant that the property at 85 Pond Street was sold at a foreclosure auction and the new owners was a GMAC Mortgage, LLC of 1100 Virginia Drive P.O. Box 8300, Fort Washington, Pa 19034. This was all while the issue was in Federal Court. This stated the property was foreclosed for $226,420.36 but the true vale of the property which it was listed for sale for was $479,000.00.

15. Exhibit "I" is proof that the Plaintiff Opposition to Defendant's Motion to Dismiss or For A More Definite Statement was received .

16. On May 10, 2010 after the defendant admitted to the unlawful foreclosure the Court Dismissed the Plaintiff's Complaint without prejudice saying the reason that the Motion was Allowed was that the Motion was without opposition. See Exhibit "J".

17. On May 17, 2010 Plaintiff filed Plaintiff's Motion Request Relief From A Judgment or Order. See Exhibit "K".

18. On June 1, 2010 the Court gave the Plaintiff till June 9, 2010 to file Opposition to Defendant's Motion To Dismiss. See Exhibit "L"

19. On June 3, 2010 the Plaintiff mailed to the Court and Defendant the Plaintiff's Opposition. See Exhibit "M".

20. On June 7, 2010 Defendant recorded a Massachusetts Foreclosure Deed By Corporation which was unlawfully prepared on May 7, 2010 while this case opposing the Note and Mortgage which the Defendants claim was the only documents that gave the Defendant rights to foreclose, was still in Court, Federal or otherwise. See Exhibit "N" this is different than what was stated in Exhibit "H(A)".

WHEREFORE, the Plaintiffs prays this Court will void the June 7, 2010 Massachusetts Foreclosure Deed By Corporation and fraudulent Mortgage an Note. ORDER JUDGEMENT for the PLAINTIFF, QUITCLAIM DEED recorded June 29, 2010 by the Plaintiff is the valid DEED with NO Note or Mortgage. Punitive damages three times the value of the property unlawfully foreclosed, $1,437,000.00. JURY DEMAND on all issues.

COUNT 11

NOW come the Plaintiffs Verified Complaint for Unlawful Foreclosure which resulted in

the Plaintiff's tenant to stop paying rent of $1,300.00 per month.

22. Restates # 1 thru # 20 in COUNT 1.

23. Defendant after knowledge of the above continued to harass and threaten the Plaintiffs and their tenants. See Exhibit "O".

24. After the Defendant harassed the Plaintiff's tenant Tina (Ruth) Hunter into not paying rent of $1,300.00 a month due, the Plaintiff was forced to send Tina (Ruth) Hunter, 30 Day No Fault Notice To Quit dated July 16, 2010.See Exhibit "P". "

25. On July 22, 2010 GMAC Mortgage paid the Plaintiffs tenant Tina Hunter $3,000.00 to stop paying rent to the Plaintiffs and to vacate the property. See Exhibit "Q&R".

27. On or about July 22, 2010 the locks were changed and unknown at the time to the Plaintiff that GMAC Mortgage paid Ms. Hunter $3,000.00 to move.

28. On or about July 28, 2010 the Plaintiff noticed that Ms. Hunter had moved and changed the locks and had left the door to the Garage unlocked , a portion of the property never rented to ms. Hunter, see Exhibit "R".

29. Ms. Hunter owed two months rent for a total of $2,600.00.

WHEREFORE, the Plaintiffs pray this Court will order the Defendant to pay the Plaintiffs $2,600.00 plus Punitive Damages of three times . JURY DEMAND on all issues.

## COUNT 111

NOW come the Plaintiffs Verified Complaint for Loss of Property.

30. Restates 1 thru 29.

31. On or about July 28, 2010 the Plaintiff noticed the door to the garage with their property was left unlocked then Plaintiffs noticed over $8,000.00 of their property missing.

32. Defendant admits to their agent secured the property on July 27, 2010 and changed the locks. See Exhibit "S # 8".

WHEREFORE, the Plaintiff prays this Court will Order the Defendant to pay to the Plaintiffs $8,000.00 plus Punitive Damages of three times. JURY DEMAND on all issues.

## COUNT IV

NOW come the Plaintiffs Verified Complaint for Emotional Distress.

33. Plaintiff restates 1 thru 32.

34. On July 28, 2010 the Plaintiff entered a Lease agreement with Arthur Caparelliotis for 85 Pond Street, South Yarmouth, MA 02664.

35. Some time after Mr. Caparelliotis moved into the said property a couple tried to enter the property while Mr. Caparelliotis was home. Mr. Caparelliotis stoped them and sent for Plaintiff, Steven Surabian. The Plaintiff told them they could not enter his property and to leave.

36. In October, 2010 HSBC Bank tried to take Poisson by bringing Tina Hunter to District Court, knowing she would not show up, because of their agreement between those two for $3,000.00.see Exhibit " T ".

37. Arthur Caparelliotis and Steven Surabian as occupants of 85 Pond Street entered the Complaint as Defendants. See Exhibit "T 1".

38. Steven Surabian filed an Answer or Amended Answer to the Original Complaint that did not

list Steven Surabian as an occupant. See Exhibit "U".

39. Steven Surabian Motioned the District Court To Move To Superior Court because the Cross Complaint exhibit "U" was over the limit of District Court. See Exhibit "V".

40. The Motion to Move to Superior Court was DENIED. See Exhibit "W".

41. Mr. Caparelliotis filed a Motion to Compel Discovery because HSBC Bank refused to answer his 1st request. The District Court Denied his Motion because since Steven Surabian no Longer Owned the Property even though the Court Had the Deeds which showed Steven Surabian as Trustee owned the property on June 29, 2010, see Exhibit "B". The Court wrongfully concluded Mr. Caparelliotis had no standing. See Exhibit "X".

42. Mr. Surabian filed a NOTICE OF APPEAL for Denying his Motion to Move To Superior Court. See Exhibit "Y".

43. Plaintiffs, Steven Surabian Opposition as Defendant to Defendant, as Plaintiff Exhibit "S" Motion for judgment without a trial. See exhibit "Z" with attachments.

44. At the December 9, 2010 hearing for Motion for Judgment the District Court did not Allow the Opposition to be entered into the record or to be heard.

WHEREFORE, the Plaintiff prays this court ORDER the Defendant to pay Emotional Distress in the amount of $5,000,000.00 Five Million Dollars or any amount over the Court decides. JURY DEMAND ON ALL ISSUES

Steven Surabian Pro se
P. O. Box 397
W. Hyannisport, MA 02672
508-688-4613

Steven Surabian Trustee Pro se
1230 Rt. 28
So. Yarmouth, MA 02664
508-688-4613

DATE; December 10, 2010

eSO Shipment – Label

URGENT

From:   Origin ID: FIOA   (212) 515-5251
NAYADES LUCIANO
WELLS FARGO-CORP TRUST
45 BROADWAY
N2866-120 FL 12
NEW YORK, NY 10006

Ship Date: 03JAN11
ActWgt: 1.0 LB
CAD: 101722...

**FedEx** Express

E

SHIP TO:   (212) 515-5251        BILL SENDER
LITIGATION INTAKE
GMAC
1 MERIDIAN XING STE 100

MINNEAPOLIS, MN 55423



RFC
GMAC
8400 NORMANDALE LAKE BLVD
STE 350
BLOOMINGTON, MN 55437

**FedEx**
TRK#
0201  7942 8014 3994

78 FBLA



TUE - 04 JAN  A1

TUE - 04 JAN A1
PRIORITY OVERNIGHT

55437
MN-US
MSP

Exp# 16981 04JAN11 808A  59AC1/DE77/103F

# EXHIBIT B



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

---

**HSBC BANK USA, NATIONAL ASSOCIATION Summary Screen**

Help with this form

[ Request a Certificate ]

The exact name of the Foreign Corporation: HSBC BANK USA, NATIONAL ASSOCIATION

Entity Type: Foreign Corporation

Identification Number: 000872229

Old Federal Employer Identification Number (Old FEIN):

Date of Registration in Massachusetts: 07/14/2004

The is organized under the laws of: State: DE    Country: USA    on: Mar 31 2004

Current Fiscal Month / Day: 12 / 31

The location of its principal office:
No. and Street: 1105 NORTH MARKET STREET, SUITE ONE
City or Town: WILMINGTON    State: DE    Zip: 19801    Country: USA

The location of its Massachusetts office, if any:
No. and Street:
City or Town:    State:    Zip:    Country:

Name and address of the Registered Agent:
Name: C T CORPORATION SYSTEM
No. and Street: 155 FEDERAL STREET
STE 700
City or Town: BOSTON    State: MA    Zip: 02110    Country: USA

The officers and all of the directors of the corporation:

| Title | Individual Name First, Middle, Last, Suffix | Address (no PO Box) Address, City or Town, State, Zip Code |
|---|---|---|
| secretary | JANET L. BURAK | 452 FIFTH AVENUE NEW YORK, NY 10018 USA |
| DIRECTORS | FOR ADDITIONAL DIRECTORS | PLEASE SEE ANNUAL REPORTS, NY 10018 USA |
| CFO | JOHN J. MCKENNA | ONE HSBC CENTER BUFFALO, NY 14203 USA |
| PRESIDENT, CEO, DIRECTOR | MARTIN J.G. GLYNN | 452 FIFTH AVENUE NEW YORK, NY 10018 USA |

business entity stock is publicly traded: __

The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:

| Class of Stock | Par Value Per Share Enter 0 if no Par | Total Authorized by Articles of Organization or Amendments | | Total Issued and Outstanding Num of Shares |
|---|---|---|---|---|
| | | Num of Shares | Total Par Value | |
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | | |

___ Consent          ___ Manufacturer          ___ Confidential Data          ___ Does Not Require Annual Report

___ Partnership      ___ Resident Agent        ___ For Profit                ___ Merger Allowed

Select a type of filing from below to view this business entity filings:

ALL FILINGS
Amended Foreign Corporations Certificate
Annual Report
Annual Report - Professional
Application for Reinstatement

[ View Filings ]          [ New Search ]

| Comments |
|---|

© 2001 - 2011 Commonwealth of Massachusetts
All Rights Reserved

Help

COMMONWEALTH OF
MASSACHUSETTS
BARNSTABLE, SS.

SUPERIOR COURT
DOCKET NO.
BACV 2010-00742

SUPERIOR COURT
BARNSTABLE, SS

Filed        JAN 11 2011

_Scott W. Nickerson_  Clerk

---

STEVEN SURABIAN, AND
STEVEN SURABIAN TRUSTEE FOR
THE RICHARD SURABIAN
IRREVOCABLE TRUST,
           Plaintiffs,

vs.

HSBC BANK USA, NA AS TRUSTEE
FOR SEQUOIA MORTGAGE TRUST
2004-6,

---

REQUEST DEFAULT

### Rule 55 A Default

Defendant received Complaint on December 13, 2010. As of January 11th, 2011 Plaintiff's have not received an answer, well past the 20 day deadline.

    I, Steven Surabian, hereby depose and say under the penalties of perjury that the facts set forth above are true to the best of my knowledge and hereby verify the facts and statements set forth in the Request Default.

    Signed under the penalties of perjury this 11th day of January, 2011.

Steven Surabian Pro se
P. O. Box 397
W. Hyannisport, MA 02672
508-688-4613

Steven Surabian Trustee Pro se
1230 Rt. 28
So. Yarmouth, MA 02664
508-688-4613

### CERTIFICATE OF SERVICE

    I, the undersigned, hereby certify that on January 11th 2011 I served a copy of REQUEST DEFAULT on HSBC Bank USA Na as Trustee for Sequoia Mortgage Trust 2004-6, 2929 Walden Ave., Depew, NY 14043 Postage prepaid.

    Signed under the penalties of perjury this 11th day of January, 2011.

Steven Surabian

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:   CONTRACT   TORT
MOTOR VEHICLE TORT        EQUITABLE RELIEF        OTHER)

# Commonwealth of Massachusetts

BARNSTABLE, ss.

SUPERIOR COURT
No. *10 - 742*

*STEVEN SARABIAN AND
STEVEN SARABIAN TRUSTEE
FOR THE RICHARD SARABIAN
IRREVOCABLE TRUST*

SUPERIOR COURT
BARNSTABLE SS.
FILED   DEC 15 2010
*Scott W. Nickerson* Clerk

VS.

*HSBC BANK USA, NA AS TRUSTEE
FOR SEQUOIA MORTGAGE
TRUST 2004-6*

## SUMMONS

To the above-named defendant  :

You are hereby summoned and required to serve upon *Steven Sarabian and Steven Sarabian Trustee For* plaintiff's attorney, whose address is *P.O. Box 397 W. Hyannisport Ma 02672*, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Barnstable either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

BARBARA J. ROUSE

Witness,                    Esquire, at Barnstable, the *10th*

day of *December*, in the year of our Lord two thousand and *Ten*

*Scott W. Nickerson* Clerk

NOTE: When more than one defendant is involved, the names of all defendants shall appear in the caption. If a separate summons is issued for each defendant, each should be addressed to the particular defendant.

## NOTICE TO DEFENDANT

You need not appear personally in court to answer the complaint but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's office.

## AFFIDAVIT OF SERVICE

I, Steven Surabian, do depose and state under oath that on December 10, 2010 I mailed

certified a copy of the Complaint with attached Exhibits and the original SUMMONS for

Superior Court No. 10-742 to HSBC BANK USA, AS TRUSTEE FOR SEQUOIA

MORTGAGE TRUST 2004-6, 2929 Walden Ave., Depew, NY 14043. On December 13, 2010

Article Number 7010 0780 0001 1059 3145 was signed for, original return receipt attached.

Signed under the pain and penalties of perjury.

Steven Surabian

---

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X William Man  ☐ Agent ☐ Addressee <br> B. Received by (Printed Name)    C. Date of Delivery |
| 1. Article Addressed to: HSBC Bank USA <br> NA as Trustee for <br> Sequoia Mortgage <br> Trust 2004-6 <br> 2929 Walden Ave <br> Depew NY-14043 | D. Is delivery address different from item 1?  ☐ Yes <br> If YES, enter delivery address below:  ☐ No <br> DEC 13 2010 |
| | 3. Service Type <br> ☐ Certified Mail  ☐ Express Mail <br> ☐ Registered  ☐ Return Receipt for Merchandise <br> ☐ Insured Mail  ☐ C.O.D. <br> 4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number <br> (Transfer from service label) | 7010 0780 0001 1059 3145 |
| PS Form 3811, February 2004 | Domestic Return Receipt    102595-02-M-1540 |

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT COUNTY: __BARNSTABLE__ | DOCKET NO. 10-792 |
|---|---|---|

PLAINTIFF(S) *STEVEN SURABIAN and STEVEN SURABIAN Trustee For The Richard Surabian Irrevocable Trust*

DEFENDANT(S) *HSBC Bank USA, NA as Trustee For Sequoia Mortgage Trust 2004-6*

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE

ATTORNEY (IF KNOWN)

BBO#

SUPERIOR COURT
BARNSTABLE SS

FILED DEC 10 2010

Scott W. Nickerson Clerk

### Origin code and track designation

Place an x in one box only:
[✓] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. C.231,s.104
    (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript; relief from judgment/
    Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| C99 | Unlawful Foreclosure | | Yes/No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A.  Documented medical expenses to date:
     1.  Total hospital expenses                                            $_____
     2.  Total Doctor expenses                                             $_____
     3.  Total chiropractic expenses                                       $_____
     4.  Total physical therapy expenses                                   $_____
     5.  Total other expenses (describe)                                   $_____
                                                        Subtotal           $_____
B.  Documented lost wages and compensation to date                        $_____
C.  Documented property damages to date                                   $_____
D.  Reasonably anticipated future medical and hospital expenses            $_____
E.  Reasonably anticipated lost wages                                     $_____
F.  Other documented items of damages (describe)
                                                                           $_____

G.  Brief description of plaintiff's injury, including nature and extent of injury (describe)

Total $

### CONTRACT CLAIMS
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):

                                                           TOTAL     $..............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record *Steven Surabian Pro Se*     Date: *Dec. 10, 2010*

3-2007

COMMONWEALTH OF
MASSACHUSETTS
BARNSTABLE, SS.

SUPERIOR COURT

DOCKET NO. SUPERIOR COURT
BARNSTABLE SS
10 – 742

FILED DEC 10 2010

_Scott W. Nickerson_ Clerk

VERIFIED COMPLAINT

STEVEN SURABIAN, and
STEVEN SURABIAN TRUSTEE FOR
THE RICHARD SURABIAN
IRREVOCABLE TRUST,
                    Plaintiffs,

vs.

HSBC BANK USA, NA AS TRUSTEE
FOR SEQUOIA MORTGAGE TRUST
2004-6,
                    Defendant.

UNLAWFUL FORECLOSURE

UNLAWFUL EVICTION

EMOTIONAL DISTRESS

LOSS OF PROPERTY

JURY DEMAND

```
3182E000012/10/10CIVIL ENTR   240.00
3182E000012/10/10SECC          20.00
3182E000012/10/10SURCHARGE     15.00
3182E000012/10/10SUMMONS        5.00
```

Steven Surabian mailing address is 1230 Rt. 28, South Yarmouth, MA 02664

Steven Surabian Trustee for the Richard Surabian Irrevocable Trust address is P. O. Box 397,
West Hyannisport, MA 02672.

HSBC Bank USA, Na as Trustee for Sequoia Mortgage Trust 2004-6 , refereed now as HSBC
Bank address , 2929 Walden Avenue, Depew , NY  14043 , per the Massachusetts Foreclosure
Deed By Corporation.

        NOW comes the Plaintiffs' Verified Complaint for the unlawful Foreclosure by the

Defendant of The Plaintiffs Property located at 85 Pond Street, South Yarmouth, MA 02664 and

loss of property.

### COUNT 1

1.  The plaintiff Steven Surabian along with Stephanie LaFlash-Surabian was the owner of
record of the property located at 85 Pond Street, South Yarmouth, MA 02664 County of
Barnstable, on April 23, 2004, the same being recorded with the Barnstable County Registry of
Deeds at Book 18489, page 331; the said property shall her in after be referred to as "plaintiff's
property".

2.  On May 19th 2006 Steven Surabian along with his daughter Stephanie LaFlash-Surabian by
way of a Quitclaim Deed with Quitclaim Covenants having a property address of 85 Pond Street,

South Yarmouth, Massachusetts granted to Steven Surabian said property. This Quitclaim Deed was not recorded although it was Notarized. See Exhibit "A".

3. On June 28th, 2010, Steven Surabian as the surviving joint tenant granted to Steven Surabian, as Trustee of the Richard Surabian Irrevocable Trust with quitclaim Covenants, the land together with buildings the property at 85 Pond Street, South Yarmouth, MA 02664. See Exhibit "B".

4. HSBC Bank on the 21st day of December, 2009 acquired an Assignment of an alleged Mortgage from Mortgage Electronic Registration Systems, Inc.. See Exhibit "C".

5. On or about December 21, 2009, Defendant, HSBC Bank started to call an harass the Plaintiff and the Plaintiffs tenant, Ruth (Tina) Hunter.

6. Plaintiff repeatedly informed HSBC Bank that there was no Mortgage.

7. On March 25, 2010, after three months of harassment by HSBC Bank, Steven Surabian Filed A Verified Complaint, Jury Demand , against HSBC Bank in Massachusetts Superior Court Docket No.BACV2010-00181. See Exhibit "D with attached Exhibits".

8. April 22, 2010 was a scheduled hearing for a preliminary injunction as appears in the March 25, 2010 Complaint. See Exhibit "E".

9. On April 16, 2010 without answering the Complaint the Defendant moved to Federal Court. See Exhibit "F"

10. The Defendant did not inform the Federal Court of the Scheduled Motion for a Preliminary Injunction. See Exhibit " F    ".

11. The Defendant claim that on April 22, 2010 that they mailed Defendant's Motion To Dismiss or, In The Alternative, Motion For More Defined Statement . See Exhibit "G".

12. No proof was submitted to the Court as to when the Plaintiff received that Motion..

13. On May 7, 2010 Plaintiff mailed to the Defendant and the Court, Plaintiff's answer to Defendant's Motion To Dismiss or Alternative A More Defined Statement. See Exhibit "H".

14. Exhibit "H(A)" dated May 3, 2010, from Harmon Law Offices, P.C. informing Occupant that the property at 85 Pond Street was sold at a foreclosure auction and the new owners was a GMAC Mortgage, LLC of 1100 Virginia Drive P.O. Box 8300, Fort Washington, Pa 19034. This was all while the issue was in Federal Court. This stated the property was foreclosed for $226,420.36 but the true vale of the property which it was listed for sale for was $479,000.00.

15. Exhibit "I" is proof that the Plaintiff Opposition to Defendant's Motion to Dismiss or For A More Definite Statement was received .

16. On May 10, 2010 after the defendant admitted to the unlawful foreclosure the Court Dismissed the Plaintiff's Complaint without prejudice saying the reason that the Motion was Allowed was that the Motion was without opposition. See Exhibit "J".

17. On May 17, 2010 Plaintiff filed Plaintiff's Motion Request Relief From A Judgment or Order. See Exhibit "K".

18. On June 1, 2010 the Court gave the Plaintiff till June 9, 2010 to file Opposition to Defendant's Motion To Dismiss. See Exhibit "L"

19. On June 3, 2010 the Plaintiff mailed to the Court and Defendant the Plaintiff's Opposition. See Exhibit "M".

20. On June 7, 2010 Defendant recorded a Massachusetts Foreclosure Deed By Corporation which was unlawfully prepared on May 7, 2010 while this case opposing the Note and Mortgage which the Defendants claim was the only documents that gave the Defendant rights to foreclose, was still in Court, Federal or otherwise. See Exhibit "N" this is different than what was stated in Exhibit "H(A)".

WHEREFORE, the Plaintiffs prays this Court will void the June 7, 2010 Massachusetts Foreclosure Deed By Corporation and fraudulent Mortgage an Note. ORDER JUDGEMENT for the PLAINTIFF, QUITCLAIM DEED recorded June 29, 2010 by the Plaintiff is the valid DEED with NO Note or Mortgage. Punitive damages three times the value of the property unlawfully foreclosed, $1,437,000.00. JURY DEMAND on all issues.

COUNT 11

NOW come the Plaintiffs Verified Complaint for Unlawful Foreclosure which resulted in

the Plaintiff's tenant to stop paying rent of $1,300.00 per month.

22. Restates # 1 thru # 20 in COUNT 1.

23. Defendant after knowledge of the above continued to harass and threaten the Plaintiffs and their tenants. See Exhibit "O".

24. After the Defendant harassed the Plaintiff's tenant Tina (Ruth) Hunter into not paying rent of $1,300.00 a month due, the Plaintiff was forced to send Tina (Ruth) Hunter, 30 Day No Fault Notice To Quit dated July 16, 2010.See Exhibit "P".

25. On July 22, 2010 GMAC Mortgage paid the Plaintiffs tenant Tina Hunter $3,000.00 to stop paying rent to the Plaintiffs and to vacate the property. See Exhibit "Q&R".

27. On or about July 22, 2010 the locks were changed and unknown at the time to the Plaintiff that GMAC Mortgage paid Ms. Hunter $3,000.00 to move.

28. On or about July 28, 2010 the Plaintiff noticed that Ms. Hunter had moved and changed the locks and had left the door to the Garage unlocked , a portion of the property never rented to ms. Hunter, see Exhibit "R".

29. Ms. Hunter owed two months rent for a total of $2,600.00.

WHEREFORE, the Plaintiffs pray this Court will order the Defendant to pay the Plaintiffs $2,600.00 plus Punitive Damages of three times . JURY DEMAND on all issues.

### COUNT 111

NOW come the Plaintiffs Verified Complaint for Loss of Property.

30. Restates 1 thru 29.

31. On or about July 28, 2010 the Plaintiff noticed the door to the garage with their property was left unlocked then Plaintiffs noticed over $8,000.00 of their property missing.

32. Defendant admits to their agent secured the property on July 27, 2010 and changed the locks. See Exhibit "S # 8".

WHEREFORE, the Plaintiff prays this Court will Order the Defendant to pay to the Plaintiffs $8,000.00 plus Punitive Damages of three times. JURY DEMAND on all issues.

### COUNT IV

NOW come the Plaintiffs Verified Complaint for Emotional Distress.

33. Plaintiff restates 1 thru 32.

34. On July 28, 2010 the Plaintiff entered a Lease agreement with Arthur Caparelliotis for 85 Pond Street, South Yarmouth, MA 02664.

35. Some time after Mr. Caparelliotis moved into the said property a couple tried to enter the property while Mr. Caparelliotis was home. Mr. Caparelliotis stoped them and sent for Plaintiff, Steven Surabian. The Plaintiff told them they could not enter his property and to leave.

36. In October, 2010 HSBC Bank tried to take Poisson by bringing Tina Hunter to District Court, knowing she would not show up, because of their agreement between those two for $3,000.00.see Exhibit " T ".

37. Arthur Caparelliotis and Steven Surabian as occupants of 85 Pond Street entered the Complaint as Defendants. See Exhibit "T 1".

38. Steven Surabian filed an Answer or Amended Answer to the Original Complaint that did not

list Steven Surabian as an occupant. See Exhibit "U".

39. Steven Surabian Motioned the District Court To Move To Superior Court because the Cross Complaint exhibit "U" was over the limit of District Court. See Exhibit "V".

40. The Motion to Move to Superior Court was DENIED. See Exhibit "W".

41. Mr. Caparelliotis filed a Motion to Compel Discovery because HSBC Bank refused to answer his 1st request. The District Court Denied his Motion because since Steven Surabian no Longer Owned the Property even though the Court Had the Deeds which showed Steven Surabian as Trustee owned the property on June 29, 2010, see Exhibit "B". The Court wrongfully concluded Mr. Caparelliotis had no standing. See Exhibit "X".

42. Mr. Surabian filed a NOTICE OF APPEAL for Denying his Motion to Move To Superior Court. See Exhibit "Y".

43. Plaintiffs, Steven Surabian Opposition as Defendant to Defendant, as Plaintiff Exhibit "S". Motion for judgment without a trial. See exhibit "Z" with attachments.

44. At the December 9, 2010 hearing for Motion for Judgment the District Court did not Allow the Opposition to be entered into the record or to be heard.

WHEREFORE, the Plaintiff prays this court ORDER the Defendant to pay Emotional Distress in the amount of $5,000.000.00 Five Million Dollars or any amount over the Court decides. JURY DEMAND ON ALL ISSUES

_____          _____
Steven Surabian Pro se                    Steven Surabian Trustee Pro se
P. O. Box 397                             1230 Rt. 28
W. Hyannisport, MA 02672                  So. Yarmouth, MA 02664
508-688-4613                              508-688-4613


DATE: December 10, 2010

RETURN TO:

Steven Surabian

85 Pond Street

# South Yarmouth, MA 02664

85 Pond Street, South Yarmouth, MA 02664

### QUITCLAIM DEED

We, STEVEN SURABIAN and STEPHANIE LAFLASH SURABIAN, of South Yarmouth, Barnstable County, Massachusetts, in consideration of One Dollar and Zero Cents ($1.00) paid, paid, grant to STEVEN SURABIAN, an unmarried man, with an address of 85 Pond Street, South Yarmouth, Massachusetts, with QUITCLAIM COVENANTS, the following land with the buildings thereon located in Yarmouth (South), Barnstable County, Massachusetts, having a property address of 85 Pond Street, South Yarmouth, Massachusetts, more particularly bounded and described as follows:

BEGINNING at the southeast corner of the granted premises at the northeast corner of Lot 20, as shown on a plan hereinafter mentioned and Pond Street;

RUNNING THENCE South 59° 03' West, one hundred nine and 31/100 (109.31) feet;

THENCE North 31° 44' West by Matthews' land, eighty and 01/100 (80.01) feet to land of Preston Duff, et ux;

THENCE North 59° 03' East by said Duff land, one hundred ten and 40/100 (110.40) feet to Pond Street; and

THENCE South 30° 57' 00" East by Pond Street, eighty and 00/100 (80.00) feet to the northeast corner of Lot 20 as shown on said plan, it being the point of BEGINNING.

Being Lot 19 as shown on a plan of land entitled, "Pawkannawkut Village" duly filed in the Barnstable Registry of Deeds in Plan Book 80, Page 21.

Subject to and together with the benefit of all easements, rights, restrictions and agreements of record, appertaining thereto and to the extent now in force and applicable.

Meaning and hereby intending to convey the same premises conveyed to the Grantors by deed from John J. Butler and Carolyn F. Butler dated April 23, 2004 and recorded on April 23, 2004 with the Barnstable District Registry of Deeds, Book 18489, Page 331.

PROPERTY ADDRESS: 85 Pond Street, South Yarmouth, Massachusetts 02664

All rights of homestead and other interests are also released.

Executed under seal this _19th_ day of ___Nail___, 2006.

_Steven Surabian_

STEVEN SURABIAN

# STEPHANIE LAFLASH SURABIAN

STATE OF _Massachusetts_ )

)

COUNTY OF _Worcester_ )

On this _19th_ day of _March_ _____, 2006, before me, the undersigned notary public, personally appeared STEVEN SURABIAN, proved to me through satisfactory evidence of identification which was _Nithelaod_ _____ to be the person whose name is signed on the preceding or attached document and acknowledged to me that he signed it voluntarily for its stated purpose.

_Tabatha Magnusson_ (official signature and seal of notary)

My commission expires: _12/8/2011_

STATE OF _Massachusetts_ )

)

COUNTY OF _Worcester_ )



**TABATHA R. MAGNUSSON**
NOTARY PUBLIC
COMMONWEALTH of MASSACHUSETTS
MY COMMISSION EXPIRES
December 08, 2011

On this _19th_ day of _March_ _____, 2006, before me, the undersigned notary public, personally appeared STEPHANIE LAFLASH SURABIAN, proved to me through satisfactory evidence of identification which was _Nithelaod_ _____ to be the person whose name is signed on the preceding or attached document and acknowledged to me that she signed it voluntarily for its stated purpose.

_Tabatha Magnusson_ (official signature and seal of notary)

My commission expires: _12/8/2011_

**TABATHA R. MAGNUSSON**
NOTARY PUBLIC
COMMONWEALTH of MASSACHUSETTS
MY COMMISSION EXPIRES
December 08, 2011

## QUITCLAIM DEED

I, STEVEN SURABIAN, surviving joint tenant, of 1230 Route 28, South Yarmouth, MA 02664, in consideration of ONE and 00/100 ($1.00) DOLLAR, paid, grant to STEVEN SURABIAN, as TRUSTEE of the RICHARD SURABIAN IRREVOCABLE TRUST, under a Declaration of Trust dated October 9, 2008, an abstract of which is recorded in Book 24561 Page 16, of 1230 Route 28, South Yarmouth, MA 02664 with QUITCLAIM COVENANTS, the land together with the buildings thereon, situated in Yarmouth (South), Barnstable County, Massachusetts, with a property address of 85 Pond Street, South Yarmouth, Massachusetts, more particularly bounded and described as follows:

Beginning at the Southeast corner of the granted premises at the northeast corner of Lot 20, as shown on a plan hereinafter mentioned and Pond Street;

Thence S. 59 degrees 03' W. one hundred nine and 31/100 (109.31) feet;

Thence running N. 31 degrees 44' W. by Matthews' land, eighty and 01/100 (80.01) feet to land of Preston Duff, et ux;

Thence N. 59 degrees 03' E. by said Duff land, one hundred ten and 40/100 (110.40) feet to Pond Street;

Thence running S. 30 degrees 57' 00" E. by Pond Street, eighty and 00/100 (80.00) feet to the Northeast corner of Lot 20 as shown on said plan, it being the point of beginning.

Being Lot 19 as shown on a plan of land entitled "Pawkannawkut Village" duly filed in Barnstable County Registry of Deeds in Plan Book 80 Page 21.

Subject to and with the benefit of all rights, rights of way, easements, restrictions and reservations of record insofar as the same are in force and applicable.

EXhIBIT "B" Pg 1 oP 2

Sandra L. Armstrong
Notary Public
My Commission Expires December 16, 2016
Commonwealth of Massachusetts

For title see deed from John J. Butler and Carolyn F. Butler dated April 23, 2004 recorded in Book 18489 Page 331 with the Barnstable County Registry of Deeds.

PROPERTY ADDRESS: 85 Pond Street, South Yarmouth, MA 02664.

WITNESS our hands and seals this 28 day of June , 2010.

_Steven Surabian_
Steven Surabian

### COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss.                                                                     June 28 , 2010

        Then personally appeared the above named Steven Surabian, proved to me through satisfactory evidence of identification, which was M A D L to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

My Commission Expires:                      _Notary Public_
                                            Notary Public

Sandra L. Armstrong
Notary Public
My Commission Expires December 16, 2016
Commonwealth of Massachusetts

EXhibiT "B" pg 2 of 2

BARNSTABLE REGISTRY OF DEEDS

## ASSIGNMENT OF MORTGAGE

Mortgage Electronic Registration Systems, Inc., P.O. Box 2026, Flint, MI 48501, holder of a mortgage from Steven Surabian and Stephanie LaFlash Surabian to Mortgage Electronic Registration Systems, Inc. dated April 23, 2004, recorded with the Barnstable County Registry of Deeds at Book 18489, Page 333 assigns said mortgage to HSBC Bank USA, NA as Trustee for Sequoia Mortgage Trust 2004-6, 10 East 40th Street, 14th Floor, New York, NY 10016 , without recourse.

IN WITNESS WHEREOF, the said Mortgage Electronic Registration Systems, Inc. has caused its corporate seal to be hereto affixed and these presents to be signed, in its name and behalf by Francis J. Nolan, Assistant Secretary and Vice President*

this 21st day of December, 2009

<div style="margin-left:auto;">

Mortgage Electronic Registration Systems, Inc.

By: _____

Francis J. Nolan, Assistant Secretary and Vice President*

</div>

*For signatory authority please see Corporate Resolution recorded with the Barnstable County Registry of Deeds at Book 17220, Page 89.

The Commonwealth of Massachusetts

Middlesex, ss

December 21 , 2009

On this 21st day of December 2009, before me, the undersigned notary public, personally appeared Francis J. Nolan, proved to me through satisfactory evidence of identification, which were personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Capacity: (as Assistant Secretary and Vice President*

for Mortgage Electronic Registration Systems, Inc. )

_____ (Affix Seal)
Notary Signature

My commission expires: 3/5/2015

200901-2726

Property Address: 85 Pond Street, Yarmouth, MA 02664

EXHIBIT C

COMMONWEALTH OF
MASSACHUSETTS
BARNSTABLE, SS.

SUPERIOR COURT
DOCKET NO.
*BACV2010-00181*

STEVEN SURABIAN )
              PLAINTIFF )
      V. )

HSBC BANK USA, NA AS TRUSTEE )
SEQUOIA MORTGAGE TRUST )
2004-6, )
         DEFENDANT )

VERIFIED
COMPLAINT

JURY DEMAND

DEFENDANTS  PRELIMINARY
INJUNCTION

### COUNT 1

1.   The plaintiffs Steven Surabian is the owner of record of property located at 85 Pond Street, in South Yarmouth, Massachusetts, County of Barnstable, the same being recorded with the Barnstable County Registry of Deeds at Book 18489, Page 333; the said property shall her in after be referred to as "plaintiff's property." ( See attached copy Exhibit "H")

2.   Defendant is doing business at 10 East 40th Street, 14th Floor, New York, NY 10016 .

3.   ASSIGNMENT OF MORTGAGE assigned to Defendant 21st day of December, 2009. (See attached copy Exhibit "A" )

4.   December 9th, 2009 Defendants informed the Plaintiffs of there intent to foreclose. ( See attached copy Exhibit "B")

5.   December 30th, 2009 the Plaintiffs disputed the validity of this debit. ( See attached copy Exhibit "C" )

6.   Four page ADJUSTABLE RATE NOTE supplied by the Defendant, does note have a NOTARY SEAL on any page and only Steven Surabians name no Stephanie LaFlash-Surabian. These can not be anything Steven Surabian  signed. ( See attached copy Exhibit "D" )

7.   Fifteen page MORTGAGE supplied by the Defendant is only has the Notary seal on page fourteen. There is not a NOTARY seal attached to the previous thirteen pages, these pages were replaced after signing and before recording. Also there is no page fifteen. ( See attached copy Exhibit "E" )

3/25/10

ELISABETH ROSE ERICKSON
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES 05/09/2014

8.   Three page ADJUSTABLE RATE RIDER supplied by the Defendant does not have a NOTARY seal on any page. ( See attached copy Exhibit "F" )

9.   Defendant iscontinuing FORECLOSING on the disputed Mortgage. (See attached Exhibit "G")

WHEREFORE, Plaintiffs prays that this Court will order the Defendant to cease and desist from continuing Foreclosure till the disputed Mortgage and Note are resolved. Plaintiffs make a DEMAND for a jury on the above-described dispute.

## COUNT 11

10.   The plaintiffs reavers the allegations of paragraph 1 thru 9 in this complaint.

11.   As a results of this FORECLOSURE by the defendants of the plaintiffs property the plaintiff has suffered injury in the loss of there property, the loss of rent and the loss of there good name and the loss of the sale of said property.

WHEREFORE, plaintiffs prays that they be awarded damages by this Court for the value of said plaintiffs property in the amount of Four Hundred Seventy-five Thousand Dollars ( $475,000.00 )

Plaintiffs make a demand for a jury on the money damages above-described.

## COUNT 111

12.   The plaintiffs reavers the allegations of paragraph 1 thru 11 in this complaint.

13.   The plaintiffs claim the defendants have failed to follow the necessary requirements for foreclosure exactly

WHEREFORE, plaintiffs pray the Court award the plaintiffs a clear title and the defendants are to give a discharge of the disputed Mortgage and Note or such other relief as may be appropriate.

I Steven Surabian, hereby depose and say under the penalties of perjury that the facts set forth above are true to the best of our knowledge and hereby verify the facts and statements set forth in the above complaint.

Signed under the penalties of perjury this 25 day of March, 2010.

Steven Surabian Pro Se
1230 Rt. 28, So. Yarmouth, Ma 02664
508-688-4613

ELISABETH ROSE ERICKSON
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES 05/09/2014

3/25/10

COMMONWEALTH OF
MASSACHUSETTS
BARNSTABLE, SS.

SUPERIOR COURT
DOCKET NO.

STEVEN SURABIAN )
                    PLAINTIFF )

                 V. )

HSBC BANK USA, NA AS TRUSTEE )
SEQUOIA MORTGAGE TRUST )
2004-6, )
                    DEFENDANT )

MOTION
PRELIMINARY INJUNCTION

## MOTION PRELIMINARY INJUNCTION

PLAINTIFF, requests a preliminary injunction from the defendants continuing to FORECLOSE on Plaintiffs property till the disputed Note and Mortgage are resolved by this Court.

I Steven Surabian, hereby depose and say under the penalties of perjury that the facts set forth above are true to the best of our knowledge and hereby verify the facts and statements set forth in the above complaint.

Signed under the penalties of perjury this 25 day of March, 2010.

Steven Surabian Pro Se
1230 Rt. 28, So. Yarmouth, Ma 02664
508-688-4613

## ASSIGNMENT OF MORTGAGE

Mortgage Electronic Registration Systems, Inc., P.O. Box 2026, Flint, MI 48501, holder of a mortgage from Steven Surabian and Stephanie LaFlash Surabian to Mortgage Electronic Registration Systems, Inc. dated April 23, 2004, recorded with the Barnstable County Registry of Deeds at Book 18489, Page 333 assigns said mortgage to HSBC Bank USA, NA as Trustee for Sequoia Mortgage Trust 2004-6, 10 East 40th Street, 14th Floor, New York, NY 10016, without recourse.

IN WITNESS WHEREOF, the said Mortgage Electronic Registration Systems, Inc. has caused its corporate seal to be hereto affixed and these presents to be signed, in its name and behalf by Francis J. Nolan, Assistant Secretary and Vice President*

this 21st day of December, 2009

Mortgage Electronic Registration Systems, Inc.

By: _____

Francis J. Nolan, Assistant Secretary and Vice President*

*For signatory authority please see Corporate Resolution recorded with the Barnstable County Registry of Deeds at Book 17220, Page 89.

The Commonwealth of Massachusetts

Middlesex, ss

December 21, 2009

On this 21st day of December 2009, before me, the undersigned notary public, personally appeared Francis J. Nolan, proved to me through satisfactory evidence of identification, which were personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Capacity: (as Assistant Secretary and Vice President*

for Mortgage Electronic Registration Systems, Inc. )

_____ (Affix Seal)
Notary Signature

My commission expires: 3/5/2015

200901-2726

EXHIBIT "A"

Property Address: 85 Pond Street, Yarm..., MA 02664

# HARMON LAW OFFICES, P.C.

150 CALIFORNIA STREET
NEWTON, MASSACHUSETTS 02458
TEL (617) 558-0500
FAX (617) 244-7304

*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*

December 9, 2009

Mr. Steven Surabian
1230 Route 28
South Yarmouth, MA 02664

RE:     Mortgage on 85 Pond Street, Yarmouth, Massachusetts

Dear Mr. Surabian:

This office has been retained by GMAC Mortgage, LLC to foreclose on a mortgage from Steven Surabian and Stephanie LaFlash Surabian, in the original principal amount of $201,750.00 dated April 23, 2004, which mortgage is currently held by HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6, under Power of Sale and by entry for breach of the conditions of the loan documents. You are further notified that the note is hereby accelerated, and the entire balance is due and payable forthwith and without further notice. Even though the note has been accelerated, you may still have the right to reinstate the loan. If so, and if you desire to reinstate the loan, you will need to pay an amount of money sufficient to bring the loan fully current.

Under the terms of the note and mortgage, there is outstanding through the date of this letter $201,749.99 in principal and $19,175.07 in interest and other charges for a total of **$220,925.06.** Furthermore, attorney's fees and costs and other charges will continue to accrue pursuant to the terms of the loan documents.

The amount necessary to reinstate or pay off the loan changes daily. You may order a reinstatement or payoff 24 hours a day on-line by going to www.hloreinstatement.com or to www.hlopayoff.com. Please follow the instructions contained on the web page. Please note that only requests made by owners, borrowers, mortgagors and authorized parties will be processed. You may also contact us during business hours to request a reinstatement or payoff by calling (617) 558-0598. When completing the on-line form or when calling our office, please reference your Case Number 200901-2726 so that we may process your request more quickly.

Exhibit "B" Pg 1 of 2

FCL

/Acceleration Letter - Mortgagor/Surabian, Steven/Surabian, Stephanie

Unless you, within thirty days after receipt of this notice, dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by this office. If you notify this office in writing within the thirty-day period that the debt, or any portion thereof, is disputed, this office will obtain verification of the debt or a copy of the judgment against you, if any, and a copy of such verification or judgment will be mailed to you by this office. Upon your written request within the thirty-day period, this office will provide you with the name and address of the original creditor, if different from the current creditor.

The law does not require this office to wait until the end of the thirty-day period before proceeding with legal action to collect the debt. If, however, you request in writing verification of the debt, or any portion thereof, or the name and address of the original creditor within the thirty-day period which begins with your receipt of this notice, the law requires this office to suspend its efforts (through litigation or otherwise) to collect the debt until it mails the required information to you.

Your failure to dispute the validity of the debt may not be construed by any courts as admission of liability by you.

Very truly yours,

Shana Krasnow, Esquire

SZK/EDB/200901-2726

CERTIFIED MAIL NO.
RETURN RECEIPT REQUESTED

PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Exhibit "B" Pg 2 of 2

Steven Surabian
1230 Route 28
South Yarmouth, Ma 02664

Shana Krasnow, Esquire
Harmon Law Offices, P.C.
150 California Street
Newton, Ma 02458

Case Number 200901-2726

December 30, 2009

I dispute this debt. Please send me all the documents you have which will prove I owe any debt.

Thank You,

Steven Surabian

EXHIBIT "C"

True and Certified Copy of the
Original

*Signature*

Loan Number: 0083564765

# ADJUSTABLE RATE NOTE
### (Six Month LIBOR Index–Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| April 23, 2004 | South Yarmouth | MASSACHUSETTS |
|---|---|---|
| *[Date]* | *[City]* | *[State]* |

85 Pond Street, Yarthmouth, MA 02664
*[Property Address]*

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $201,750.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 3.125%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first 60 months and then will consist of principal and interest.

I will make my monthly payments on the first day of each month beginning on June, 2004. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2034, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 908, Newark, NJ 07101-0908, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $525.40. This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

EXHIBIT "D" Pg 1 OF 4

Adjustable Rate Note (Six Month LIBOR Index-Rate Caps)
GreenPoint Mortgage Funding

Page 1 of 4

H0427MU 02/04



G P M W 0 0 8 3 5 6 4 7 6 5 1 4 0

4. **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the first day of November, 2004 and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for Six-month U.S. dollar-denominated deposits in the London market ("LIBOR") as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index.."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding One and 750/1000ths percentage points (1.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

(i) Interest-Only Payment Period. The "interest-only payment period" is the period from the date of this Note up to but not including June 01, 2009. For the monthly payments due during the interest-only payment period, after calculating any new interest rate as provided above, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

(ii) Amortization Payment Period. The "amortization payment period" is the period after the interest-only payment period. For the monthly payment due during the amortization payment period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

My interest rate will never be greater than 12.000%.

(E) Effective Date or Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice or Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5. **BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6. **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits,



G P M W D 0 0 8 . 3 5 6 . 4 7 6 5 1 4 0

then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that anyone of us may be required to pay all of the amounts owed under this Note.

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I

G P M W D 0 0 8 3 5 6 4 7 6 5 1 4 0

Exhibit D
Pg 4 of 4

may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
Steven Surabian                  -Borrower                                     -Borrower

_____ (Seal)      _____ (Seal)
                                 -Borrower                                     -Borrower

*[Sign Original Only]*

Adjustable Rate Note (Six Month LIBOR Index-Rate Caps)
GreenPoint Mortgage Funding                    Page 4 of 4                    H0427MU 02/04

G P M W D 0 0 0 8 3 5 6 4 7 6 5 1 4 0

Bk 18489 Pg333 #30682
04-23-2004 & 11:03a

After recording please return to:

GreenPoint Mortgage Funding, Inc.
[Company Name]

[Name of Natural Person]

981 Airway Court, Suite E
[Street Address]

Santa Rosa, CA, 95403-2049
[City, State Zip Code]

Graeber, Davis & Cantwell, P.C.
15 Cottage Avenue, 4th Floor
Quincy, MA 02169

Exhibit
"E"
Pg 1 of 15

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

**DEFINITIONS**

MIN: 100013890835647658

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 23, 2004, together with all Riders to this document.

(B) "Borrower" is Steven Surabian
STEPHANIE LAFLASH SURABIAN

. Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI, 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is GreenPoint Mortgage Funding, Inc..
Lender is a Corporation organized and existing under the laws of
the State of New York. Lender's address is 100 Wood Hollow Drive, Novato, CA 94945

(E) "Note" means the promissory note signed by Borrower and dated April 23, 2004.
The Note states that Borrower owes Lender Two Hundred One Thousand Seven Hundred Fifty and 00/100ths
Dollars (U.S. $201,750.00)

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 1 of 15

MERS Modified Form 3022, 01/01
14041MA 08/00
©2004, The Compliance Source, Inc.

G P M W D 0 0 8 3 5 6 4 7 6 6 1 1 7

plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 01, 2034.

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Revocable Trust Rider
☐ Other(s) [specify]

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—     Page 2 of 15     MERS Modified Form 3022 01/01
www.compliancesource.com     1401MA 10/01
©2002, The Compliance Source, Inc.

GPMWD0083564765117

Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the
County of Barnstable:
*[Type of Recording Jurisdiction]* *[Name of Recording Jurisdiction]*

which currently has the address of 85 Pond Street
*[Street]*

Yarmouth , Massachusetts 02664 ("Property Address"):
*[City]* *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.— Page 3 of 15 MERS Modified Form 3022 01/01
LOWELL, www
©2000, The Compliance Source, Inc.

G P M W 0 0 0 8 3 5 6 4 7 6 5 1 1 7

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 4 of 15
MERS Modified Form 3022 01/01
1001DA MERT
©2001 The Compliance Source, Inc.

In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

EXHIBIT "E"

Pg 6 OF 15

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 6 of 15

MERS Modified Form 3022 01/01
14301MA 08/00
©2000, The Compliance Source, Inc.

G P M W D 0 0 6 3 5 6 4 7 6 5 1 1 7

are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 7 of 15
MERS Modified Form 3022 01/01
1041MA 08/00
©2000, The Compliance Source, Inc.

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11.** Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 8 of 15
MERS Modified Form 3022 01/01
14301MA 08/00
©2000, The Compliance Source, Inc.

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7

or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—

Page 9 of 15

MERS Modified Form 3022 01/01

1089NA 08/00
©2000, The Compliance Source, Inc.

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7

not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.thecompliancesource.com
Page 10 of 15

MERS Modified Form 3022 01/01
14301MA 08/00
©2000, The Compliance Source, Inc.

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 11 of 15
MERS Modified Form 3022 01/01
1305MA 08/04
©2004, The Compliance Source, Inc.

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7



the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 28.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                            Page 12 of 15
www.compliancesource.com                                                                            MERS Modified Form 3022 01/01
                                                                                                    1069ZL 03/03
                                                                            ©2001, The Compliance Source, Inc.

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7

ℒℒℒ ℓℓ

EXHIBIT "E"
Pg 13 of 15

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 15
MERS Modified Form 3022 01/01
14985MA 08/00
©2000, The Compliance Source, Inc.

G P M W D 0 0 0 8 3 5 8 4 7 6 5 1 1 7

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
Steven Sutabian                              -Borrower
                                             [Printed Name]

_____ (Seal)
Stephanie LAFLASH SUTABIAN         -Borrower
                                             [Printed Name]

_____ (Seal)
                                             -Borrower
                                             [Printed Name]

_____ (Seal)
                                             -Borrower
                                             [Printed Name]

_____ [Space Below This Line For Acknowledgment] _____

State of MA

County of Plymooth       §
                         §
                         §

On this 23 day of April 2004 , before me personally appeared
STEVEN SUTABIAN
STEPHANIE LAFLASH SUTABIAN

to me known to be the person (or persons) described in and who executed the foregoing instrument, and acknowledged that he/she (or they) executed the same as his/her (or their) free act and deed.

        Dominic L. Fang
        Notary Public - Massachusetts
        My Commission Expires        Signature _____
(Seal)  May 14, 2010

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                    MERS Modified Form 3022 8[A1]
www.compliancesource.com          Page 14 of 15         1002M4  8/00
                                                 -3009, The Compliance Source, Inc.

.G  P  M  W  D  0  0  8  3  5  6  4  7  6  5  1  1  7

## ADJUSTABLE RATE RIDER

Loan Number: 0083564765

(LIBOR Six-Month Index (As Published by the Wall Street Journal)

THIS ADJUSTABLE RATE RIDER is made this 23rd day of April, 2004, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to GreenPoint Mortgage Funding, Inc. ("Lender") of the same date and covering the property described in the Security Instrument and located at:

### 85 Pond Street, Yarthmouth, MA 02664

#### Property Address

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.** INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 3.125%. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.** INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of November, 2004 and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for Six month U.S. dollar-denominated deposits in the London market as published by The Wall Street Journal, "Money Rates" table. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, or is no longer published, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation or Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding One and 750/1000ths percentage points (1.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

(i) Interest-Only Payment Period. The "interest-only payment period" is the period from the date of this Note Up to but not including June 01, 2009. For the monthly payments due during the interest-only payment period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on

Adjustable Rate Rider (LIBOR Six Month Index (As Published in The Wall Street Journal)-
GreenPoint Mortgage Funding
- Page 1 of 3

ID#659EU 04742 (Rev. 02/04)

the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

(ii) Amortization Payment Period. The "amortization payment period" is the period after the interest-only period. For the monthly payments due during the amortization payment period, after calculating any new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes
My interest rate will never be greater than 12.000%.

(E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Steven Surabian                 -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
STEPHANIE LAFLESH SURABIAN       -Borrower

_____ (Seal)
                                -Borrower

[Sign Original Only]

Adjustable Rate Rider (LIBOR Six Month Index (As Published in The Wall Street Journal).
GracePoint Mortgage Funding
                                    Page 3 of 3
                                            US4534MU 04/02 (Rev. 02/04)

G P M W D 0 0 8 3 5 6 4 7 6 5 1 1 7

# HARMON LAW OFFICES, P.C.

150 CALIFORNIA STREET
NEWTON, MASSACHUSETTS 02458
TEL (617) 558-0500
FAX (617) 244-7304

*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*

February 24, 2010

Mr. Steven Surabian
1230 Route 28
South Yarmouth, MA 02664

RE:   HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6
      /Surabian, Steven/Surabian, Stephanie
      Case Number: 419177

Dear Mr. Surabian:

Enclosed is a copy of an Order of Notice in connection with the above-referenced matter.

Very truly yours,

Harmon Law Offices, PC
SZK/EDB/200901-2726-Surabian, Steven/Surabian, Stephanie

Enclosure

CERTIFIED MAIL NO.
RETURN RECEIPT REQUESTED


Certified Article Number
7160 3901 9848 7441 0046
SENDERS RECORD

PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Exhibit "9"

pg 1 oP 3

200901-2726                          FCL

                                          /ON    Letter    to    Parties/Surabian,
                                          Steven/Surabian, Stephanie

**HARMON LAW OFFICES, P.C.**
150 CALIFORNIA STREET
NEWTON, MASSACHUSETTS 02458
MAILING ADDRESS:
P.O. BOX 610389
NEWTON HIGHLANDS, MA 02461-0389
TEL (617) 558-0500
FAX (617) 244-7304

*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*

February 24, 2010

Mr. Steven Surabian
1230 Route 28
South Yarmouth, MA 02664

RE:  HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-
S Surabian Steven Surabian  Stephanie
Case Number: 4-6-

Dear Mr. Surabian:

Enclosed is a copy of an Order of Notice in connection with the above-referenced matter.

Very truly yours,

Harmon Law Offices, PC
SZK/EDB/200901-2726-Surabian, Steven/Surabian, Stephanie

Enclosure

PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

*Exhibit "9"*
*Pg 2 of 3*

(SEAL)

# THE COMMONWEALTH OF MASSACHUSETTS
## LAND COURT
### DEPARTMENT OF THE TRIAL COURT

FILED

9 DEC 23 PM 2:10

To:

Steven Surabian; Stephanie LaFlash Surabian

Case No.
09 MISC 419177

HSBC Bank USA, National Association

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act.

HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6

claiming to be the holder of a Mortgage
covering real property in Yarmouth,
numbered 85 Pond Street

given by Steven Surabian and Stephanie LaFlash Surabian to Mortgage Electronic Registration Systems, Inc., dated April 23, 2004, and recorded with the Barnstable County Registry of Deeds at Book 18489, Page 333 and now held by the plaintiff by assignment

has filed with said court a complaint for authority to foreclose said mortgage

in the manner following: by entry and possession and exercise of power of sale.

If you are entitled to the benefits of the Servicemembers Civil Relief Act as amended and you object to such foreclosure you or your attorney should file a written appearance and answer in said court at Boston on or before APR 12 2010

or you may be forever barred from claiming that such foreclosure is invalid under said act.
Witness, KARYN F. SCHEIER, Chief Justice of said Court on FEB 19 2010

A TRUE COPY
ATTEST:

Attest:

Deborah J. Patterson

RECORDER

DEBORAH J. PATTERSON
RECORDER

200901-2726-ORF

**RETURN TO:**

Steven Surabian

85 Pond Street

# South Yarmouth, MA 02664

85 Pond Street, South Yarmouth, MA 02664

## QUITCLAIM DEED

We, STEVEN SURABIAN and STEPHANIE LAFLASH SURABIAN, of South Yarmouth, Barnstable County, Massachusetts, in consideration of One Dollar and Zero Cents ($1.00) paid, paid, grant to STEVEN SURABIAN, an unmarried man, with an address of 85 Pond Street, South Yarmouth, Massachusetts, with QUITCLAIM COVENANTS, the following land with the buildings thereon located in Yarmouth (South), Barnstable County, Massachusetts, having a property address of 85 Pond Street, South Yarmouth, Massachusetts, more particularly bounded and described as follows:

BEGINNING at the southeast corner of the granted premises at the northeast corner of Lot 20, as shown on a plan hereinafter mentioned and Pond Street;

RUNNING THENCE South 59° 03' West, one hundred nine and 31/100 (109.31) feet;

THENCE North 31° 44' West by Matthews' land, eighty and 01/100 (80.01) feet to land of Preston Duff, et ux;

THENCE North 59° 03' East by said Duff land, one hundred ten and 40/100 (110.40) feet to Pond Street; and

THENCE South 30° 57' 00" East by Pond Street, eighty and 00/100 (80.00) feet to the northeast corner of Lot 20 as shown on said plan, it being the point of BEGINNING.

Being Lot 19 as shown on a plan of land entitled, "Pawkannawkut Village" duly filed in the Barnstable Registry of Deeds in Plan Book 80, Page 21.

Subject to and together with the benefit of all easements, rights, restrictions and agreements of record, appertaining thereto and to the extent now in force and applicable.

Meaning and hereby intending to convey the same premises conveyed to the Grantors by deed from John J. Butler and Carolyn F. Butler dated April 23, 2004 and recorded on April 23, 2004 with the Barnstable District Registry of Deeds, Book 18489, Page 331.

PROPERTY ADDRESS: 85 Pond Street, South Yarmouth, Massachusetts 02664

All rights of homestead and other interests are also released.

Executed under seal this 19th day of _____ Naul _____, 2006.

_Steven Surabian_

**STEVEN SURABIAN**

_[signature]_

# STEPHANIE LAFLASH SURABIAN

STATE OF _Massachusetts_ )

)

COUNTY OF _Worcester_ )

On this _19th_ day of _March_____, 2006, before me, the undersigned notary public, personally appeared **STEVEN SURABIAN**, proved to me through satisfactory evidence of identification which was _individual_____, to be the person whose name is signed on the preceding or attached document and acknowledged to me that he signed it voluntarily for its stated purpose.

_[signature]_ (official signature and seal of notary)

My commission expires: _12/8/2011_

STATE OF _Massachusetts_ )

)

COUNTY OF _Worcester_ )

On this _19th_ day of _March_____, 2006, before me, the undersigned notary public, personally appeared **STEPHANIE LAFLASH SURABIAN**, proved to me through satisfactory evidence of identification which was _individual_____ to be the person whose name is signed on the preceding or attached document and acknowledged to me that she signed it voluntarily for its stated purpose.

_[signature]_ (official signature and seal of notary)

My commission expires: _12/8/2011_



**TABATHA R. MAGNUSSON**
NOTARY PUBLIC
COMMONWEALTH of MASSACHUSETTS
MY COMMISSION EXPIRES
December 08, 2011

**TABATHA R. MAGNUSSON**
NOTARY PUBLIC
COMMONWEALTH of MASSACHUSETTS
MY COMMISSION EXPIRES
December 08, 2011

# Commonwealth of Massachusetts
## County of Barnstable
### The Superior Court

CIVIL DOCKET# BACV2010-00181

Steven Surabian, Plaintiff

vs.

HSBC Bank USA, NA as Trustee Sequoia Mortgage Trust 2004-6 , Defendant

## SUMMONS AND ORDER OF NOTICE

To the above-named:

You are hereby summoned and required to serve upon Steven Surabian, plaintiff's attorney, whose address is 1230 Route 28 South Yarmouth, MA 02664, , an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Barnstable either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Barnstable County Superior Court, in Barnstable on 04/22/2010, at 02:00 PM in Barnstable Superior Court, at which time you may appear and show cause why such application should not be granted.

Witness, Barbara J. Rouse, Esquire, Chief Justice of the Superior Court, at Barnstable, Massachusetts this 25th day of March, 2010.

............................................
First Assistant Clerk

(AFFIX RETURN OF SERVICE ON BACK OF SUMMONS)

EXhiBiT E

D'Orlando, Gina $\qquad$ *Exhibit F pg 1 of 4*

| From: | ECFnotice@mad.uscourts.gov |
| Sent: | Friday, April 16, 2010 1:35 PM |
| To: | CourtCopy@mad.uscourts.gov |
| Subject: | Activity in Case 1:10-cv-10643 Surabian v. HSBC Bank USA, NA as Trustee Sequoia Mortgage Trust 2004-6 Notice of Removal |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered by Calandrelli, Joseph on 4/16/2010 at 1:35 PM EDT and filed on 4/16/2010

| Case Name: | Surabian v. HSBC Bank USA, NA as Trustee Sequoia Mortgage Trust 2004-6 |
| Case Number: | 1:10-cv-10643 |
| Filer: | HSBC Bank USA, NA as Trustee Sequoia Mortgage Trust 2004-6 |
| Document Number: 1 | |

**Docket Text:**
**NOTICE OF REMOVAL by HSBC Bank USA, NA as Trustee Sequoia Mortgage Trust 2004-6 from Barnstable, case number 10-10643. ( Filing fee: $ 350, receipt number 0101-2869102 Fee Status: Filing Fee paid) (Attachments: # (1) Affidavit A, # (2) Civil Cover Sheet & Category Sheet)(Calandrelli, Joseph)**

**1:10-cv-10643 Notice has been electronically mailed to:**

Joseph P. Calandrelli    jcalandrelli@princelobel.com, gdorlando@princelobel.com

**1:10-cv-10643 Notice will not be electronically mailed to:**

Steven Surabian
1230 Rt. 28
South Yarmouth, MA 02664

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/16/2010] [FileNumber=3319949-0
] [a39f8065c458560636da40342e7755ae04d58468282a1f6ea3f88580bef9765c657
b5a7e388450da924aa756e7192bde5c59f89a7605b32e030e9f4e900a2ae0]]
**Document description:**Affidavit A
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/16/2010] [FileNumber=3319949-1
] [73ce27623384a1a2cae7e1fc9a0f58b46f7a1505277749b15706880ca6f94b7ccfc
466ffbd337c79bd417cbc236848be852dbbccad9390deed1dfb4ae0dc5c8e]]
**Document description:**Civil Cover Sheet & Category Sheet
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/16/2010] [FileNumber=3319949-2
] [6b3c578035150f72ab0ea796be2e53acc4e4fd52498391fef531a5fbb23090de2ea
41bc92d1acaa11803b0a0548331e81dfd6b0ce5f67363f395fac4d12fd6c9]]

*Exhibit "F" pg 2 of 4*

JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Steven Surabian

**DEFENDANTS**
HSBC Bank USA, NA as Trustee Sequoia Mortgage Trust 2004-6

(b) County of Residence of First Listed Plaintiff **Barnstable**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **(New York)**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Steven Surabian (Pro Se)  ((508-888-4613)
1230 Rt 28, So. Yarmouth, MA 02664

Attorneys (If Known)
Richard E. Briansky (BBO#632709), Joseph P. Calandrelli (BBO# 666128), Prince, Lobel, Glovsky & Tye LLP, 100 Cambridge St., Ste. 2200, Boston, MA 02114 (617-456-8000)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                   and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☒ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)
☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgement

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. sec. 1332; 28 U.S.C. sec. 1441
Brief description of cause:
Plaintiff seeks $475,000 from defendant for an allegedly improper foreclosure

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE                                          DOCKET NUMBER

DATE  4/16/10

SIGNATURE OF ATTORNEY OF RECORD
Joseph Calandrelli

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) Steven Surabian v. HSBC Bank USA, NA

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   for patent, trademark or copyright cases

☑ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
380, 385, 450, 891.

☐ IV. 220, 422, 423, 430, 460, 462, 463, 465, 480, 490, 510, 530, 610,
620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

☐ V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

        YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

        YES ☐    NO ☑

  If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

        YES ☐    NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

        YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

        YES ☑    NO ☐

  A.   If yes, in which division do all of the non-governmental parties reside?

    Eastern Division ☑    Central Division ☐    Western Division ☐

  B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

    Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

        YES ☐    NO ☑

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Richard E. Briansky (BBO# 632709 ); Joseph P. Calandrelli (BBO# 666128)

ADDRESS Prince, Lobel, Glovsky & Tye LLP, 100 Cambridge St., Suite 2200, Boston, MA 02114

TELEPHONE NO. (617) 456-8000

                                      (CategoryForm-08.wpd -2/8/08)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN SURABIAN )<br><br>Plaintiff, )<br>)<br>v. )<br>)<br>HSBC BANK USA, NA as TRUSTEE )<br>SEQUOIA MORTGAGE TRUST 2004-6, )<br>)<br>Defendant. )<br>_____ ) | Civ. No. 1:10-cv-10643-RWZ |

## HSBC BANK USA, NA, AS TRUSTEE'S MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT

Pursuant to Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure,

Defendant HSBC Bank USA, NA, as Trustee of the Sequoia Mortgage Trust 2004-6

("HSBC") hereby moves to dismiss the Verified Complaint filed by Plaintiff Steven Surabian

("Surabian"). In the alternative, HSBC respectfully requests that the Court order Surabian to

provide a more definite statement regarding the factual bases for his claims.

### INTRODUCTION

This action arises out of a purchase-money loan Surabian obtained in April 2004,

which was secured by a mortgage on property located in Yarmouth, Massachusetts. Surabian

claims that the mortgage, currently held by HSBC, should be discharged because each page

of the loan documents is not notarized, the signature of Stephanie LaFlash Surabian

("Stephanie") does not appear on the loan documents, and because HSBC failed to comply

with all prerequisites of foreclosing. Each of Surabian's claims fails as a matter of law. As

is clearly evident from the property ownership documents, Stephanie's signature does in fact

$Exhibit$ "G" $pg$ 1 $of$ 6

1094732.1

appear on those documents. The absence of a notary seal on each page of the loan

documents does not invalidate the mortgage as a matter of law. Finally, Surabian's

conclusory allegations regarding the foreclosure process are not supported by any factual

assertions and have therefore failed to state any cognizable claim for relief against HSBC.

## FACTUAL BACKGROUND

On April 23, 2004, Steven and Stephanie Surabian purchased a parcel of property

located at 85 Pond Street, Yarmouth, Massachusetts (the "Property"). To finance the

purchase, the Surabians obtained a loan from GreenPoint Mortgage Funding, Inc.

("GreenPoint") in the principal amount of $201,750 (the "Loan") and executed an Adjustable

Rate Note (the "Note") promising to repay that balance with interest over a period of thirty

(30) years. *Adjustable Rate Note*, ¶ 1, attached to the Verified Complaint as Exhibit F. Each

of the Surabians' signature appears on this Note. *Id.*, 4. To secure the Note, the Surabians

granted a mortgage to Mortgage Electronic Registration Systems, Inc. ("MERS"), in its

capacity as nominee for GreenPoint (the "Mortgage"). *Mortgage*, Definitions (C), attached

to the Verified Complaint as Exhibit E. The Mortgage provided, among other things, that:

> [Surabians] does hereby mortgage, grant and convey to MERS (solely
> as nominee for [GreenPoint] and [GreenPoint's] successors and
> assigns) and to the successors and assigns of MERS, with power of
> sale . . .

the Property. *Id.*, Definitions (Q), Transfer of Rights in the Property. Both Steven

and Stephanie's signatures on the Mortgage were notarized, and it was recorded at

Book 18489, Page 333 of the Barnstable County Registry of Deeds. *Mortgage*, 1 and

14.

The Surabians thereafter defaulted under the terms of the Note, and they were

informed that foreclosure proceedings would commence. *Verified Complaint*, ¶ 4. In

EXHIBIT "G" Pg 2 OF 6

response, Steven sent a letter to Harmon Law Offices, P.C., indicating that he disputed the debt. *Id.*, ¶ 5; *Surabian Letter*, attached to the Verified Complaint as Exhibit C.

On December 21, 2009, MERS executed an Assignment of Mortgage assigning its interest in the Mortgage to HSBC (the "Assignment"). *Assignment*, attached to the Verified Complaint as Exhibit A. Finally, on December 23, 2009, the Land Court issued an Order of Notice scheduling a return date of April 12, 2010. *Order of Notice*, a copy of which is attached to the Verified Complaint as Exhibit G.

On March 25, 2010, Surabian filed this Verified Complaint. It consists of three unidentified counts. From a review of the allegations, it appears that Surabian is seeking to invalidate the Mortgage and to recover damages claiming that: (a) each page of the loan documents do not contain notarized seals; (b) Stephanie's signature does not appear on the loan documents; (c) the debt is disputed; and (d) HSBC has "failed to follow the necessary requirements for foreclosure exactly." *Verified Complaint*, ¶ 14.

## ARGUMENT

**A.  Stephanie Surabian's Signature Does Appear On the Loan Documents And The Signatures Are Notarized.**

Surabian claims that the Mortgage is unenforceable because Stephanie's signature does not appear anywhere on the Adjustable Rate Note. This is simply untrue. A quick review of the Note attached as Exhibit D to the Verified Complaint reveals that Stephanie Surabian did in fact sign the Note. However, even if she didn't sign the Note, this would not invalidate the Mortgage. The Mortgage was granted to MERS by both Surabians. Regardless of whether Stephanie was a borrower on the loan, she executed the Mortgage granting MERS and its successors and assigns the authority to foreclose on the Property in the event of a default under the Note. As a result, Surabian's claim fails as a matter of law.

EXhiBiT "G" Pg 3 oF 6

Surabian's claim that the Mortgage should be discharged because the loan documents lack a notary seal on each page also fails as a matter of law. As Surabian acknowledges, both his and Stephanie's signatures are notarized on page 14 of the Mortgage. There is simply no requirement that a mortgagor sign each individual page of the Mortgage or Note and have each of those signatures notarized. The Mortgage was signed and recorded promptly in the Barnstable County Registry of Deeds. It is therefore enforceable and Surabian's claim fails as a matter of law.

**B.** **Surabian Has Not Set Forth Sufficient Facts To State A Claim for Relief. In the Alternative, HSBC Is Entitled To A More Definite Statement Regarding The Factual Bases of Surabian's Claim.**

Surabian also claims that he is entitled to relief because the debt is "disputed" and because HSBC "failed to follow the necessary requirements for foreclosure exactly." *Verified Complaint*, ¶¶ 9, 13. No further factual basis is provided to support these allegations.[1] Surabian doesn't identify what HSBC failed to do when commencing foreclosure proceedings. He also doesn't allege that he is not in default under the terms of the Note, nor does any allegation of that appear in Surabian's letter. He simply asserts, in conclusory fashion, that the Mortgage and Note should be discharged or that HSBC should be enjoined from foreclosing until the "disputed Mortgage and Note are resolved."

Surabian, however, possess an "obligation to provide the grounds of [his] entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008); see also Flomenbaum v. Commonwealth, 451 Mass. 740, 751 n.12 (2008) (noting that recent changes to motion to dismiss standard impose "stricter" requirements on plaintiffs than previous standard). This obligation "requires more than

---

[1] Surabian currently has another action pending in this Court against another mortgagee on a second parcel of property he owns in Yarmouth, Massachusetts. See 1:10-cv-10546-NG. Surabian's allegations in the two actions are identical.

$Ex h_1 B_1 T \ "G^T \ pg \ 4 \ oP6.$

labels and conclusions." Twombly, 550 U.S. at 555. It requires factual allegations that "raise a right to relief above the speculative level." Iannacchino, 451 Mass. at 636. While HSBC acknowledges that Surabian filed this action *pro se*, this does not relieve him of the obligation to comply with the Rules of Civil Procedure. Pomales v. Celulares Telefonica, Inc., 342 F.3d 44, 50 n.1 (1st Cir. 2003). Surabian's unsupported allegations are insufficient to state a claim for relief against HSBC. Estate of Bennett v. Wainwright, 548 F.3d 155, 162 (1st Cir. 2008) (noting that on a motion to dismiss, a court should "reject unsupported conclusions or interpretations of law").

In the alternative, HSBC should be entitled to a more definite statement with respect to these claims. Since Surabian has not identified the particular action he alleges HSBC should have taken prior to foreclosure, HSBC cannot reasonably be required to frame a responsive pleading to this count. See Fed. R. Civ. P. 12(e); Mihos v. Swift, 358 F.3d 91, 106 n.12 (1st Cir. 2004). HSBC would be prejudiced by attempting to defend a claim against such vague assertions that do not even inform it of what it is allegedly liable for. Therefore, if the Court is inclined to deny HSBC's motion to dismiss, it should order that Surabian provide a more definite statement before requiring HSBC to submit its responsive pleading. See Twombly, 550 U.S. at 558 (holding that court's "retain the power to insist upon some specificity in pleading" before allowing a lawsuit to proceed).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Surabian's Verified Complaint. In the alternative, it should order that Surabian provide a more definite statement with respect to the factual bases for his claims.

*E x h i b i T "G" P g 5 o f 6*

HSBC BANK USA, NA, as TRUSTEE OF
THE SEQUOIA MORTGAGE TRUST 2004-6,
By its attorneys,

_/s/ Joseph Calandrelli_
Richard E. Briansky, BBO# 632709
rbriansky@princelobel.com
Joseph P. Calandrelli, BBO# 666128
jcalandrelli@princelobel.com
**PRINCE, LOBEL, GLOVSKY & TYE LLP**
100 Cambridge Street, Suite 2200
Boston, MA 02114
Tel:  617.456.8000

Dated:  April 22, 2010

## CERTIFICATE OF SERVICE

I, Joseph Calandrelli, certify that a true and accurate copy of the foregoing document
was filed through the Court's ECF system this 22nd day of April, 2010. I further certify that
a true and accurate copy of the foregoing document was sent by overnight mail, postage
prepaid to the plaintiff at the following address:

Steven Surabian
1230 Rt. 28
South Yarmouth, MA 02664

_/s/ Joseph Calandrelli_
Joseph Calandrelli

EXhIBIT "G" pg 6 oF6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEVEN SURABIAN )
        Plaintiffs, )
        )
v. )    Civ. No. 1:10-cv-10643-RWZ
HSBC BANK USA, NA as TRUSTEE )
SEQUOIA MORTGAGE TRUST 2004-6 )
        Defendant. )
        )
        )

## PLAINTIFFS ANSWER TO DEFENDANTS MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT

Plaintiffs object to Defendants Motions pursuant to Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure.

### INTRODUCTION

This jury demand action arises out of an attempted illegal foreclosure by the Defendant on the Plaintiffs property. Defendants were informed of this dispute by the Plaintiffs See Exhibit "A" of the Defendants NOTICE OF REMOVAL, Plaintiffs JURY DEMAND VERIFIED COMPLAINT . Defendants moved this case from State Court to this court on April 116, 2010 see SUMMONS AND ORDER OF NOTICE there was a Motion Hearing for Preliminary Injunction in Massachusetts Superior Court to be heard April 22, 2010. After moving Complaint to Federal Court Defendants claim to have sold the property at a foreclosure auction. See attached Exhibit "A" On page 2 of 2 of CIVIL COVER SHEET dated April 16, 2010 #8 was checked of NO, yet there is a JURY DEMAND. Surabian claims that the mortgage, currently held by HSBC, should be discharged because that is not a mortgage Surabian signed for, No Notary seals on signature of

EXhiBiT "H" page 1 oP 5

what is claimed by Defendant to be Steven Surabians signature on the four page ADJUSTABLE

RATE NOTE and No Stephanie. Plaintiff claims at least first three pages were just attached to

this document prior to recording.(See Exhibit "D" of the Complaint) Plaintiff claims page 1-13

of the Mortgage was attached to page 14 which has both signatures Notarized. Plaintiff claims

these first thirteen pages were not the thirteen pages signed by Steven and Stephanie. (See

Exhibit "E" of Plaintiffs VERIFIED COMPLAINT.

## FACTUAL BACKGROUND

On the 23rd day of April, 2004, Steven Surabian and Stephanie LaFlash-Surabian

purchased a parcel of property located at 85 Pond Street, Yarmouth, Massachusetts (the

"property")

Steven Surabian did not obtain a loan to finance the property in the amount of $201,750.

The Surabians never granted a mortgage$201,750 to Mortgage Electronic Registration Systems,

Inc. ("MERS"). The Notarized signatures were not for what was recorded, there fore the

Surabians could not default under the terms of that Note.

On December 21, 2009, MERS executed an Assignment of Mortgage assigning its interest

in the Mortgage to HSBC (the"Assignment") this is not proof that the Mortgage is legal or in fore

cable under the law . HSBC should have noticed these discrepancies. If the Note had NO

SIGNATURES would they claim Surabians still owe and continue with

FORECLOSURE?

Defendant claims in Massachusetts all pages do not need to be Notarized. The intent of

Massachusetts was not so you could attach any prior pages to a signature and thus those pages

become part of that document.   See Exhibit "E" of the Complaint the so called fifteen page

EXhiBiT "H" pg 2 of 5

Mortgage. Page 14 of 15 is the signature of Steven Surabian and Stephanie with a Notary Seal but the previous thirteen pages do not belong with that document. This may have been an honest mistake or intentional on the part of whom ever recorded that document. Someone one took some money but that someone was not Steven Surabian. Exhibit "D" & "F" of the Complaint are the same as the above no signature or Notary Seal were there is a signature.

Plaintiffs were informed by the Defendant that they intended to foreclose under those disputed documents and now that have foreclosed.

On March 25, 2010 the Plaintiffs were forced to file their Verified Complaint Jury Demand. The Plaintiffs seek to invalidate the Mortgage and to recover damages caused by this continued attempt to foreclose based on fradulent documents.

## ARGUMENT

A.      Defendants claim Stephanie did sign the note and to see Exhibit "D" of the Complaint. This is untrue, Stephanie signature is not on those four pages. The Mortgage Signed for was not the Mortgage recorded. Therefore the Surabians did not authority to foreclose. As a results, Defendants argument fails as a matter of law.

The claim by the defendant that no need to show proof that pages attached to a signature are the pages agreed to simply is not true. If that were so parties could legally switch pages and attach pages more likeable to that party.

B.      Surabian Did Set Forth Sufficient Facts To State A Claim for Relief.

Steven Surabian did not default under the terms of the note because the note is not a legal. This was expressed in the complaint and was not simply asserted, in conclusory fashion, that the Mortgage and Note should be discharged or that HSBC should be enjoined from foreclosing until

*EXHIBIT "H" PG 3 OF 5.*

the "disputed Mortgage and Note are resolved." There was Exhibits in the Complaint to support the Plaintiffs claim.

Cases sited by the Defendant are not relevant to this case. The Surabians' allegations are not unsupported, there was support supplied as Exhibits in the Complaint.

HSBC not only "FAILED to follow the necessary requirements for foreclosure exactly, but went ahead with the foreclosure after moving Complaint to Federal Court.

## CONCLUSION

For the foregoing reason, this court should Dismiss the Defendants Motions.

Steven Surabian Pro se
1230 Rt. 28
South Yarmouth Ma 02664
508-688-4613

Dated: MAY 07, 2010

## CERTIFICATE OF SERVICE

I, Steven Surabian, certify that a true and accurate copy of the foregoing document was mailed on this 7th day of May, 2010 was mailed postage paid to the defendants attorney, Joseph P. Calandrelli, Prince, Lobel, Glovsky & Tye LLP, 100 Cambridge St., Suite 2200 Boston, Ma 02114

Steven Surabian

EXHIBIT "H" Pg 4 oP 5

## HARMON LAW OFFICES, P.C.
150 CALIFORNIA STREET
NEWTON, MASSACHUSETTS 02458
TEL (617) 558-0500
FAX (617) 244-7304

*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*

May 3, 2010

Occupant
85 Pond Street
Yarmouth, MA 02664

Re:   Conveyance of 85 Pond Street, Yarmouth, MA 02664

To Whom It May Concern:

You are hereby notified pursuant to Massachusetts General Laws Chapter 244, Section 15A that the above-referenced property has been sold at a foreclosure auction. The new owner is GMAC Mortgage, LLC of 1100 Virginia Drive P.O. Box 8300 , Fort Washington , PA 19034.

Very truly yours,

Harmon Law Offices, P.C.

200901-2726 ~ Surabian, Steven/Surabian, Stephanie

EXHIBIT "A"

EXHIBIT "H"

EXHIBIT 1

**Receipt 1:**

7009 0960 0000 3580 7608

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to: Office of the Clerk
United States District Court
John Joseph Moakley Courthouse
1 Courthouse Way
Suite 2300
Boston MA 02210

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent ☐ Addressee
B. Received by (Printed Name) C. Date of Delivery
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.
4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7009 0960 0000 3580 7608

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

Postage $ $0.44
Certified Fee $2.80
Return Receipt Fee (Endorsement Required) $2.30
Restricted Delivery Fee (Endorsement Required) $0.00
Total Postage & Fees $ $5.54

Postmark Here   05/08/2010

Sent To United States District Court
Street, Apt No.; or PO Box No. 1 Courthouse Way, Suite 2300
City, State, ZIP+4 Boston MA 02210

**Receipt 2:**

7009 0960 0000 3580 7585

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to: Joseph P. Calandrelli
Prince, Lobel, Glovsky & Tye
100 Cambridge St
Suite 2200
Boston MA 02114

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent ☐ Addressee
B. Received by (Printed Name) D. Burke C. Date of Delivery
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.
4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7009 0960 0000 3580 7585

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

Postage $ $0.44
Certified Fee $2.80
Return Receipt Fee (Endorsement Required) $2.30
Restricted Delivery Fee (Endorsement Required) $0.00
Total Postage & Fees $ $5.54

Postmark Here

Sent To Prince, Lobel, Glovsky & Tye
Street, Apt No.; or PO Box No. 100 Cambridge St, Suite 2200
City, State, ZIP+4 Boston MA 02114

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEVEN SURABIAN
                    Plaintiff                           CIVIL ACTION

        V.                                              NO. 10CV10643-RWZ

HSBC BANK USA, NA
                    Defendants

JUDGMENT

ZOBEL, D. J.

In accordance with the Order entered on 5/10/10; Judgment is entered
dismissing the complaint without prejudice.

By the Court,

s/ Lisa A. Urso
Deputy Clerk

5/10/10
Date

EXhiBiT J Pg 1 of 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*EX h i B i T J*
*Pg 2 of 2*

```
                                    )
STEVEN SURABIAN                     )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )          Civ. No. 1:10-cv-10643-RWZ
                                    )
HSBC BANK USA, NA as TRUSTEE        )
SEQUOIA MORTGAGE TRUST 2004-6,      )
                                    )
        Defendant.                  )
                                    )
```

## HSBC BANK USA, NA, AS TRUSTEE'S MOTION TO DISMISS
## OR IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT

Pursuant to Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure,

Defendant HSBC Bank USA, NA, as Trustee of the Sequoia Mortgage Trust 2004-6

("HSBC") hereby moves to dismiss the Verified Complaint filed by Plaintiff Steven Surabian

("Surabian"). In the alternative, HSBC respectfully requests that the Court order Surabian to

provide a more definite statement regarding the factual bases for his claims.

### INTRODUCTION

This action arises out of a purchase-money loan Surabian obtained in April 2004,

which was secured by a mortgage on property located in Yarmouth, Massachusetts. Surabian

claims that mortgage, currently held by HSBC, should be discharged because each page

of the loan documents is not notarized, the signature of Stephanie LaFlash Surabian

("Stephanie") does not appear on the loan documents, and because HSBC failed to comply

with all prerequisites of foreclosing. Each of Surabian's claims fails as a matter of law. As

is clearly evident from the property ownership documents, Stephanie's signature does in fact

*Allowed, without opposition. Judgment may be*
*entered dismissing the Complaint without prejudice.*
*(Rya) Zobel. \ 5/10/10*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STEVEN SURABIAN ) | Civ. No. 10CV10643-RWZ |
| ) | |
| Plaintiffs, ) | PLAINTIFFS MOTION REQUEST |
| ) | RELIEF FROM A JUDGMENT OR |
| v. ) | ORDER |
| ) | REQUEST DEFAULT |
| HSBC BANKUSA, NA AS TRUSTEE ) | |
| SEQUOIA MORTGAGE TRUST 2004-6 ) | |
| Defendant, ) | |
| ) | |

## PLAINTIFFS MOTION REQUEST RELIEF FROM A JUDGMENT OR ORDER

Pursuant to Rules 60 (a),60 (b)(1), 60(b)(3), 60(b)(6) and 60(d)(1)&(2) of the Federal Rules of Civil Procedure, Plaintiff Steven Surabian hereby requests a hearing for oral argument in objection to the Courts ORDER entered on 5/10/2010 granting Motion to Dismiss by Judge D. J. ZOBEL.

## INTRODUCTION

This action aries because Defendant is foreclosing on the Plaintiffs property at 85 Pond Street Yarmouth Massachusetts based on a fraudulent loan documents. Plaintiff filed a Verified Complaint, Jury Demand and a Preliminary Injunction on March 25, 2010. The Hearing for the Preliminary Injunction was scheduled on April 22, 2010. On April 16, 2010 the Defendants filed a Notice of Removal on April 16, 2010 stating on the CIVIL COVER SHEET # 8 Defendant checked NO Motions pending. Massachusetts Superior Court SUMMONS AND ORDER Dated March 25, 2010 Hearing for Preliminary Injunction was to be heard April 22, 2010.

Defendant has failed to answer Plaintiffs Verified Complaint as of today May 17, 2010, DEFAULTING.

On April 22, 2010 Defendants filed a Motion to Dismiss. On May 7,2010 Plaintiffs filed an ANSWER and OBJECTION.

Without a hearing and while the Defendants were in DEFAULT Judge D. J.Zobel entered an ORDER granting the Defendants Motion to Dismiss on 5/10/2010.

Prior to this Dismissal the Defendants Continued with the Illegal Foreclosure and held an Auction.

## FACTUAL BACKGROUND

EXhiBiT "K" page 1 oF 3

Defendant has failed to Answer the Complaint and is in Default.

John J. Butler and Carolyn F. Butler conveyed by deed to Steven Surabian and Stephanie LaFlash-Surabian property at 85 Pond Street Yarmouth Ma. On April 23, 2004 and recorded with the Barnstable District Registry of Deeds, Book18489, Page 331.

Steven Surabian and Stephanie LaFlash-Surabian on May 19, 2006 granted to Steven Surabian by Quitclaim Deed title to said property.

Steven Surabian did not default under the terms of the note because the Note in question is a FRAUD and the Defendant knows this.

Defendant even while this complaint was in Superior Court and while it has been in this Federal Court has continually forged ahead with its plain to foreclose using fraudulent documents even conducting an Auction.

On April 22, 2010 without answering Plaintiffs Verified Complaint Jury Demand Defendants filed a Motion to Dismiss or, in the alternative, Motion for More Defined Statement.

On May 7, 2010 Plaintiffs filed there Answer and Objection.

Without hearing oral argument while the Defendants were in Default there Motion was granted on May 10, 2010 and no action was taken on the Plaintiffs Preliminary Injunction.

## ARGUMENT

Plaintiffs answered and objected to Defendants Motion, No Hearing was scheduled and Motion was granted . Allowing the Defendants to continue with a FORECLOSURE based on FRAUDULENT DOCUMENTS. By this dismissal the Court has ALLOWED the DEFENDANT to get away with there continued Unlawful FORECLOSURE even while this case was being heard in this court . If this ORDER is not REMOVED Plaintiffs will lose there property due to Fraud.

Plaintiffs should have there day in Court. In the alternative this Court should hold the Defendants in Default.

Signed under the penalties of perjury this17th day of May 2010.

---

Steven Surabian Pro se
1230 Rt. 28
South Yarmouth, MA 02664
508-688-4613                    Dated: April 17, 2010

## CERTIFICATE OF SERVICE

ExhiBiT "K" Pg 2 of 3

I, Steven Surabian, certify that a true and accurate copy of the foregoing document was mailed on May 17, 2010 to the Defendants attorney Joseph P. Calandrelli, Prince, Lobel, Glovsky & Tye LLP, 100 Cambridge street, Suite 2200, Boston, MA 02114

---

Steven Surabian

EXHIBIT "K"
Pg 3 OF 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

U.S. DISTRICT COURT
DISTRICT OF
2010 MAY 18 PM 2:34
FILED
IN CLERKS OFFICE

STEVEN SURABIAN )
                 )       Civ. No. 10CV10643-RWZ
    Plaintiffs, )
                 )     PLAINTIFFS MOTION REQUEST
                 )     RELIEF FROM A JUDGMENT OR
v. )     ORDER
                 )     REQUEST DEFAULT
HSBC BANKUSA, NA AS TRUSTEE )
SEQUOIA MORTGAGE TRUST 2004-6 )
    Defendant, )
                 )

EXHIBIT L

## PLAINTIFFS MOTION REQUEST RELIEF FROM A JUDGMENT OR ORDER

    Pursuant to Rules 60 (a),60 (b)(1), 60(b)(3), 60(b)(6) and 60(d)(1)&(2) of the Federal Rules of Civil Procedure, Plaintiff Steven Surabian hereby requests a hearing for oral argument in objection to the Courts ORDER entered on 5/10/2010 granting Motion to Dismiss by Judge D. J. ZOBEL.

## INTRODUCTION

    This action aries because Defendant is foreclosing on the Plaintiffs property at 85 Pond Street Yarmouth Massachusetts based on a fraudulent loan documents. Plaintiff filed a Verified Complaint, Jury Demand and a Preliminary Injunction on March 25, 2010. The Hearing for the Preliminary Injunction was scheduled on April 22, 2010. On April 16, 2010 the Defendants filed a Notice of Removal on April 16, 2010 stating on the CIVIL COVER SHEET # 8 Defendant checked NO Motions pending. Massachusetts Superior Court SUMMONS AND ORDER Dated March 25, 2010 Hearing for Preliminary Injunction was to be heard April 22, 2010.

    Defendant has failed to answer Plaintiffs Verified Complaint as of today May 17, 2010, DEFAULTING.

    On April 22, 2010 Defendants filed a Motion to Dismiss. On May 7,2010 Plaintiffs filed an ANSWER and OBJECTION.

    Without a hearing and while the Defendants were in DEFAULT Judge D. J.Zobel entered an ORDER granting the Defendants Motion to Dismiss on 5/10/2010.

    Prior to this Dismissal the Defendants Continued with the Illegal Foreclosure and held an Auction.

## FACTUAL BACKGROUND

*Plaintiff may file an opposition to the motion to dismiss that cites some legal authority against the motion to dismiss. Such opposition shall be submitted no later than June 9, 2010 and the court will consider the Rule 60 motion thereafter.*
Rw Zobel. 6/1/10

(7)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEVEN SURABIAN )
          Plaintiffs, )
     )
v. )    Civ. No. 1:10-cv-10643-RWZ
HSBC BANK USA, NA as TRUSTEE )
SEQUOIA MORTGAGE TRUST 2004-6 )
          Defendant. )
  )

## PLAINTIFFS OPPOSITION TO DEFENDANTS MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT

Plaintiffs object and requests a hearing pursuant to Rules 12(b), 12(e), 12(i) 38 & 39 to Defendants Motions pursuant to Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure.

### INTRODUCTION

This jury demand action arises out of an attempted illegal foreclosure by the Defendant on the Plaintiffs property. Defendants were informed of this dispute by the Plaintiffs See Exhibit "A" of the Defendants NOTICE OF REMOVAL, Plaintiffs JURY DEMAND VERIFIED COMPLAINT . Defendants moved this case from State Court to this court on April116, 2010 see SUMMONS AND ORDER OF NOTICE there was a Motion Hearing for Preliminary Injunction in Massachusetts Superior Court to be heard April 22, 2010. After moving Complaint to Federal Court Defendants claim to have sold the property at a foreclosure auction. See attached Exhibit "A" On page 2 of 2 of CIVIL COVER SHEET dated April 16, 2010 #8 was checked off NO, yet there is a JURY DEMAND. Surabian claims that the mortgage, currently held by HSBC, should be discharged because that is not a mortgage Surabian signed for, No Notary seals on signature of

$Exhibit \ "M" \ pg \ 1 \ of \ 5$

what is claimed by Defendant to be Steven Surabians signature on the four page ADJUSTABLE

RATE NOTE and No Stephanie. Plaintiff claims at least first three pages were just attached to

this document prior to recording.(See Exhibit "D" of the Complaint) Plaintiff claims page 1-13

of the Mortgage was attached to page 14 which has both signatures Notarized. Plaintiff claims

these first thirteen pages were not the thirteen pages signed by Steven and Stephanie. (See

Exhibit "E" of Plaintiffs VERIFIED COMPLAINT). See attached Affidavit of Steven Surabian.

## FACTUAL BACKGROUND

On the 23rd day of April, 2004, Steven Surabian and Stephanie LaFlash-Surabian

purchased a parcel of property located at 85 Pond Street, Yarmouth, Massachusetts (the

"property" )

Steven Surabian did not obtain a loan to finance the property in the amount of $201,750.

The Surabians never granted a mortgage$201,750  to Mortgage Electronic Registration Systems,

Inc. ("MERS"). The Notarized signatures were not for what was recorded, there fore the

Surabians could not default under the terms of that Note.

On December 21, 2009, MERS executed an Assignment of Mortgage assigning its interest

in the Mortgage to HSBC (the"Assignment") this is not proof that the Mortgage is legal or in fore

cable under the law . HSBC should have noticed these discrepancies. If the Note had NO

SIGNATURES would they claim Surabians still owe and continue with

FORECLOSURE?

Defendant claims in Massachusetts all pages do not need to be Notarized. The intent of

Massachusetts was not so you could attach any prior pages to a signature and thus those pages

become part of that document.  See Exhibit "E" of the Complaint the so called fifteen page

$E \times h_1 B_1 T$ "M" $pg$ $2 o p 5$

Mortgage. Page 14 of 15 is the signature of Steven Surabian and Stephanie with a Notary Seal but the previous thirteen pages do not belong with that document. This may have been an honest mistake or intentional on the part of whom ever recorded that document. Someone one took some money but that someone was not Steven Surabian. Exhibit "D" & "F" of the Complaint are the same as the above no signature or Notary Seal were there is a signature.

Plaintiffs were informed by the Defendant that they intended to foreclose under those disputed documents and now that have foreclosed.

On March 25, 2010 the Plaintiffs were forced to file their Verified Complaint Jury Demand. The Plaintiffs seek to invalidate the Mortgage and to recover damages caused by this continued attempt to foreclose based on fraudulent documents.

## ARGUMENT

A.      Defendants claim Stephanie did sign the note and to see Exhibit "D" of the Complaint. This is untrue, Stephanie signature is not on those four pages. The Mortgage Signed for was not the Mortgage recorded. Therefore the Surabians did not authorize to foreclose. As a results, Defendants argument fails as a matter of law.

The claim by the defendant that no need to show proof that pages attached to a signature are the pages agreed to simply is not true. If that were so parties could legally switch pages and attach pages more likeable to that party.

B.      Surabian Did Set Forth Sufficient Facts To State A Claim for Relief.

Steven Surabian did not default under the terms of the note because the note is not a legal. This was expressed in the complaint and was not simply asserted, in conclusory fashion, that the Mortgage and Note should be discharged or that HSBC should be enjoined from foreclosing until

$E \times h i B i T$ "M" $pg 3 of 5$

the "disputed Mortgage and Note are resolved." There was Exhibits in the Complaint to support the Plaintiffs claim.

Cases sited by the Defendant are not relevant to this case. The Surabians' allegations are not unsupported, there was support supplied as Exhibits in the Complaint .

HSBC not only "FAILED to follow the necessary requirements for foreclosure exactly, but went ahead with the foreclosure after moving Complaint to Federal Court .(See Exhibit "A")

C.     Under Rule 12 (b) "No defense or objection is waved by joining it with one or more other defenses or objections in a responsive pleading or in a motion".

D.     Under Rule 12(e) Motion for a more definite statement. The court can only order a more definite statement after which the Plaintiff will have 14 days to obey unless the Court grants a longer time in its Order.

E.     Under Rule 12(I) Hearing Before Trial..If a party so moves, any defense listed in Rule 12(b) (1)-(7)--whether made in a pleading or by motion--and a motion under Rule 12© must be heard and decided befor trial unless the court orders a deferral until trial.

F.     Under Rule 38(c)it is considered to have demanded a jury trial on all the issues so triable . Plaintiff demands this issue be tried by a jury because Plaintiff's Jury Demand did not specify issues for Jury Demand.

G.     Rule 39(a) WHEN A DEMAND IS MADE. When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The trial on all issues so demanded must be by jury . Jury Demand was made on the Verified Complaint .

H.     Rule 41 (b). Dismissal of Actions Involuntary Dismissal; Effect. The Defendant may move to dismiss the action or any claim against it only if the Plaintiff fails to prosecute or to comply with these rules or a court order. Plaintiff did not fail at any of these thus No Dismissal.

EXhiBiT "M" Pg 4 oF5

## CONCLUSION

For the foregoing reason, this court should Dismiss the Defendants Motions.

Steven Surabian Pro se
1230 Rt. 28
South Yarmouth Ma 02664
508-688-4613

Dated: June 3, 2010

### CERTIFICATE OF SERVICE

I, Steven Surabian, certify that a true and accurate copy of the foregoing document was mailed on this 3rd day of June, 2010 was mailed postage paid to the defendants attorney, Joseph P. Calandrelli, Prince, Lobel, Glovsky & Tye LLP, 100 Cambridge St., Suite 2200 Boston, Ma 02114

Steven Surabian

EXHIBIT "M" pg 5 of 5

*Exhibit "N" page 1 of 4*

# MASSACHUSETTS FORECLOSURE DEED BY CORPORATION

HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6

a national association duly established under the laws of the State of Delaware and having its usual place of business at 2929 Walden Avenue , Depew , NY 14043

the current holder by assignment of a mortgage

from    Steven Surabian and Stephanie LaFlash Surabian

to      Mortgage Electronic Registration Systems, Inc.

dated      April 23, 2004 and  recorded with the Barnstable County Registry of Deeds at Book 18489, Page 333

, by the power conferred by said mortgage and

every other power for  TWO HUNDRED TWENTY-SIX THOUSAND FOUR HUNDRED TWENTY AND 31/100 ($226,420.31) DOLLARS

paid, grants to HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6 , the premises conveyed by said mortgage.

BARNSTABLE COUNTY EXCISE TAX
BARNSTABLE COUNTY REGISTRY OF DEEDS
Date: 06-07-2010 @ 11:21am
Ctl#: 602          Doc#: 27878
Fee: $611.55  Cons: $226,420.31

MASSACHUSETTS STATE EXCISE TAX
BARNSTABLE COUNTY REGISTRY OF DEEDS
Date: 06-07-2010 @ 11:21am
Ctl#: 602          Doc#: 27878
Fee: $774.63  Cons: $226,420.31

WITNESS  the execution and the corporate seal of said national association this  7th  day of  May  , 2010.

Property Address: 85 Pond Street, Yarmouth, MA 02664

200901-2726

/Foreclosure    Deed    MA/Surabian,
Steven/Surabian, Stephanie

*EXHIBIT "N"*
*Pg 2 of 4*

HSBC Bank USA, National Association as Trustee
for SEQUOIA MORTGAGE TRUST 2004-6, *by GREAT C*
*Mortgage GCC as*
*Attorney in Fact\**

By: _____

Jeffrey Stephan
Limited Signing Officer **

*For signatory authority please see Limited Power of Attorney recorded herewith.

** For signatory authority, please see the Certificate of Assistant Secretary recorded
with the Barnstable County Registry of Deeds at Book 23272, Page 280.

## Commonwealth of Pennsylvania

Montgomery, ss.                                                                                      May 7 , 2010

On this 7 day of May _____ 2010, before me, the undersigned notary public,
personally appeared ___ Jeffrey Stephan ___, proved to me through satisfactory
evidence of identification, which were personal knowledge (form of identification), to be the
person whose name is signed on the preceding or attached document, and acknowledged to me
that (he) (she) signed it voluntarily for its stated purpose.

Capacity: (as _____ Attorney in Fact*

for___ HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST
2004-6, )

_____
Notary Signature

My commission expires: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Trina Wiltbank, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Sept. 10, 2013
Member, Pennsylvania Association of Notaries

CHAPTER 183 SEC. 6 AS AMENDED BY CHAPTER 497 OF 1969

Every deed presented for record shall contain or have endorsed upon it the full name, residence and post office address of
the grantee and a recital of the amount of the full consideration thereof in dollars or the nature of the other consideration therefor, if not
delivered for a specific monetary sum. The full consideration shall mean the total price for the conveyance without deduction for any
liens or encumbrances assumed by the grantee or remaining thereon. All such endorsements and recitals shall be recorded as part of
the deed. Failure to comply with this section shall not affect the validity of any deed. No register of deeds shall accept a deed for
recording unless it is in compliance with the requirements of this section.

200901-2726
Surabian, Steven/Surabian, Stephanie

*Exhibit "N" Pg 3 0F 4*

**AFFIDAVIT**

I, Jeffrey Stephan, Limited Signing Officer, of GMAC Mortgage, LLC as Attorney in Fact *
for HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6
make oath and say that the principal and interest obligation mentioned in the mortgage above
referred to were not paid or tendered or performed when due or prior to the sale, and that HSBC
Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6 caused to
be published on March 25, 2010, April 1, 2010 and April 8, 2010 in the Register - Cape Cod, a
newspaper having a general circulation in Yarmouth, a notice of which the following is a true copy.
(See attached Exhibit A)

I also complied with Chapter 244, Section 14 of the Massachusetts General Laws, as amended,
by mailing the required notices certified mail, return receipt requested.

Pursuant to said notice at the time and place therein appointed HSBC Bank USA, National
Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6 sold the mortgaged premises
at public auction by Charles F. Cawley, a duly licensed auctioneer, to HSBC Bank USA, National
Association as Trustee for SEQUOIA MORTGAGE TRUST 2004-6 for TWO HUNDRED
TWENTY-SIX THOUSAND FOUR HUNDRED TWENTY AND 31/100 ($226,420.31) DOLLARS
bid by HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST
2004-6, being the highest bid made therefor at said auction.

200901-2726

/Affidavit MA/Surabian, Steven/Surabian,
Stephanie

EXHIBIT "N" PG 4 OF 4

HSBC Bank USA, National Association as
Trustee for SEQUOIA MORTGAGE TRUST
2004-6 by GMAC Mortgage, LLC as Attorney in Fact*

By: ~~Jeffrey Stephan~~
Limited Signing Officer **

*For signatory authority please see Limited Power of Attorney recorded herewith.

** For signatory authority, please see the Certificate of Assistant Secretary recorded with the Barnstable County Registry of Deeds at Book 23272, Page 250.

### Commonwealth of Pennsylvania

Montgomery, ss.                                            May 7, 2010

On this __7__ day of __May_____ 2010, before me, the undersigned notary public,
personally appeared ____Jeffrey Stephan____ ,proved to me through satisfactory evidence
of identification, which were _personal knowledge_ (form of identification) , to be the person whose
name is signed on the preceding or attached document, who swore or affirmed to me that the
contents of the document are truthful and accurate to the best of his/her knowledge and belief.


Capacity: (as __Attorney in Fact*_____

for___ HSBC Bank USA, National Association as Trustee for SEQUOIA MORTGAGE TRUST
2004-6 )

_____ (Affix Seal)
Notary Signature

My commission expires: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Trina Wiltbank, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Sept. 10, 2013
Member, Pennsylvania Association of Notaries

# ORLANS|MORAN

ORLANS|MORAN
PO Box 962169
Boston, Massachusetts 02196
P 617-502-4100 F 617-502-4101
www.orlans.com

**VIA SHERIFF'S SERVICE**

June 16, 2010

NOTICE TO QUIT

Tina Hunter
And all other occupants residing at
85 Pond Street
Yarmouth, MA 02664

RE:  85 Pond Street, Yarmouth, MA 02664

Dear Tina Hunter and all other occupants:

The undersigned represents HSBC Bank USA, National Association, as Trustee for Sequoia 2004-6, the present owner of the property situated at 85 Pond Street, Yarmouth, MA 02664 (the "Property") as a result of the foreclosure of a Mortgage dated April 23, 2004 recorded with the Barnstable County Registry of Deeds in Book 18489, on Page 333 which foreclosure sale was held at the Property on April 22, 2010 pursuant to Ma Gen. Law Ch. 244§14..

NOTICE IS HEREBY GIVEN that HSBC Bank USA, National Association, as Trustee for Sequoia 2004-6 hereby terminates your tenancy and/or occupancy of the Property.. You are hereby instructed to vacate, remove all personal belongings from and surrender possession of the Property you now occupy, namely, 85 Pond Street, Yarmouth, MA 02664 within **ninety (90)** days after service on you of this Notice, unless you deliver satisfactory evidence to the undersigned that you are a bona fide tenant entitled to the protections of either Section 702(a)(2)(A) or Section 703 of "Protecting Tenants at Foreclosure Act of 2009" (PTFA). If you believe you are entitled to the protections of PFTA you must forward the following as soon as possible by personal delivery to our offices at 45 School Street, Boston, MA 02108 or by fax or mail to the attention of the undersigned for our review:
1. a copy of your lease signed by you and the owner.
2. a telephone number and the best time to reach you.
3. evidence of rental payments for the last three (3) months such as copies of cancelled checks.

If we do not receive this information we will assume that you are not entitled to the protections of the PTFA.

If you fail to vacate within time provided, HSBC Bank USA, National Association, as Trustee for Sequoia 2004-6 will proceed with a court action to evict you. Any fund paid by you after this Notice shall be accepted for use and occupancy only and not for rent, shall not waive this notice nor subsequent eviction proceedings nor shall it create or reinstate any tenancy. You may be required to produce the original of this notice at any trial for possession of the premises.

PLEASE NOTIFY THIS OFFICE IMMEDIATELY IF YOU ARE ENTITLED TO THE BENEFITS OF THE SERVICE MEMBERS CIVIL RELIEF ACT.

> HSBC Bank USA, National Association, as Trustee
> for Sequoia 2004-6
> By its attorneys,
>
> David Rhein, Esq.
> Orlans Moran PLLC
> P.O. Box 962169
> Boston, Massachusetts 02196
> Phone: (617) 502-4100

File No: 618.4872

## RETURN OF SERVICE

Occupants: Tina Hunter

I hereby certify and return that on **June 17, 2010**, I served a copy of the within **Notice to Quit** upon the within named occupant in the following manner:

By leaving true and attested copies at the last and usual place of abode. Said service was made at 85 Pond St., Yarmouth, MA 02664. I further certify and return that on the same day, I mailed via U.S. Postal Service 1st class mail a true and attested copy to the above stated address.

Dated: June 17, 2010         Robert B. Francisco

EXHIBIT "O" Pg 3 OF 3

*form 17 • 235*

## 30 DAY NO FAULT NOTICE TO QUIT

Ruth (Teena) Hunter
85 Pond Street
S Yarmouth, MA
02664

Date: July 16, 2010

Dear Teena

Notice is hereby given you to quit and deliver up the premises now occupied by you as a Tenant at Will at a rental of $1,300 = per month at the expiration of the next rental period (the last day of July ) of your tenancy, beginning after this notice.

The premises are described as follows:

Single Family NOT Including garage
or Room Above Shared Laundry Room.

PLEASE NOTE: Any monies tendered by the tenant and accepted by the landlord or their agent after receipt of this notice are accepted for use and occupation only and not as rent and without in any way waiving any and all rights under this notice or under any subsequent summary process proceeding. The landlord hereby reserves the right to accept monies re-establishing any new tenancy.

Very truly yours,

*[signature]*

EXHIBIT P

# GMAC Mortgage

## Relocation Assistance Agreement

THIS RELOCATION ASSISTANCE AGREEMENT ("Agreement") dated 07/22/10 _____ is between GMAC/Client Branded Solutions ("GMAC") having an office, and all adult occupants _____ of the premises located 25 POND ST [Unit 1] YARTHMOUTH MA 02664

GMACM is responsible for managing the Property on behalf of GMAC ("Owner"). In exchange for your agreement to vacate the Property on or before 07/22/2010 ___ at [ ____ ] under the following terms, GMACM is authorized to offer you a relocation assistance payment ("Payment"). *7/27/10 @ 9:00AM*

### 1. Payment
You agree to vacate the Property on or before the date shown above, and to comply with all terms of this Agreement. If you fulfill all the terms of this Agreement, GMAC will pay you [3000.00 ] and you must be present at the time of inspection to receive payment under this agreement.

### 2. Access to the Property
Upon execution of this Agreement by You and GMACM, and at all times thereafter, You agree to allow GMACM and/or its designated agent access to the Property with reasonable notice and at reasonable hours, for the purpose of determining a market value on the Property, or to identify the necessity for repairs to the Property, or to show the Property to prospective tenants and/or purchasers. You further agree to allow GMACM and/or its designated agent to place For Sale/For Rent signs on the Property.

### 3. Vacating
Within [ ] business days after you notify GMACM that you have moved and GMACM has received all keys to the Property, GMACM will have a final inspection made of the Property. If the inspection shows that the Property, including all fixtures and appliances, is in a condition acceptable to us, ordinary wear and tear accepted, and that all furnishings and personal property have been removed, then you will receive the full amount of the Payment within [ ] business days of the inspection. Occupants and all other parties shall leave the interior and exterior of the Property in clean condition, including, but not limited to: (a) floors swept and cleaned and (b) all trash and debris removed from the interior, exterior and curb of the Property.

Occupants and all other parties shall not remove from the Property any fixture. The term "fixture" is defined as a thing affixed / attached to the Property by means of cement, plaster, nails, bolts, screws or roots. Fixtures include, but are not limited to, light fixtures, built-in refrigerators, ovens, stoves, stove-top hoods, air conditioning units, water heaters, window coverings, wall-to-wall carpeting, sinks, kitchen and bathroom fixtures, doors, garage door openers (including the remotes) and plants in the yard.

If GMACM determines that the Property is not in the condition described above (because, for example, You have caused damage to the Property, either intentionally or through your negligence), GMACM will deduct from the Payment the cost of repairs needed to put the Property into the condition intended by this Agreement, and the difference will be paid in You. However, if such cost exceeds the amount of the Payment, You will not be eligible to receive the Payment

If at the time you accept this Agreement, GMACM has commenced an eviction proceeding or taken other legal action against you as it is entitled to by law, GMACM reserves its rights to continue these proceedings until you actually vacate the Property under the terms of this Agreement. If You do not vacate the Property on or before the date shown above, You will not be entitled to receive the Payment, and GMACM will have the right to begin or continue eviction proceedings against You, as the case may be, and to take any other action it is entitled to by law.

*EXhiBiT Q" page 1 of 2*

# GMAC Mortgage

**4. Time for Acceptance**
In order for you to accept this offer, you must sign this Agreement and we must receive it at no later than 5:00 P.M **WITHIN 3 DAYS OF RECEIPT. PLEASE SEND SIGNED AGREEMENT VIA FAX TO** CAROL DOMINGUEZ

If GMACM does not receive the executed agreement from you within this timeframe, this offer will be null and void. GMACM will have the right to begin eviction proceedings against you, and to take any other action it is entitled to by law.

**5. Release**
By accepting this offer, you are releasing all past, present or future claims and actions of any kind that you may have against GMACM and/or the Property Owner in connection with the Property.

**6. No Bankruptcy**
By executing this Agreement, you represent that you do not have bankruptcy proceedings pending at this time.

**7. Entire Agreement**
This Agreement contains the entire understanding and all of the terms between you and GMACM with respect to the matters contained herein and supersedes any prior oral or written understandings. Any changes to this Agreement must be in writing and signed by GMACM and You. This Agreement shall not be binding unless and until all parties have signed this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date shown below.

_____    _22 July 2010_
OCCUPANT                            Date

_____    _____
OCCUPANT                            Date

_____    _____
OCCUPANT                            Date

_____
OCCUPANT CONTACT NUMBER

By: ___CAROL_____DOMINGUEZ_____
    GMACM Authorized Signatory

Its: ___Cash for Keys Coordinator_____
     Title

EXHIBIT "O" PAGE 2 OF 2

Relocation Assistance Agreement                page 2 of 2
2711 Haskell Avenue  Dallas, TX 75204

## AFFIDAVIT OF RUTH S. HUNTER

I, Ruth S. Hunter, on oath, depose and state as follows:

1. My name is Ruth S. Hunter. I and my two minor children were tenants of Steven Sarabian at the single family residence located at 85 Pond Street, West Yarmouth, MA ("the Premises") from October 2009 until July 27, 2010.

2. During the entire course of the tenancy I never had access to the garage portion of the premises, the area above the garage.

3. When we moved into the premises, Steven Sarabian had personal belongings in the garage, above the garage, in the attic. There was also a tire, glass door, barbeque grill, tarp, trash and debris in the yard on the sides of the house.

4. On or about May 17, 2010, I received notice from Orlans Moran stating that HSBC owned the property effective April 22, 2010, and instructing me to vacate the property. The Notice indicated that I would receive relocation assistance for moving expenses if I cooperated.

5. On or about June 16, 2010 I received a Notice to Quit from Orlans Moran ordering me to vacate the premises.

6. On or about June 23, 2010 I was told by Steven Sarabian that he continued to own the property and to disregard the bank's Notice to Quit. Notwithstanding Mr. Sarabian's claims of continued ownership, I complied with Orlans Morans' Notice to Quit and I began the process of securing a new rental property.

7. On or about July 16, 2010, I received a Notice to Quit from Steven Sarabian ordering me to vacate the property effective July 31, 2010. (See attached.)

8. On or about July 22, 2010, I executed a Relocation Assistance Agreement with GMAC to vacate the rented premises and return said premises to a broom clean condition on or before July 31, 2010, in exchange for Three Thousand ($3,000.00) Dollars in relocation assistance.

9. On or about July 27, 2010, in reliance upon the Relocation Assistance, I moved, together with my two children and all personal possessions and belongings from the rented premises to a new rental property.

10. Effective July 27, 2010, the only personal property, belongings, and debris remaining at the subject property belongs to Steven Sarabian and were outside of the leased premises or outside of my dominion and control.

EXhiBiT "R" pg 1 of 2

11.      Upon receipt of the Three Thousand ($3,000.00) Dollars in relocation assistance, I agree to waive any and all future claims for liability to either Orlans Moran or GMAC associated with this tenancy, eviction, and/or relocation.

Signed under the penalties of perjury this 28 day of July, 2010.

_Ruth S. Hunter_
Ruth S. Hunter

## COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss.                                                July 28 2010

On this 28 day of July, 2010, before me, the undersigned notary public, personally appeared Ruth Hunter, Ruth S. Hunter, proved to me through satisfactory evidence of identification, which was personal knowledge to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily as her free act and deed, before me,

Notary Public
My Commission Expires:



EXHIBIT "R" Pg 2 OF 2

# ORLANS | MORAN

ORLANS | MORAN
PO Box 962169
Boston, MA 02196
P 617-502-4100  F 617-502-4101
www.orlans.com

December 1, 2010

Court Clerk, Civil Business
Barnstable Division District Court
Courthouse
Main Street, Route 6A
Barnstable, MA 02630

Re:    HSBC Bank USA, National Association, as Trustee for Sequoia 2004-6
       v.
       Tina Hunter

       Civil Action #:    201025SU1814
       Address:           85 Pond Street, Yarmouth, MA 02664
       Attorney File #:   618.4872

To Whom It May Concern:

Please schedule a hearing for this matter on Thursday, December 9, 2010 at 09:00 AM. Please let me know if you have any questions or concerns.

Sincerely,

Benjamin Adeyinka,
Orlans Moran PLLC
P.O. Box 962169
Boston, MA 02196
Phone 617-502-4100
Fax 617-502-4101

CC: Steven Surabian and Arthur Caparelliotis (via regular mail)

EXHiBiT "S" pg 1 oF 3

Barnstable, ss.

Barnstable Division District Court
Civil Action No. 201025SU1814

-----------------------------------------------

HSBC Bank USA, National Association, as Trustee for
Sequoia 2004-6
      Plaintiff,

v.

Tina Hunter aka Ruth S. Hunter
      Defendant.

-----------------------------------------------

## PLAINTIFF'S MOTION FOR JUDGMENT

Now comes the Plaintiff, HSBC Bank USA, National Association, as Trustee for Sequoia 2004-6, and respectfully requests that this Honorable Court issue a Judgment for Possesion in this matter.

In support of its motion the Plaintiff states the following:

1. The Plaintiff, was the successful bidder at the foreclosure sale of the property located at 85 Pond Street, Yarmouth, MA 02664 (the "subject property") which auction was held on April 22, 2010. (Please see **Exhibit A** for copy of foreclosure deed).

2. The Defendant was the former tenant occupying 85 Pond Street, Yarmouth, MA 02664.

3. On May 24, 2010, Defendant contacted Plaintiff's counsel and confirmed her occupancy at the Property.

4. The original notice to quit for this action was served on the Defendant on June 17, 2010. (Please see **Exhibit B** for copy of notice to quit).

5. On or about June 23, 2010, the Defendant received a call from the former mortgagor, Steven Surabian, who alleged to still own the property.

6. On or about July 16, 2010, the Defendant received a Notice to Quit from Mr. Surabian ordering the Defendant to vacate by July 31, 2010. (Please see **Exhibit C** for copy of Mr. Surabian's notice to quit).

7. On or about July 22, 2010, Defendant's Attorney, Christopher Fiset negotiated a vacate date of July 27, 2010 with Plaintiff's Counsel. (Please see **Exhibit D** for copy of Relocation agreement).

8. On or about July 27, 2010, Defendant vacated the Property pursuant to a Relocation Agreement. On that day, Plaintiff's agent's secured the property

*EXHIBIT "S" Pg 2 OF 3*

9. On or about July 28, 2010, Defendant provided Plaintiff with an Affidavit regarding the personal property left in the unit. (Please see **Exhibit E** for copy of Affidavit).

10. On or about August 13, 2010, Mr. Surabian broke into the Property and illegal rented the Property to Arthur Caparelliotis.

11. On November 18, 2010, Mr. Surabian and Mr. Caparelliotis appeared for hearing in this Honorable Court. At the hearing Mr. Surabian filed a Motion to Transfer to Superior Court and Mr. Caparelliotis filed a Motion to Compel Discovery.

12. On November 19, 2010, the Honorable Judge W. James O'Neil denied Mr. Caparelliotis Motion to Compel Discovery and Mr. Surabian Motion to Transfer on the grounds that both individuals lacked standing. (Please see **Exhibit F** for copy of Judge's Order).

13. Upon knowledge and information, Mr. Caparelliotis still occupies the property, which was illegally rented by Mr. Surabian.

14. Mr. Surabian has no legal right to lease the Plaintiff's Property and Mr. Caparelliotis is a squatter with no rights to possession.

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court issue judgment for possession for the subject property and issue a restraining order enjoining Mr. Surabian from trespassing on the Property.

Respectfully submitted,
HSBC Bank USA, National Association, as Trustee
for Sequoia 2004-6
By its attorney,

David J. Rhein, Esq.
BBO#
Orlans Moran PLLC
45 School Street
Boston, MA 02108
(617) 502-4119

EXHIBIT "S" pg 3 of 3

## CERTIFICATE OF SERVICE

I, David Rhein, hereby certify that on December ____, 2010, I served a copy of the foregoing by mailing a copy first class mail, postage prepaid to: Mr. Caparelliotis and Mr. Surabian, 85 Pond Street, Yarmouth, MA 02664, Yarmouth, MA 02664

_____
David J. Rhein, Esq.

Commonwealth of Massachusetts
SUMMARY PROCESS (EVICTION) SUMMONS AND COMPLAINT

District Department

BARNSTABLE Division

Barnstable ss

☒ Residential
☐ Commercial

Docket No. _____
(To be added by clerk's office)

Entry Date: 10-04-10

NOTICE OF A COURT CASE TO EVICT YOU - PLEASE READ IT CAREFULLY

ESTA ES UNA NOTIFICACION DE UN CASO EN CORTE PARA DESALOJARLE -
FAVOR DE LEER EL MISMO CON CUIDADO

TO DEFENDANT(S)/TENANT(S)/OCCUPANT(S): Aina Hunter and/or Current Occupants

ADDRESS: 85 Pond Street _____ CITY/TOWN: Yarmouth ZIP: 02664

You are hereby summoned to appear at a hearing before a Judge of the Court at the time and place listed below:

DAY: Thursday DATE: October 14, 2010 TIME: 9:00 a.m. COURT NAME: Barnstable District

COURT ADDRESS: 3195 Main Street, Barnstable, 02630 ROOM: REPORT TO THE CLERKS OFFICE

to defend against the complaint of PLAINTIFF/LANDLORD/OWNER: HSBC Bank USA,

National Association, as Trustee for Sequoia 2004-6, of

STREET 2929 Walden Avenue CITY/TOWN: Depew ZIP: 14043

that you occupy the premises at 85 Pond Street, Yarmouth, MA 02664

being within the judicial district of this court, unlawfully and against the right of said Plaintiff/Landlord/Owner

because: you continue to occupy subject premises beyond the time stated in the Notice to Quit

and further, that $3,500.00 Use and Occupancy rent is owed according to the following account:

WITNESS,

First or Chief Justice
David Rhein # 635175
Printed Name of Plaintiff or Attorney
[signature] 3808#
Signature of Plaintiff or Attorney
9/21/10
Date or Signature of Plaintiff or Attorney

ACCOUNT ANNEXED (itemize)

Use and Occupancy in the amount
of $ 700.00 per month from
the date of the foreclosure 04-22-10
1650 W. Big Beaver, Troy, MI 48083
248-502-1400 Attorney
617-502-4134
Telephone Number of Plaintiff or Attorney

NOTICE TO EACH DEFENDANT/TENANT/OCCUPANT: At the hearing on 10-14-10
you (or your attorney) must appear in person to present your defense. You (or your attorney) must also file a
written answer to this complaint. An answer is your response stating the reason(s) why you should not be evicted
and may, in residential cases, include any claims you have against the Landlord. (An Answer Form is available
in the clerk's office whose telephone number is 508-375-6600 .) You must file (deliver or mail)
the answer with the court clerk and serve (deliver or mail) a copy on the landlord (or landlord's attorney) at the
address shown above. The Answer must be received by the court clerk and received by the landlord (or the
landlord's attorney) no later than Monday, 10-11-10 , which is the first Monday after the "entry
date" listed above. The entry date is the day by which your landlord must file this complaint with the court clerk.

Page 1 of 2 Pages

618 4872

NOTICE TO EACH DEFENDANT/TENANT/OCCUPANT: IF YOU DO NOT FILE AND SERVE AN ANSWER, OR IF YOU DO NOT DEFEND AT THE TIME OF THE HEARING, JUDGMENT MAY BE ENTERED AGAINST YOU FOR POSSESSION AND THE RENT AS REQUESTED IN THE COMPLAINT.

SI USTED NO REGISTRA O NOTIFICA UNA CONTESTA, O SI USTED NO PRESENTA UNA DEFENSA A LA HORA DE LA AUDIENCIA, UNA SENTENCIA PUEDE SER REGISTRADA EN SU CONTRA PARA POSECCION Y POR LA RENTA REQUERIDA EN EL RECLAMO.

To the Sheriffs of our several counties, or their Deputies, or any Constable of any City or Town within said Commonwealth, GREETINGS: We command you to summon the within named defendant(s)/ tenant(s)/occupant(s) to appear as herein ordered.

Robert E. Powers
Clerk Magistrate

### Officer's Return

_____, ss     City/Town: _____   Date: _____

By virtue of this Writ, I this day served the within-named tenant or occupant, and summonsed him/her as herein directed, by giving in hand to _____

or leaving it at _____

_____ the last and usual place of abode.

A copy of this summons was mailed first class to each tenant/occupant at the address on: _____

Fees for Service:

| | |
|---|---|
| Service | $_____ |
| Copy/Attest | _____ |
| Travel | _____ |
| Use of Car | _____ |
| Mailing | _____ |

Signature of Officer _____

Printed Name of Officer _____

Address of Officer _____

TOTAL   $_____

Telephone Number of Officer _____

NOTICE TO PLAINTIFF/LANDLORD/OWNER: Have the Officer complete and return above. Service must be made on the defendant(s) no later than the seventh day and not earlier than the thirtieth day before the Monday entry date. This form must be filed in court no later than the close of business on the scheduled Monday entry date. In appropriate cases, proper evidence of notice to quit must be provided to this court upon the filing of this complaint. See Uniform Summary Process Rule 2(d). According to Uniform Summary Process Rule 2(c), the hearing date is the second Thursday after the entry date. In some courts, the hearing date is the second Monday, third Tuesday, third Wednesday, or second Friday.

Amended effective: 09/01/05

Page 2 of 2 Pages

EXHIBIT "T"

618.4872
Pg. 2 OF 2

| NOTICE OF NEXT EVENT | DOCKET NUMBER<br>**201025SU001814** | Trial Court of Massachusetts<br>District Court Department |  |
|---|---|---|---|

CASE NAME  HSBC  BANK USA NATIONA ASSOCIATION **vs. TINA HUNTER**

| PARTY TO WHICH THIS COPY OF NOTICE IS ISSUED<br>D01  ARTHUR CAPARELLIOTIS,STEVEN SURABIAN<br>AND ALL OTHER OCCUPANTS<br>85  PIND ST.<br>S YARMOUTH, MA 02664 | CURRENT COURT<br>Barnstable District Court<br>Main Street<br>P.O. Box 427<br>Barnstable, MA 02630-0427<br>(508) 375-6600 |
|---|---|

| ATTORNEY FOR PARTY TO WHICH THIS COPY OF NOTICE IS ISSUED | HEARING SCHEDULED on 10/14/2010<br>09:00 AM RESCHEDULED for 11/18/2010<br>09:00 AM. | ←←←←<br>WHEN<br>YOU<br>MUST<br>APPEAR<br>←←←← |
|---|---|---|
| | ROOM/SESSION | |

**TO THE PARTIES TO THIS CASE:**

The nature, date and time of the next scheduled event concerning this case is indicated above.

**You are required to be present at this event.**

If you have good reason to request the Court to reschedule this event for another date, such request must be made by motion in accordance with the applicable court rule.  Please note that the granting of a continuance is not automatic even when all the parties agree.

Additional Comments (if any):

THIS CASE IS CONTINUED TO  11/18/10 AT 9:00 AM BY THE COURT. BOTH PARTIES ARE TO APPEAR

EXhiBIT T1

| DATE ISSUED<br>10/14/2010 | CLERK-MAGISTRATE/ASST. CLERK<br>C-M Robert E. Powers |
|---|---|

Date/Time Printed:   10/14/2010 11:24 AM

BARNSTABLE : SS:

BARNSTABLE DISTRICT COURT
CIVIL ACTION NO. 201025SU001814

---

HSBC BANK USA, NATIONAL
ASSOCIATION, AS TRUSTEE
FOR SEQUOIA 2004-6,
    Plaintiff,

vs.

STEVEN SURABIAN TRUSTEE FOR
THE RICHARD SURABIAN
IRREVOCABLE TRUST

---

ANSWER OR AMENDED ANSWER

NOW comes Steven Surabian, defendant answer or amended answer. On September 30, 2010 Steven Surabian answered the complaint before he was named as a defendant. On October 14, 2010 a hearing was held and was rescheduled to November 18, 2010. Pursuant to Mass General Law chapter 218 section 19 by way of defendant's counter-complaint which exceeds the District Courts limit, the amount in controversy is $1,275,000.00. Defendant asks the Court to dismiss or remove to Superior Court.

1. I specifically deny the following facts stated in the Complaint: The Plaintiff is not the legal owner of record for the property known as 85 Pond Street Yarmouth, MA. See affidavit of Steven Surabian dated, September 30, 2010 attached to original answer before being informed of the Complaint.

2. I was not properly named in the original Complaint as the Trustee of the Richard Surabian Irrevocable Trust which not only is the legal owner of said property but is also an occupant, tenant.

3. The Plaintiff attempted an unlawful foreclosure and does not posses a deed, as of September 23, 2010 deed was held by the Richard Surabian Irrevocable Trust. See affidavit of Steven Surabian of September 30, 2010 already part of the Court record.

WHEREFORE, defendant prays the Court will dismiss this Complaint

### COUNTERCLAIM

NOW comes Steven Surabian, defendant's Counterclaim of $425,000.00 with triple damages asked for in the amount of $1,275,000.00. Exceeding the limit of the District Court.

EXHIBIT "U" Pg. 1 of 2

1. The Plaintiff did not follow the proper legal procedures to foreclose on the property known as 85 Pond Street South Yarmouth Ma. See the affidavit of Steven Surabian September 30, 2010.

2. The value of 85 Pond Street is in excess of $425,000.00

WHEREFORE, defendant prays the Court will Order Counterclaim Allowed. The Counterclaim exceeds the limits of the District Court an District Court under Mass General Law 218 section 19 Remove to Superior Court the Defendants Counter-Claim.

Steven Surabian Pro se
P. O. Box 397
West Hyannisport, MA 02672
508-688-4613

## CERTIFICATE OF SERVICE

I, Steven Surabian certify I mailed a copy of the above to David Rhein, Box 962169 Boston Ma 02196 first class mail postage prepaid and to Arthur Caparelliotis at 85 Pond Street S. Yarmouth MA 02664.

Steven Surabian

*Exhibit "U" pg 2 of 2*

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE: SS:                          BARNSTABLE DISTRICT COURT
                                         CIVIL ACTION NO. 201025SU001814

HSBC BANK USA, NATIONAL
ASSOCIATION, AS TRUSTEE
FOR SEQUOIA 2004-6,
                    Plaintiff,           MOTION TO MOVE TO
                                         SUPERIOR COURT
vs.

STEVEN SURABIAN TRUSTEE FOR
THE RICHARD SURABIAN
IRREVOCABLE TRUST, ETL.
                    Defendant.

　　　　NOW comes Steven Surabian, Defendants Motion pursuant to Mass General Law
chapter 218 section 19 to move to Superior Court. The amount in the Counter-Complaint exceeds
the limit in District Court. Hearing is requested an to save money and time November 18, 2010
would be best as scheduled date already in place if not acceptable any date before other than
November 10 & 11 2010.

1. The Defendants Counter-Complaint is asking for $ 1,275,000.00

2. $1,275,000.00 exceeds the limit of District Court

　　　　WHEREFORE, this Court has no chose but to have this case moved to the Barnstable
Superior Court.

                                         Steven Surabian Pro se
                                         P. O. Box 397
                                         West Hyannisport, MA 02672
Date: November 1, 2010                   508-688-4613

                         CERTIFICATE OF SERVICE
　　I, Steven Surabian certify I mailed a copy of the above to David Rhein, Box 962169 Boston,
MA 02196 first class mail postage prepaid on November 1, 2010 and to Arthur Caparelliotis at
85 Pond Street South Yarmouth, MA 02664.

                                         Steven Surabian

EXhiBiT "V"

| ORDER | DOCKET NUMBER 201025SU001814 | Trial Court of Massachusetts District Court Department |
|---|---|---|

CASE NAME  HSBC  BANK  USA NATIONA ASSOCIATION  vs.  TINA HUNTER

PARTY TO WHICH THIS COPY OF NOTICE IS ISSUED
P01  HSBC  BANK  USA NATIONA ASSOCIATION

CURRENT COURT
Barnstable District Court
Main Street
P.O. Box 427
Barnstable, MA 02630-0427
(508) 375-6600

ATTORNEY FOR PARTY TO WHICH THIS COPY OF NOTICE IS ISSUED
P01  JOHN C. DORN
   THE LAW OFFICE OF JOHN C. DORN
   PO BOX 840
   E. SANDWIC, MA 02537

## ORDER

ON 11/18/10 DEFENDANT'S STEVEN SURABIAN'S MOTION TO MOVE TO SUPERIOR COURT WAS DENIED.
AFTER HEARING.

EXHIBIT "W"

## NOTICE OF ENTRY OF ORDER

Pursuant to Mass. R. Civ. P. 77(d) and 79(a), this Order has been entered on the docket on the "Date Order Entered" shown below and this notice is being sent to all parties.

| DATE ISSUED 11/19/2010 | JUDGE ISSUING ORDER Hon. W. James O'Neill | CLERK-MAGISTRATE C-M Robert E. Powers |
|---|---|---|

Date/Time Printed:  11/19/2010 08:09 AM

| ORDER | DOCKET NUMBER<br>201025SU001814 | Trial Court of Massachusetts<br>District Court Department  |
|---|---|---|

CASE NAME HSBC  BANK  USA NATIONA ASSOCIATION  vs.  TINA HUNTER

| PARTY TO WHICH THIS COPY OF NOTICE IS ISSUED<br>P01  HSBC  BANK  USA NATIONA ASSOCIATION | CURRENT COURT<br>Barnstable District Court<br><br>Main Street<br>P.O. Box 427<br>Barnstable, MA 02630-0427<br>(508) 375-6600 |
|---|---|
| ATTORNEY FOR PARTY TO WHICH THIS COPY OF NOTICE IS ISSUED<br>P01  JOHN C. DORN<br>    THE LAW OFFICE OF JOHN C. DORN<br>    PO BOX 840<br>    E. SANDWIC, MA 02537 | |

## ORDER

ON 11/18/10  ARTHUR CAPARELLIOTIS'S MOTION TO COMPEL DISCOVERY AND FOR CONTINUANCE WAS
DENIED  AS  DEFENDANT HAS NO STANDING  IN THIS ACTION.   WJO

EXhiBiT "X"

## NOTICE OF ENTRY OF ORDER

Pursuant to Mass. R. Civ. P. 77(d) and 79(a), this Order has been entered on the docket on the "Date Order Entered" shown
below and this notice is being sent to all parties.

| DATE ISSUED<br>11/19/2010 | JUDGE ISSUING ORDER<br>Hon. W. James O'Neill | CLERK-MAGISTRATE<br>C-M Robert E. Powers |
|---|---|---|

Date/Time Printed:   11/19/2010 09:02 AM

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE: SS:                          BARNSTABLE DISTRICT COURT
                                         CIVIL ACTION NO. 201025SU001814

HSBC BANK USA, NATIONAL
ASSOCIATION, AS TRUSTEE
FOR SEQUOIA 2004-6,                      NOTICE OF APPEAL
          Plaintiff,

vs.

STEVEN SYRABIAN TRUSTEE FOR
THE RICHARD SURABIAN
IRREVOCABLE TRUST AND
ARTHUR CAPARELLIOTIS.
          Defendants.

NOW COMES the Defendant Steven Surabian's NOTICE OF APPEAL for the

following:

1. Defendant Arthur Caparelliotis filed a Motion To Compel Discovery, Discovery was
requested prior and Plaintiff refused to comply.

2. Defendant Steven Surabian was entitled to the Discovery as well as all Defendants.

3. There was no need for Defendant Steven Surabian to duplicate Request or Motion To
Compel.

4. Arthur Caparelliotis is a tenant of Steven Surabian and therefore has standing in this action.

5. Plaintiff did not file an Opposition to this Motion, this was an un-opposed Motion.

WITHOUT any bases the Order stated Arthur Caparelliotis As Defendant Has No
Standing In This Action.

As a Tenant Arthur Caparelliotis is a defendant. See attached Exhibits "A & B"
and without opposition this Motion should have been ALLOWED.

6. Motion To Move To Superior Court was filed on November 1st 2010.

7. Plaintiff did not file an Opposition.

EXHIBIT "Y" PG 1 OF 2

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, SS.

BARNSTABLE DIVISION DISTRICT COURT
CIVIL ACTION NO. 201025SU1814

HSBC BANK USA, NATIONAL ASSOCIATION,
AS TRUSTEE FOR SEQUOIA 2004-6
        Plaintiff,

v.

TINA HUNTER aka RUTH S. HUNTER,
STEVEN SURABIAN and ARTHUR
CAPARELLIOTIS.
        Defendants.

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT

Now comes the Defendant, Steven Surabian and respectfully requests that this Court

Deny the Plaintiff's Motion for Judgment for Possession.

In support of this objection the Defendant states the Following:

1. The Plaintiff has allowed only four days time for the Defendants to respond. Defendant

Steven Surabian received Motion Monday December 5, 2010. Therefore Defendant

objects to the hearing date of December 9, 2010. ( See attached CERTIFICATE OF

SERVICE EXHIBIT  D ).

2. The defendants were not officially added as defendants by the Plaintiff.

3. Steven Surabian was always in possession of 85 Pond Street even while Ms. Hunter

was a tenant. See Ms Hunters Affidavit Plaintiff's Exhibit E # 2 & 3.  Ruth S. Hunter

states she never had access to the garage portion of the premises or the area above the

garage  The area above the garage is the third bedroom. When Ruth S. Hunter moved into

$EXhiBiT$ "Z" $pg\ 1\ oF\ 13$

85 Pond St. Ms. Hunter states Steven Surabian had personal belongings in the garage, the room above the garage and in the attic.

4. The Defendant, Steven Surabian alleges the Plaintiff conducted an illegal foreclosure auction at 85 Pond Street, Yarmouth, MA 02664. ( Please see EXHIBIT A for a copy of the defendant's Case Opening Notice in the United States Court of Appeals For the First Circuit case No. 10-2400).

5. Steven Surabian was never a mortgagor. (See EXHIBIT B Notice of Appeal ).

6. Plaintiff had no right to negotiate a Relocation Agreement with Steven Surabian's tenant.

7. On June 29, 2010 Steven Surabian the legal owner of the property at 85 Pond St. signed a Quitclaim Deed to STEVEN SURABIAN, as TRUSTEE of the RICHARD SURABIAN IRREVOCABLE TRUST. ( See EXHIBIT C ).

8. Steven Surabian has the right to enter the property at 85 Pond St., he is the Trustee of the Legal owner.

9. Steven Surabian as the Trustee for the legal owner has the right to lease the property at 85 Pond Street to Arthur Caparelliotis.

10. Steven Surabian's Motion heard on November 10, 2010 was Denied by Judge W. James O'Neil, the Motion was to Transfer to Superior Court.

11. Judge O'Neil did not Deny Steven Surabian's Motion because Steven Surabian lacked standing as the Plaintiff now claims. ( See Plaintiff's EXHIBIT F for copy of Judges order ).

12. Mr. Caparelliotis still occupies the property, which was legally rented to him by Steven Surabian.

13. Steven Surabian on March 25, 2010 filed a Verified Complaint for the attempted illegal

Exhibit "2" pg 2 of 13.

Foreclosure against HSBC Bank Jury Demand with a preliminary injunction scheduled for

April 22, 2010.

14. HSBC Bank on April 16, 2010 moved the case to Federal Court without telling the

Federal Court about the scheduled preliminary injunction.

15. While the case was still open HSBC Bank conducted an illegal auction on April 22, 2010,

which HSBC Bank has admitted to.

16. This case is now on Appeal. ( See EXHIBIT A ).

WHEREFORE, Steven Surabian respectfully requests that this Court Deny the Plaintiff's
Motion for possession.

---

Steven Surabian Pro se
P. O. Box 397
W. Hyannisport, MA 02672
508-688-4613

DATED: December 8, 2010

EXHIBIT "Z" Pg 3 oF 13

# United States Court of Appeals
## For the First Circuit

No. 10-2400

STEVEN SURABIAN

Plaintiff - Appellant

v.

HSBC BANK USA, NA, as Trustee Sequoia Mortgage Trust 2004-6

Defendant - Appellee

### CASE OPENING NOTICE

Issued: December 1, 2010

The above-captioned appeal was docketed in this court today pursuant to Rule 12 of the Federal Rules of Appellate Procedure. The above case number and caption should be used on all papers subsequently submitted to this court. If any party disagrees with the clerk's office's designation of the parties on appeal, it must file a motion to amend the caption with any supporting documentation attached. Absent an order granting such a motion, the parties are directed to use the above caption on all pleadings related to this case.

Upon confirmation by the circuit clerk that the record is complete either because no hearing was held, no transcript is necessary, or the transcript is on file, the clerk's office will set the briefing schedule and forward a scheduling notice to the parties.

Within seven days of filing the notice of appeal, appellant must pay the filing fee to the district court clerk. An indigent appellant who seeks to appeal in forma pauperis must file a motion and financial affidavit in the district court in compliance with Fed. R. App. P. 24. Unless this court is provided with notice of paying the filing fee to the clerk of the district court or filing a motion seeking in forma pauperis status within fourteen days of the date of this notice, this appeal may be dismissed for lack of prosecution. 1st Cir. R. 3.0(b).

An appearance form should be completed and returned immediately by any attorney who wishes to file pleadings in this court. 1st Cir. R. 12.0(a) and 46.0(a)(2). *Pro se* parties are not required to file an appearance form. Any attorney who has not been admitted to practice before the First Circuit Court of Appeals must submit an application and fee for admission with the appearance form. 1st Cir. R. 46.0(a)(2).

EXHIBIT A  Pg 1 of 2

EXHIBIT "Z"  Pg 4 of 13

Dockets, opinions, rules, forms, attorney admission applications, the court calendar and general notices can be obtained from the court's website at www.ca1.uscourts.gov. Your attention is called specifically to the notice(s) listed below:

- Notice to Counsel and Pro Se Litigants
- Transcript Notice

If you wish to inquire about your case by telephone, please contact the case manager at the direct extension listed below.

Margaret Carter, Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210
Case Manager: Todd Smith - (617) 748-4273

EXHIBIT A pg 2 of 2

EXHIBIT "Z" pg 5 of 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

STEVEN SURABIAN
      Plaintiff,

v.
                           Civ. No. 1:10-cv-10643-RWZ

HSBC BANK USA, NA as TRUSTEE
SEQUOIA MORTGAGE TRUST 2004-6,
      Defendant

---

## PLAINTIFF, STEVEN SURABIAN'S NOTICE OF APPEAL

    Plaintiff Steven Surabian hereby gives Notice of Appeal, As grounds therefore, Steven Surabian states the following:

    1.  Defendant claims in opposition # 1 of HSBC Bank's Opposition to Plaintiff's Motion to Reinstate, that Plaintiff claims the Mortgage was unlawful because each page of the loan documents was not notarized. The Plaintiff's in fact claims that because the documents are not notarized that is proof that those documents are forged.

    2.  Defendants also claim in # 1 of their opposition that on April 22, 2010, HSBC filed a motion to dismiss, arguing that Surabian failed to state a claim upon which relief can be granted and by May 10, 2010, the Court had not received any opposition from Surabian and accordingly, it ( I presume the Court ) allowed HSBC'S motion and dismissed the complaint .Defendant never claimed or argued that the Plaintiff's filed opposition untimely or the date Plaintiff received Defendant's motion to dismiss. Attached as Exhibit "A" is the return receipts mailed to the Court and Defendant of Plaintiff's opposition mailed on May 7, 2010 and received by May 10, 2010 Also see attached Exhibit "B" letter by Harmon Law Offices, P.C. dated May 3, 2001 prior to the Courts dismissal on May 10, 2010 that 85 Pond street was unlawfully auctioned prior and with out proper legal proceedings, which the plaintiff is seeking relief from.

    3.  Defendant claims on May 18, 2010, Plaintiff, Surabian filed a motion for relief from judgment. HSBC filed an opposition on May 25, 2010 and on June 1, 2010, the Court ordered that Surabian file an opposition to HSBC's previously-filed motion to dismiss, which the Defendant admits was done. The Defendant claims after a review of the papers and arguments presented by both parties, the Court found that there was "no reason for [Surabian's] failure to submit a timely opposition to dismiss and none of his papers refute [HSBC's] arguments that the complaint lacks merit." the case was then terminated.

    4.  The bases for Surabian's Notice of Appeal is as follows:

*Exhibit B pg 1 of 4*
*Exhibit 2 pg 6 of 13*

A. The Plaintiff Steven Surabian sought relief from the defendant's attempted unlawful foreclosure by filing a verified complaint in Massachusetts Superior Court

B. The Plaintiff claimed the documents the Defendant claimed gave the Defendant the right to foreclose were not any documents signed by the Plaintiff.

C. There fore there were no documents authorizing the Defendant to fore close

D. There was a scheduled preliminary injunction in the Massachusetts Superior Court see Exhibit "C" but the Defendant failed to inform this Court when the Defendant moved this case from Massachusetts Superior Court to the United States District Court District Of Massachusetts see Exhibit "D." Part of Defendant's fraud in denying the Plaintiff protection under the law from the Defendant's fraudulent foreclosure. This case should have been returned to the Massachusetts Superior Court.

E. On April 22, 2010 Defendant filed a motion to dismiss or in the alternate a more defined statement. Defendants never filed proof of when the Plaintiff received the motion

F. On May 3, 2010 Harmon Law Offices, P.C. acknowledges the property at 85 Pond Street Yarmouth, MA was foreclosed while this Plaintiff's case was still pending seeking protection from the Court.

G. Plaintiff mailed their opposition on May 7, 2010 and was received by May 10, 2010. See Exhibit "A."

H. A judgment Dismissing without prejudice was entered on May 10, 2010 stating Allowed Without Opposition . See Exhibit "E". Judge Zobel should not have protected the Defendants fraud and should have:

1. Returned the case to the Massachusetts Superior Court were the Plaintiff sought protection from the fraud the Defendants were conducting because this case belonged in the state court or

2. Allow Motion for a more defined statement from the Plaintiff, if one was warranted or

3. Denied the Defendants Motion

4. This Courts Ruling was clearly in error by claiming Without Opposition no mention was ever made as to an Untimely Opposition

I. May 17, 2010 Plaintiff made Motion Request Relief From A Judgment or Order indicating objection to Defendants Motion to Dismiss or requesting a more defined statement and objection was filed timely from the date Plaintiff received the Defendant's motion. See Exhibit "F."

EXhIBiT B Pg 2 oF 4
BXh,B IT "2" Pg 7 oP 13

1. Plaintiff indicated their was Opposition to the Defendant's Motion to dismiss or in the alternate a request for a more defined statement

2. There was no need to indicate the Opposition was filed timely as the Order did not address that issue, only issue the Court mentioned was that No Opposition was filed so Plaintiff only argued that one was filed and received

3. Plaintiff indicated to that date, Defendant was in default by not answering the Complaint

4. This Court Allowed the Defendant to go further with their fraud

5. On May 15, 2010 Defendant first indicated that it was not that the Plaintiff failed to file Opposition but that the Opposition was filed untimely. Defendant did not provide the Court with affidavits or other proof that the Plaintiff filed untimely. See Exhibit "G."

A. Defendant alleged the Court should deny the Request because the Plaintiff has not demonstrated that the allegation in the complaint can properly withstand even the most lenient standard in a motion to dismiss

   1. Defendant admits that there is no proof that the documents the Defendant claims give them the right to foreclose are documents the Plaintiff signed. Defendant admits no notarized seals

   2. The Defendant foreclosed by evading the scheduled Motion Preliminary Injunction by falsely stating to this Court that there were no scheduled Motions

   3. Judge Zobel on May 10, 2010 Allowed the motion to dismiss without prejudice and no mention that the complaint was without merit only that there was no Opposition even though there was an Opposition.

J. June 1, 2010 Judge Zobel gave Plaintiff till June 9, 2010 to file Opposition to the motion to dismiss and to cite some legal authority against the motion to dismiss

   1. On June 3, 2010 the Plaintiff filed Opposition. See Exhibit "H "marked also as exhibit "A & B".

   2. Only on June 11, 2010 does Judge Zobel raise the issue that the original Complaint lacks merit and Denied the Plaintiff's Motion for Relief From A Judgment Or Order. The only conclusion of this is that Judge Zobel could not keep protecting the Fraud being pursued by the Defendant on the grounds that Opposition was not filed or not filed timely.

K. Plaintiff filed a Motion To Reinstate and on November 8, 2010 the Defendant filed Opposition

EXhiBiT B pg 3 oF 4
Exhi BIT "Z" pg 8 oF 13

1. Defendant's Opposition # 1 states that there was no opposition as of May 10, 2010 See Exhibit "A" Proof the Court and the Defendant was in possession of Plaintiff's Opposition. Judge Zobel eared in allowing the Motion and thus in the dismissal.

2. Defendant admits that the Mortgage documents are unlawful because each page of the loan documents were not notarized and were doctored before recording.

L. On November 12, 2010 Judge Zobel Denied Plaintiffs Motion To Reinstate citing Plaintiff failed to show were the Court was in error. Plaintiff claims if Judge Zobel was not so adamant about protecting the Defendant Judge Zobel was in possession of enough documents by the Plaintiff as shown above to have Denied the Defendant's Motion to Dismiss. Judge Zobel interpreted on her own that the Plaintiff did not or filed late their Opposition, Defendant never raised that argument until after Judge Zobel made that unwarranted assumption.

!. Judge Zobel should have concluded that this case be returned to the Massachusetts Superior Court because that is were the Plaintiff had protection from an unlawful Foreclosure

2. Judge Zobel never mentioned how the Plaintiff failed to file their Opposition or how their filing was untimely

WHERE for the Plaintiff prays this Appeal will be excepted and heard

Steven Surabian Pro se
P. O. Box 397 West Hyannisport, MA 02672
508-688-4613

Date; November 17, 2010

## CERTIFICATE OF SERVICE

I Steven Surabian certify that a copy of the above was mailed on November 17, 2010 postage paid 1st class mail to the defendant's attorney, Joseph P. Calandrelli, Prince, Lobel, Glovsky & Tye LLP, 100 Cambridge Street, Suite 2200 Boston, MA 02114.

_____

Steven Surabian

EXhiBiT B pg 4 oF 4
EX hiBiT "2" pg 9 oF 13

## QUITCLAIM DEED

I, STEVEN SURABIAN, surviving joint tenant, of 1230 Route 28, South Yarmouth, MA 02664,

in consideration of ONE and 00/100 ($1.00) DOLLAR, paid, grant to STEVEN SURABIAN, as

TRUSTEE of the RICHARD SURABIAN IRREVOCABLE TRUST, under a Declaration of

Trust dated October 9, 2008, an abstract of which is recorded in Book 24561 Page 16, of 1230

Route 28, South Yarmouth, MA 02664 with QUITCLAIM COVENANTS, the land together

with the buildings thereon, situated in Yarmouth (South), Barnstable County, Massachusetts,

with a property address of 85 Pond Street, South Yarmouth, Massachusetts, more particularly

bounded and described as follows:

Beginning at the Southeast corner of the granted premises at the northeast corner of Lot 20, as
shown on a plan hereinafter mentioned and Pond Street;

Thence S. 59 degrees 03' W. one hundred nine and 31/100 (109.31) feet;

Thence running N. 31 degrees 44' W. by Matthews' land, eighty and 01/100 (80.01) feet to land
of Preston Duff, et ux;

Thence N. 59 degrees 03' E. by said Duff land, one hundred ten and 40/100 (110.40) feet to
Pond Street;

Thence running S. 30 degrees 57' 00" E. by Pond Street, eighty and 00/100 (80.00) feet to the
Northeast corner of Lot 20 as shown on said plan, it being the point of beginning.

Being Lot 19 as shown on a plan of land entitled "Pawkannawkut Village" duly filed in
Barnstable County Registry of Deeds in Plan Book 80 Page 21.

Subject to and with the benefit of all rights, rights of way, easements, restrictions and
reservations of record insofar as the same are in force and applicable.

EXhIBIT "Z" pg 10 OF13.

EXhIBIT C. pg 1 OF 2

Sandra L. Armstrong
Notary Public
My Commission Expires December 16, 2016
Commonwealth of Massachusetts

For title see deed from John J. Butler and Carolyn F. Butler dated April 23, 2004 recorded in Book 18489 Page 331 with the Barnstable County Registry of Deeds.

PROPERTY ADDRESS: 85 Pond Street, South Yarmouth, MA 02664.

WITNESS our hands and seals this 28 day of June , 2010.

_Steven Surabian_ (signature)
Steven Surabian

## COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss.                                        June 28 , 2010

Then personally appeared the above named Steven Surabian, proved to me through satisfactory evidence of identification, which was __M A DL__ to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

My Commission Expires:                   _Sandra L Armstrong_ (signature)
                                         Notary Public

Sandra L. Armstrong
Notary Public
My Commission Expires December 16, 2016
Commonwealth of Massachusetts

EXHIBIT "Z" PG 11 OF 13

EXHIBIT C PG 2 OF 2

BARNSTABLE REGISTRY OF DEEDS

## CERTIFICATE OF SERVICE

I, David Rhein, hereby certify that on December ____, 2010, I served a copy of the foregoing by mailing a copy first class mail, postage prepaid to: Mr. Caparelliotis and Mr. Surabian, 85 Pond Street, Yarmouth, MA 02664, Yarmouth, MA 02664

_____
David J. Rhein, Esq.

EXHIBIT D 1

EXHIBIT "Z" pg 12 OF 13

Exhibit D.2

Mr. steven Syrian
85 Pond street
Yarmouth, MA 02664

EXHIBIT "2" pg 13 of 13

oran PLLC
962169
IA 02196

**2**

Westlaw.

Slip Copy, 2011 WL 381612 (E.D.N.Y.)
(Cite as: 2011 WL 381612 (E.D.N.Y.))

**C**Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
NATIONWIDE MUTUAL INSURANCE COM-
PANY as subrogee of Gail D. Jones-Lewis, Plaintiff,
v.
MORNING SUN BUS COMPANY and Xiao B.
Wang, Defendants.

No. 10-CV-1777 (ADS)(AKT).
Feb. 2, 2011.

Epstein Frankini & Grammatico, by: Claude N.
Grammatico, Esq., of Counsel, Woodbury, NY, for
the Plaintiff.

Lavin, O'Neil, Ricci, Cedrone & DiSipio, by:
Timothy J. McHugh, Esq., of Counsel, New York,
NY, for the Defendants.

**MEMORANDUM OF DECISION AND ORDER**
SPATT, District Justice.

*1 This case arises from personal injuries sus-
tained by Gail D. Jones-Lewis ("Jones-Lewis"), in a
bus accident in Connecticut between a bus owned by
Best Trails and Travel, Inc. ("Best Trails") and a bus
leased by Morning Sun Bus Company ("Morning
Sun"). Jones-Lewis was a passenger on the Best
Trails bus when it collided with the Morning Sun
bus, which was being driven by Xiao B. Wang
("Wang" and together with Morning Sun "the Defen-
dants"). Pursuant to an insurance policy with Na-
tionwide Mutual Insurance Company ("Nationwide"
or "the Plaintiff"), Jones-Lewis received certain no-
fault benefits for her injuries.

On April 21, 2010, Nationwide, as subrogee of
Jones-Lewis, commenced this subrogation action
against the Defendants seeking to recover the no-fault
insurance payments pursuant to New York General
Insurance Law § 5104. Presently before the Court is
the Defendants' motion to dismiss the complaint pur-
suant to Fed.R.Civ.P. 12(b) (2) for lack of personal
jurisdiction and Fed.R.Civ.P. 12(b)(6) for failure to
state a claim. For the reasons that follow, the Court
grants the motion to dismiss for lack of personal ju-

risdiction as to both of the Defendants. Because the
Court ultimately finds that it lacks personal jurisdic-
tion over both of the Defendants, it does not reach the
issue of whether the complaint states a claim for re-
lief.

**I. BACKGROUND**

The following facts are drawn from the com-
plaint, motion papers and annexed exhibits submitted
by the parties, and are construed in the light most
favorable to the Plaintiff.

*A. Factual Background*

The Plaintiff, Nationwide Mutual Insurance
Company, is a foreign corporation licensed to do
business in the State of New York. Defendant Morn-
ing Sun Bus Company is a Massachusetts corporation
with its primary place of business in Norfolk, Massa-
chusetts. Defendant Xiao B. Wang is a Massachusetts
resident and employee of Morning Sun. The relevant
facts giving rise to this case are as follows.

On April 21, 2007, Wang was driving a Morning
Sun bus when he was involved in a motor vehicle
accident with a Best Trails bus in the Autumn Bus
Lobby at the Mohegan Sun Casino in Uncasville,
Connecticut. Gail Jones-Lewis, a New York resident,
was passenger on the Best Trails bus and sustained
injuries as a result of the accident.

At the time of the accident, Jones-Lewis had a
personal automobile insurance policy with National-
wide that had been issued from Nationwide's office in
Woodbury, New York (the "Jones-Lewis policy").
As a result of Jones-Lewis's injuries from the acci-
dent, Nationwide paid certain no-fault benefits on her
behalf, including $53,289.43 in Personal Injury Pro-
tection ("PIP") payments and $47,520.70 in Addi-
tional Personal Injury Protection ("APIP") payments
(the "no-fault benefits"). Under the Jones-Lewis pol-
icy, Nationwide has a right to seek reimbursement for
the no-fault benefits from the third parties involved in
the accident, in this case Wang and Morning Sun.

*2 On April 21, 2010, Nationwide commenced
the instant action as subrogee of Jones-Lewis, seek-
ing to recover the above stated no-fault benefits from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 381612 (E.D.N.Y.)
(Cite as: 2011 WL 381612 (E.D.N.Y.))

the Defendants under New York General Insurance Law § 5104. Both of the Defendants signed a waiver of service of the summons and complaint preserving their objections to the jurisdiction of this Court. (Docket Nos. 8, 9.)

In addition to the instant litigation, Jones-Lewis's injuries from this accident have been the subject of two additional lawsuits. The first was a personal injury lawsuit filed on October 24, 2008 by Jones-Lewis and another Best Trails passenger in the Superior Court in the State of Connecticut, Jurisdiction of New London (the "Connecticut action"). The defendants in the Connecticut action are Morning Sun, Wang, Best Trails, the driver of the Best Trails bus Alexandr Dorin, and ABC Bus Leasing Inc. ("ABC Leasing"), the owner of the bus leased to Morning Sun. The Connecticut action is still pending.

The second related lawsuit was filed on or about September 11, 2009 in the Supreme Court of the State of New York, County of Nassau (the "State Court action"). Nationwide commenced the State Court action as subrogee of Jones-Lewis against ABC Leasing, Morning Sun, Wang, Best Trails, and Dorin, seeking the same relief presently sought before this Court. By Order dated January 21, 2010, the Honorable Thomas Feinman of the Supreme Court of the State of New York, County of Nassau dismissed the State Court action as against Wang for lack of personal jurisdiction. Subsequently, while the instant motions were pending, the State Court action was discontinued without prejudice.

On June 28, 2010, the Defendants brought the present motions to dismiss alleging that the Court lacks personal jurisdiction over both Morning Sun and Wang, and that Nationwide cannot state a claim for relief under New York, Massachusetts, and Connecticut law. For its part, Nationwide contends that New York law is applicable and that it has stated a claim under New York law, and the motion to dismiss for lack of personal jurisdiction is premature because jurisdictional discovery is necessary to resolve the issue.

## II. DISCUSSION

### A. Legal Standard on a Motion to Dismiss under Fed.R.Civ.P. 12(b)(2)

Fed R. Civ. P. 12(b)(2) ("Rule 12(b)(2)") permits a defendant to challenge a court's personal jurisdic-

tion over it prior to the filing of an answer or the commencement of discovery. In diversity cases, "personal jurisdiction is determined by the law of the state in which the district court sits, which in this case is New York." *DiStefano v. Carozzi North Am., Inc.,* 286 F.3d 81, 84 (2d Cir.2001). Accordingly, in analyzing a Rule 12(b)(2) motion, courts in New York follow a two-step process. First, a court will determine whether personal jurisdiction lies pursuant to any of the provisions of New York's long-arm statute, CPLR §§ 301 and 302. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.,* 319 F.Supp.2d 352, 357 (S.D.N.Y.2004) (citing *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 105, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987)). Second, a court must analyze whether personal jurisdiction comports with the basic requirements of due process. *Id.*

*\*3* "A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA), Inc. v. Am. Buddha,* 609 F.3d 30, 34 (2d Cir.2010); *Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir.2001). In deciding a motion to dismiss for lack of personal jurisdiction, the Court may rely upon materials that are outside the pleadings, including any affidavits submitted by the parties. *See DiStefano,* 286 F.3d at 84. However, where, as here, the Court "relies on the pleadings and affidavits, and chooses not to conduct a 'full-blown evidentiary hearing,' plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant." *Porina v. Marward Shipping Co., Ltd.,* 521 F.3d 122, 126 (2d Cir.2008); *Penguin,* 609 F.3d at 34-35. "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant ." *Id.* at 35 (internal quotations and alterations omitted); *see also Tamam v. Fransabank Sal,* 677 F.Supp.2d 720, 725 (S.D.N.Y.2010) ("A *prima facie* showing of jurisdiction does not mean that plaintiff must show only some evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction.") (internal quotation marks omitted).

### B. Whether the Court has Personal Jurisdiction over Morning Sun

Pursuant to the New York long-arm statute, there

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

are two ways that a New York court can exercise personal jurisdiction over a non-resident defendant: general jurisdiction pursuant to N.Y. C.P.L.R. § 301 ("section 301") or specific jurisdiction pursuant to N.Y. C.P.L.R. § 302 ("section 302").

As an initial matter, the Court notes that in pleading the allegations in the complaint relating to jurisdiction, Nationwide essentially adds "Morning Sun Bus Company, Inc., its agents, servants and/or employees" to a formulaic recitation of the long-arm statute. By simply stating the standard, Nationwide asks this Court to find, without any corroborating facts, that Morning Sun *by definition* has the required contacts with New York required to satisfy the long-arm statute, even those which contradict each other and the undisputed facts of the case. For example, despite the undisputed fact that there is only one relevant tort-alleged negligence causing an automobile accident in Connecticut-Nationwide inexplicably pleads both that Morning Sun committed a tort within the State of New York to satisfy section 302(a)(2) (Compl., ¶ 17), and that Morning Sun committed a tort outside of New York to satisfy section 302(a)(3) (Compl., 22).

The Second Circuit has held that a plaintiff cannot meet the burden of showing a prima facie case of jurisdiction where the complaint asserts only "conclusory non-fact-specific jurisdictional allegations" and a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 185 (2d Cir.1998) (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)); *accord Galerie Gmurzynska v. Hutton,* 257 F.Supp.2d 621, 625 (S.D.N.Y.2003) ( "However, conclusory allegations are not enough to establish personal jurisdiction.") (internal quotation marks omitted), *aff'd,* 355 F.3d 206 (2d Cir.2004). Nevertheless, even accepting the allegations as true for the purposes of this motion, the Court finds that Nationwide has failed to make a prima facie showing of personal jurisdiction over Morning Sun.

*4 In addition, Nationwide contends the Court should deny the motion to dismiss because Morning Sun has not provided affirmative evidence that the Court lacks personal jurisdiction. However, it is well-settled that the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA), Inc. v. Am. Buddha,* 609 F.3d 30, 34-35 (2d Cir.2010). Thus, contrary to Nationwide's assertion, the burden was not on Morning Sun to show that it was not subject to personal jurisdiction, but rather the burden was on Nationwide to plead facts that, if true, would provide the Court with personal jurisdiction.

Finally, it is not entirely clear to the Court whether Nationwide seeks to premise personal jurisdiction over Morning Sun on section 301, section 302, or both. In opposition to the instant motion, Nationwide only addresses whether Morning Sun is subject to the Court's specific jurisdiction under section 302. However, there are certain allegations in the complaint and arguments in Nationwide's opposition to the instant motion that appear to assert that Morning Sun is subject to general jurisdiction in New York. Specifically, Nationwide states in the complaint that Morning Sun is authorized to do business in New York and that Morning Sun, its agents and employees are engaged in business in New York. As discussed in detail below, under certain circumstances these allegations could support general jurisdiction under section 301. Moreover, the only example of an actual contact with New York that Nationwide cites is Morning Sun's website, which is accessible in New York. To the extent this constitutes solicitation of business in New York, in combination with other factors this too could support general jurisdiction. Thus, in an abundance of caution, the Court considers whether Nationwide has made a prima facie case that Morning Sun is subject to general jurisdiction in New York.

**1. As to General Jurisdiction pursuant to CPLR § 301**

CPLR § 301 provides for jurisdiction over a defendant that is "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in the state." *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998) (internal quotation marks and citation omitted). "[A] corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Wiwa v. Royal Dutch Petroleum Co.,* 226

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 381612 (E.D.N.Y.)
(Cite as: 2011 WL 381612 (E.D.N.Y.))

F.3d 88, 95 (2d Cir.2000) (internal citation and quotation marks omitted). In determining whether a defendant is subject to general jurisdiction, New York courts look to a number of factors including: (1) "the existence of an office in New York"; (2) "the solicitation of business in the state"; (3) "the presence of bank accounts and other property in the state"; and (4) "the presence of employees of the foreign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985).

*5 Nationwide vaguely alleges that Morning Sun has employees and property in New York, and engages in business in New York, but otherwise fails to include any detail that may suggest that the property, employees, and business transactions are substantial enough to constitute "doing business" in New York. Furthermore, while Morning Sun's website could potentially fall within the category of "solicitation of business in the state," it is well-established that " 'solicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services.' " *Xiu Feng Li v. Hock,* 371 Fed. Appx. 171, 174 (2d Cir.2010) (quoting *Laufer v. Ostrow,* 55 N.Y.2d 305, 310, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982)); *Spencer Trask Ventures v. Archos S.A.,* No. 01-CV-1169, 2002 WL 417192, at *6 (S.D.N.Y. Mar. 18, 2002) ("[T]he fact that a foreign corporation has a website accessible in New York is insufficient to confer jurisdiction under CPLR § 301.").

Nevertheless, jurisdiction under section 301 may be appropriate based on Nationwide's allegation that Morning Sun is authorized to do business in New York. Generally, a party authorized to do business in New York is subject to general jurisdiction in New York regardless of whether it conducts substantial business in New York. See *Amalgamet, Inc. v. Ledoux & Co.,* 645 F.Supp. 248, 249 (S.D .N.Y.1986) ("Defendant argues that the mere fact that it was authorized to do business in New York does not confer personal jurisdiction on this court. However, the general rule is that a foreign corporation which files a certificate of authority to do business in New York has consented to personal jurisdiction in the state."). There is a rationale for asserting jurisdiction solely based on authorization to business in New York. Pursuant to New York Business Corporation Law § 304(b), when a company obtains authorization to do business in New York, there is a "concomitant desig-

nation of the Secretary of State as its agent for service of process," which is considered a "consent to in personam jurisdiction." *Augsbury Corp. v. Petrokey Corp.,* 97 A.D.2d 173, 175, 470 N.Y.S.2d 787, 789 (3d Dep't 1983).

For its part, Morning Sun disputes that it is authorized to do business in New York by: 1) stating in its moving brief that Morning Sun is "not authorized to do business in New York" and 2) attaching to its moving brief a printout from the New York Department of State: Division of Corporations website showing that "Morning Sun Bus Company" is not listed as an entity authorized to do business in New York. (*See* Pl.'s Br. at 7; Ex. F.) Although the Court can consider evidence outside of the complaint on a Rule 12(b)(2) motion to dismiss, the Court finds neither the statement nor the website to be admissible evidence. A statement in a memorandum of law, as opposed to one in an affidavit from a person with knowledge, is insufficient to raise an issue of fact. See *In re Teligent, Inc.,* Nos. 01-12974, 03-3577, 2004 WL 724945, at *4 (Bankr.S.D.N.Y. Mar. 30, 2004) (disregarding anti-jurisdictional facts that the defendant asserted in a memorandum of law, where the defendant did not include a supporting affidavit based on personal knowledge). In addition, without any explanation or affirmation as to its evidentiary value or admissibility, the Court affords no weight to the printout from the New York Department of State website. While neither the statement nor the printout are admissible evidence to prove that Morning Sun is not authorized to do business in New York, they do raise a serious question as to whether Morning Sun is in fact authorized to do business in New York.

*6 Further undermining the credibility of Nationwide's assertion that Morning Sun is authorized to do business in New York, is that Nationwide inexplicably also alleges in the complaint that Morning Sun is *not* authorized to do business in New York. (Compl., ¶ 15.) "Where plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the **contradictory allegations** in the pleadings as true in deciding a **motion to dismiss.**" *In re Richartz, Fliss, Clark & Pope, Inc.,* Adv. No. 10-03317, 2010 WL 4502038 (Bankr.S.D.N.Y.2010); *Fisk v. Letterman,* 401 F.Supp.2d 362, 368 (S.D.N.Y.2005) ("The Court, however, is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters as-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

serted or relied upon or incorporated by reference by a plaintiff in drafting the complaint."). In light of the contradictory statements in Nationwide's complaint, this factual issue is insufficient to defeat the present motion.

However, while the Court questions the veracity of such a claim, Nationwide has at least raised an issue of fact as to whether Morning Sun is authorized to do business in New York and thus subject to personal service in New York. In the appropriate cases, it is the "usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991). Thus, the Court will afford Nationwide twenty days from the date of this order to amend its pleading to clarify whether it alleges that Morning Sun is authorized to do business in New York so that service on Morning Sun can be effectuated either on the Secretary of State or another authorized agent in New York. Given Morning Sun's statement that it is not authorized to do business in New York, the Court cautions Nationwide to remember that Fed.R.Civ.P. 11(b) requires a party to have "evidentiary support" for its factual allegations, and to note that discovery is not required to ascertain whether a company is authorized do business and subject to service in New York.

**2. As to Specific Jurisdiction Pursuant to CPLR § 302**

Section 302 of New York's long-arm statute provides that:

(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of

character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

*7 (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a) (McKinney 2010). In support of its argument that Morning Sun is subject to specific jurisdiction under the long-arm statute, Nationwide primarily relies on the recitation of the long-arm statute in the complaint, and the notion that a "single transaction" through Morning Sun's website can confer jurisdiction. With regard to the website, Nationwide attaches as an exhibit to the Affidavit of Claude N. Grammatico ("Grammatico Affidavit") four pages apparently printed from Morning Sun's website. The first page appears to be a printout of a home page with a photograph of buses and a header on top of the page that says "Morning Sun Bus Company" and "We Specialize in Bus Tours & Chartered Service." (Grammatico Aff., Ex. D.) The second page includes four links a customer can click on entitled: About Us, Services, Booking, and Contact Us. The third page included is the "About Us" page, which states that Morning Sun provides a safe, comfortable and enjoyable service in the "New England Region," that is "easy to access, easy to use and easy to get you where you want to go." Finally, the fourth page provides contact information, identifying the location of Morning Sun as "219 Quincy Ave. Unit 93, Quincy, MA 02169" and stating that for booking information customers should contact an individual named George Wu at one of four Massachusetts phone numbers, or an email address. (*Id.*)

As set forth below, the Court finds that Nationwide has not met its burden as to any of the prongs of section 302.

**a. CPLR § 302(a)(1)**

"To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 381612 (E.D.N.Y.)
**(Cite as: 2011 WL 381612 (E.D.N.Y.))**

defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt. LLC,* 450 F.3d 100, 103 (2d Cir.2006). "[A] suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 246 (2d Cir.2007) (internal quotation marks and citation omitted). A connection that is "merely coincidental" is insufficient to support jurisdiction. *Johnson v. Ward,* 4 N.Y.3d 516, 520, 797 N.Y.S.2d 33, 35, 829 N.E.2d 1201, 1203 (N.Y.2005).

To support personal jurisdiction under section 302(a)(1), Nationwide alleges in the complaint that Morning Sun transacts business in New York and contracts to provide goods and services in New York. In addition, Nationwide contends that, even if Morning Sun's website does not rise to the level of "doing business" in New York for general jurisdiction, the long-arm statute is a "single act statute," and therefore personal jurisdiction is proper based on Morning Sun's "transaction of business through its website." (Pl.'s Br. at 9.) In response, Morning Sun claims that its website does not rise to the level of transacting business. However, even if did, Nationwide has still failed to make a prima facie showing of personal jurisdiction because Nationwide does not allege that any of Morning Sun's business transactions in New York, through its website or otherwise, were connected to the underlying cause of action.

**\*8** The fact that individuals in New York can access Morning Sun's website does not constitute "transacting business" for the purposes of section 302(a)(1) unless Morning Sun, through its website or other commercial activity, has some additional connection to New York. *See, e.g., ISI Brands, Inc. v. KCC Intern., Inc.,* 458 F.Supp.2d 81, 87-88 (E.D.N.Y.2006) (noting that "[e]ven the existence of an interactive 'patently commercial' website that can be accessed by New York residents is not sufficient to justify the exercise of personal jurisdiction unless some degree of commercial activity occurred in New York."); *Savage Universal Corp. v. Grazier Constr., Inc.,* 2004 WL 1824102, at \*9 (S.D.N.Y. Aug. 13, 2004) ("It stretches the meaning of 'transacting business' to subject defendants to personal jurisdiction in any state merely for operating a website, however

commercial in nature, that is capable of reaching customers in that state, without some evidence or allegation that commercial activity in that state actually occurred."); *Chloe, Div. of Richemont North Am., Inc. v. Queen Bee of Beverly Hills, LLC,* 571 F.Supp.2d 518, 528 (S.D.N.Y.2008) (collecting cases and observing that courts have exercised personal jurisdiction based upon a defendant's website only in cases where the defendant had other relevant forum contacts).

Here, Nationwide does not allege that Morning Sun purposefully solicits New York customers; that New York customers can purchase tickets through the website; or that the website directly targets New York. In fact, the pages of the website provided by Nationwide in support of this contention contradict such a notion. It does not appear that customers, in New York or anywhere else in New England, can purchase tickets through the website. Rather, the website provides information for calling, faxing, or emailing a Morning Sun representative in Massachusetts. "Under the circumstances, the bare allegation that [Nationwide] operates a website that may reach New Yorkers is insufficient to trigger the application of 302(a)(1) ." *O'Keefe v. Blue & Gold Fleet, L.P.,* 634 F.Supp.2d 284, 288 (E.D.N.Y.2009) (Spatt, J.).

Nationwide attempts to overcome this deficiency by arguing that that the long-arm statute is a "single act statute" and therefore proof of one transaction through Morning Sun's website can support jurisdiction. Notably, Nationwide does not provide a single example of a transaction that an individual in New York could make through Morning Sun's website. In addition, a single transaction can only invoke jurisdiction under section 302(a)(1) "if there is a substantial relationship between the transaction and the claim." *Kaloyeva v. Apple Vacations,* 21 Misc.3d 840, 866 N.Y.S.2d 488 (N.Y.2008); *Grimaldi v. Guinn,* 72 A.D.3d 37, 895 N.Y.S.2d 156 (N.Y.2010) ("If a Web site provides information, permits access to e-mail communication, describes the goods or services offered, downloads a printed order form, or allows online sales with the use of a credit card, and sales are, in fact, made in this manner in the forum state, *particularly by the injured consumer ...* then the assertion of personal jurisdiction may be reasonable.") (internal citations omitted) (emphasis added); *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198-99, 522 N.E.2d 40, 43

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(N.Y.1988) (holding that the single act must be one where "there is a substantial relationship between the transaction and the claim asserted"). As the Second Circuit has noted, "the long-arm statute bases jurisdiction on a level of conduct far less than that necessary for the 'doing' of business, meeting what was felt to be the requirement of due process by *demanding a direct relation between the cause of action and the in-state conduct." Fontanetta v. Am. Bd. of Internal Med., 421 F .2d 355, 357 (2d Cir.1970)* (emphasis added). Thus, a "single act" of transacting business in New York, such as a transaction through a website or any other transaction Nationwide may be referencing through its vague and conclusory allegations in the complaint, that has no "articulable nexus" or "substantial relationship" to the underlying cause of action, would undermine the due process protection intentionally provided for in the long-arm statute.

**\*9** Indeed, the New York Court of Appeals has specifically noted that, where, as here, a cause of action arises out of negligent driving in another state, the business activity must relate to that cause of action. *See Johnson,* 4 N.Y.3d at 520, 797 N.Y.S.2d at 35, 829 N.E.2d at 1203 ("Plaintiffs' cause of action arose out of defendant's allegedly negligent driving in New Jersey, not from the issuance of a New York driver's license or vehicle registration. The relationship between the negligence claim and defendant's possession of a New York license and registration at the time of the accident is too insubstantial to warrant a New York court's exercise of personal jurisdiction over defendant."). That is not to say that a website transaction could not provide the Court with jurisdiction. For example, if Jones-Lewis had been a passenger on the Morning Sun bus, and while in New York had purchased her ticket from Morning Sun through its website, that transaction would potentially provide the Court with personal jurisdiction over Morning Sun. However, those are not the facts of this case, and Nationwide does not allege that any of Morning Sun's business transactions, through its website or otherwise, had any relationship with the alleged tort. While Nationwide contends that "questions of fact remain as to the defendants' presence, involvement and contact to New York State," (Pl.'s Br. at 9), the Court ultimately finds that the requisite nexus between any of Morning Sun's potential business activities in New York and the cause of action is wholly lacking. Accordingly, the Court finds that CPLR § 302(a)(1) does not provide the Court with jurisdiction

over Morning Sun.

**b. CPLR §§ 302(a)(2) and 302(a)(3)**
Nationwide cannot premise the Court's personal jurisdiction over Morning Sun on either section 302(a)(2) or 302(a)(3), because neither is applicable where the underlying cause of action is against a non-domiciliary defendant for injuries sustained in an out-of-state motor vehicle accident. Section 302(a)(2) would only provide the Court with jurisdiction if the tortious act-in this case the alleged negligence causing the accident-occurred in New York. Putting aside the fact that, as previously noted, Nationwide claims the tortious act was committed both within New York and outside of New York, because the accident indisputably occurred in Connecticut, the Court does not have personal jurisdiction over Morning Sun under section 302(a)(2).

Moreover, while section 302(a)(3) serves as a basis for personal jurisdiction where a tortious act is committed outside of New York but causes injury in New York, section 302(a)(3) is rarely, if ever, applied in this factual scenario. Courts apply a situs-of-the-injury test to determine where the injury occurred, which in the tort context "is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 209 (2d Cir.2001) (internal quotation and citation omitted). Where, as here, the underlying cause of action arises from injuries sustained in an motor vehicle accident outside of New York, and is asserted against a party to that accident for damages, the location of the injury is where the accident occurred, not where the subsequent pain is felt. *See Morales v. Schofield,* 174 F.R.D. 253, 257 (E.D.N.Y.1997) ("The New York courts that have addressed cases where a New York plaintiff is injured in an automobile accident outside the state by a non-domiciliary who has no other New York contacts, have held that there is no personal jurisdiction over the defendant.") (citing *Lancaster v. Colonial Motor Freight Line, Inc.,* 177 A.D.2d 152, 581 N.Y.S.2d 283 (1st Dep't 1992); *Bramwell v. Tucker,* 107 A.D.2d 731, 484 N.Y.S.2d 92 (2d Dep't 1985)); *Rounds v. Rea,* 947 F.Supp. 78, 86 (W.D.N.Y.1996) ( "Further, the fact that Rea is alleged to have been driving in an unsafe manner in New York is irrelevant to the fact that the accident occurred in Pennsylvania as any injury suffered by Plaintiff was suffered in Pennsylvania, not New

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

York."); *Lancaster*, 177 A.D.2d at 158, 581 N.Y.S.2d at 287 (holding that, where the underlying cause of action related to injuries a plaintiff sustained in a car accident in South Carolina that "the injury actually occurred in South Carolina notwithstanding that plaintiff's pain and suffering largely took place in New York, her place of domicile").

*10 This is true even when, as here, the suit concerns first party no-fault benefits as opposed to personal injury damages. *Cf. McCann v. Somoza*, 933 F.Supp. 362 (S.D.N.Y.1996) (noting in a case where the New York plaintiff was seeking no-fault benefits from a New Jersey defendant based on an automobile accident in Connecticut, that Connecticut was the place of the injury). Thus, because the accident occurred in Connecticut, the place of the injury is also Connecticut, and the Court therefore lacks personal jurisdiction over Morning Sun under section 302(a)(3).

**c. CPLR § 302(a)(4)**

Finally, section 302(a)(4) also does not provide this Court with a basis for personal jurisdiction over Morning Sun. Although Nationwide alleges that Morning Bus owns, uses, or possesses real property in New York, section 302(a)(4) "requires a relationship between the property and the cause of action sued upon." *Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d 152, 159, 581 N.Y.S.2d 283, 288 (1st Dep't 1992). Insofar as Nationwide does not identify the relevant property or allege any connection between the unnamed property and the accident, section 302(a)(4) cannot provide a basis for personal jurisdiction.

Accordingly, there are no grounds for the Court to exercise personal jurisdiction over Morning Sun pursuant to any of the provisions of section 302. In addition, Given that Nationwide has not made a prima facie showing of personal jurisdiction under New York law, the Court does not need to address whether asserting personal jurisdiction over Morning Sun would violate due process. *See Best Van Lines*, 490 F.3d at 242 (finding that courts need to undergo a Fourteenth Amendment due process investigation "[i]f, but only if" personal jurisdiction is statutorily permissible).

**3. As to Nationwide's Request for Jurisdictional Discovery**

Nationwide asserts that Morning Sun's motion to dismiss is premature because jurisdictional discovery is necessary to determine whether the Court has personal jurisdiction. However, jurisdictional discovery is not required where, as here, a plaintiff fails to make a prima facie showing of personal jurisdiction. *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2d Cir.1998). "Discovery need not be granted to allow [a] plaintiff to engage in an unfounded fishing expedition for jurisdictional facts." *Gear, Inc. v. L.A. Gear California, Inc.*, 637 F.Supp. 1323, 1328 (S.D.N.Y.1986).

Although the Court notes that Morning Sun's arguments as to why it was not subject to specific jurisdiction was primarily on legal and not factual grounds, it was incumbent on Nationwide to demonstrate that "facts 'may exist' ... to defeat the motion." *Peterson v. Spartan Indus., Inc.*, 33 N.Y.2d 463, 354 N.Y.S.2d 905 (N.Y.1974). A plaintiff is not entitled to jurisdictional discovery simply to augment an inadequate pleading "if the defendant merely challenges the legal sufficiency of the jurisdictional allegations in the complaint, and does not place the factual basis for personal jurisdiction in issue." *In re Teligent, Inc.*, Nos. 01-12974, 03-3577, 2004 WL 724945, at *6 (Bankr.S.D.N.Y. Mar. 30, 2004). Nationwide has failed to raise an issue of fact as to any ground for specific jurisdiction over Morning Sun in New York based on accident that occurred in Connecticut. *See Lancaster*, 177 A.D.2d at 158, 581 N.Y.S.2d at 287 (dismissing a complaint against for lack of personal jurisdiction where "the cause of action ar[ose] from a vehicle collision which occurred in South Carolina between one of defendant's trucks and an automobile in which plaintiff was a passenger" because the accident "[was] not alleged to be, nor [could] it in any way be said to be, related to any possible business contacts or transactions which defendant corporation may have been engaged in at that time in the state of New York and further discovery could provide no evidence that would alter this conclusion"). Accordingly, Nationwide's request that the Court deny the Defendants' motion as premature pending jurisdictional discovery is denied.

**C. Whether the Court has Personal Jurisdiction over Wang**

*11 Finally, the Defendants contend that the Court should dismiss the complaint against Wang for lack of personal jurisdiction because this issue was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 381612 (E.D.N.Y.)
**(Cite as: 2011 WL 381612 (E.D.N.Y.))**

already decided by Justice Feinman in the state court proceeding. Nationwide inexplicably chose not to address the Court's personal jurisdiction over Wang in its opposition to the instant motion, nor did it address whether Justice Feinman's Order was binding. Although the Court does not deny that collateral estoppel may be applicable, the lack of personal jurisdiction over Wang is clear and therefore the Court does not need to go through a lengthy collateral estoppel analysis.

Wang is now and was at the time of the accident a resident of the State of Massachusetts. Wang is now and was at the time of the accident, employed by Morning Sun, a Massachusetts based company. Nationwide does not allege in the complaint, or in opposition to the instant motion, that Wang has any connection to the State of New York that would support personal jurisdiction under the long-arm statute. Thus, finding no basis for jurisdiction over Wang, the Court grants Wang's motion to dismiss the complaint against him.

### III. CONCLUSION
For the foregoing reasons, it is hereby

**ORDERED** that the Defendants' motion to dismiss the complaint for lack of personal jurisdiction is granted, and it is further

**ORDERED** that the Plaintiff is afforded twenty days from the date of this order to serve an amended complaint only as to whether defendant Morning Sun is subject to general jurisdiction under CPLR § 301.

**SO ORDERED.**

E.D.N.Y.,2011.
Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.
Slip Copy, 2011 WL 381612 (E.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**3**



Slip Copy, 2010 WL 4861457 (D.Puerto Rico)
(Cite as: 2010 WL 4861457 (D.Puerto Rico))

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
D. Puerto Rico.
AIR SUNSHINE, INC., et al., Plaintiffs,
v.
Stephen M. CARL, Defendant.
Air Sunshine, Inc., et al., Plaintiffs,
v.
Yvette Hau-Lepera, Defendant.
Air Sunshine, Inc., et al, Plaintiffs,
v.
Sergio López, Defendant.

Civil Nos. 09-2019 (MEL), 09-2039(MEL), 09-
2041(MEL).
Nov. 30, 2010.

Gabriel I. Penagaricano-Soler, Gabriel I. Penagari-
cano Law Office, Guaynabo, PR, for Plaintiffs.

Fidel A. Sevillano-Del-Rio, United States Attorneys
Office, San Juan, PR, for Defendant.

***OPINION AND ORDER***
MARCOS E. LÓPEZ, United States Magistrate
Judge.
**I. PROCEDURAL HISTORY**
**\*1** On October 5, 2009, plaintiffs Air Sunshine,
Inc., Air Sunshine de P.R., Inc. (together "Air Sun-
shine"), and Mirmohammad Adili ("Adili," and col-
lectively "plaintiffs") filed a complaint in the instant
case against Stephen M. Carl ("Carl"), the principal
maintenance inspector in the South Florida Flight
Standards District Office ("FSDO") of the Federal
Aviation Administration ("FAA"). (Docket No. 1
(the "Carl complaint").) Claiming, *inter alia*, that
Carl intentionally delayed the certification and in-
spection process for several of Air Sunshine's air-
craft, plaintiffs assert federal causes of action under
Bivens v. Six Unknown Named Agents, 403 U.S. 388,
91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and 42 U.S.C.
§ 1985, and also bring state law claims pursuant to
Article 1802 of the Puerto Rico Civil Code, P.R.

Laws Ann. tit. 31, § 5141, and for tortious interfer-
ence with contract and intentional infliction of emo-
tional distress. *Id.*

On October 8, 2009, plaintiffs brought suit
against FAA employees Yvette Hau-Lepera ("Hau-
Lepera") and Sergio López ("López"), asserting iden-
tical claims based on the same nucleus of facts. (09-
2039, Docket No. 1 (the "Hau-Lepera complaint"));
(09-2041, Docket No. 1 (the "López complaint").)
Hau-Lepera filed her answer on April 21, 2010, and
Carl and López filed their answers on February 22,
2010. (09-2039, Docket No. 9; 09-2041, Docket No.
9; Docket No. 19.) The three cases were subsequently
consolidated. (Docket No. 20.)

Pending before the court is defendants' motion
for substitution of parties and for dismissal of the
complaint. (Docket No. 31.) Plaintiffs opposed the
motion and defendants replied. (Docket Nos. 37; 42.)

**II. FACTUAL BACKGROUND**
Air Sunshine is a private airline based in San
Juan, Puerto Rico. (Docket No. 1, ¶ 1.) Looking to
expand its business, Air Sunshine entered into a lease
in late 2005 to operate three SAAB 340 turboprop
aircraft. (Docket No. 1, ¶ 8.) As part of that process,
Air Sunshine was required to obtain certifications
from the South Florida FAA office, necessitating the
approval of several manuals and the passing of a
number of "proving runs." (Docket No. 1, ¶¶ 9-10.)
During the relevant time, Air Sunshine also sought
from the same FAA office certification for its fleet of
C-420 aircraft and a ferry permit needed to begin
repairs on one of its aircraft. (Docket No. 1, ¶¶ 32-
47.)

*SAAB 340 Aircraft*

*Flight Attendant Manual Certification*

Plaintiffs claim that Air Sunshine submitted its
flight attendant manual for the SAAB 340 to the FAA
for certification in March 2006, and that it was sub-
sequently approved. (09-2039, Docket No. 1, ¶ 10.)
However, in November 2007, defendant Hau-Lepera,
a FAA cabin safety inspector, informed Adili, presi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

dent of Air Sunshine de P.R., Inc., that the approval of the flight attendant manual was "null and void" and that the manual would have to be resubmitted in an entirely new format since Air Sunshine's principal operations inspector (POI) had not consulted her prior to submitting the manual for approval. (09-2039, Docket No. 1, ¶¶ 11-12.) Of note, plaintiffs do not dispute Hau-Lepera's claim that the POI was required to consult with her prior to approving the manual, stating instead that it was a "matter beyond Air Sunshine's control or knowledge." (09-2039, Docket No. 1, ¶ 11.) Despite Air Sunshine's protestations that the manual complied with FAA regulations, plaintiffs aver that they agreed to resubmit it to expedite the certification process. (09-2039, Docket No. 1, ¶ 13.) The Hau-Lepera complaint states that she caused further delay by then refusing to meet with plaintiffs to discuss the requested revisions until February 2008. (09-2039, Docket No. 1, ¶¶ 14-15.) Hau-Lepera finally approved plaintiff's flight attendant manual in August 2008. (09-2039, Docket No. 1, ¶ 16.) In total, plaintiffs claim to have submitted three versions of the flight attendant manual to Hau-Lepera, all of which were "functionally identical" and in compliance with FAA regulations. (09-2039, Docket No. 1, ¶ 16.) Plaintiffs allege that due to Hau-Lepera's conduct, Air Sunshine was forced to abandon its plan to operate the aircraft in a 30-seat configuration. (09-2039, Docket No. 1, ¶ 18.)

*Operations Certifications*
　　*2 Air Sunshine met with FAA officials on or about October 8, 2008 about outstanding issues regarding Air Sunshine's operations manual for the SAAB 340 aircraft. (Docket No. 1, ¶ 13.) During that meeting, plaintiffs claim that Adili told Carl, the principal maintenance inspector assigned to Air Sunshine, that Hau-Lepera, a good friend of Carl's, had done Air Sunshine "no justice," stating that the flight attendant manual remained "mired in unexplained delays." (Docket No. 1, ¶ 14.) Plaintiffs also assert that during the course of the meeting Carl made a racial slur about an African-American FAA employee, which plaintiffs claim caused "great alarm" and "discomfort" to Adili, himself a member of a racial minority. (Docket No. 1, ¶ 15.)

　　Following the meeting, plaintiffs claim that Carl delayed the proving runs by sending a letter to Adili containing numerous questions that Air Sunshine had already answered. (Docket No. 1, ¶ 17.) Plaintiffs

claim that in response to an e-mail from Adili regarding the timing of an upcoming meeting, Carl stated that previous FAA inspectors were incorrect and that Air Sunshine was not in compliance with FAA regulations. (Docket No. 1, ¶ 20.) However, Carl did not inform Air Sunshine what specific regulations it was violating. *Id.*

　　On or about November 24, 2008, Adili received an e-mail from Carl's assistant-signed by Carl-stating that Air Sunshine's latest submission to the FAA "lacked procedural format." (Docket No. 1, ¶ 23.) On December 22, 2008, Carl sent Adili an e-mail stating that he could not simultaneously process both the SAAB 340 certifications and the C-402 aircraft inspections, and that Adili had to choose between them, even though Air Sunshine had been waiting for both tasks to be completed for "well over one year." (Docket No. 1, ¶ 25.) In March 2009, an aviation consultant retained by Adili to assist with the manual revisions sent Carl a letter asking him to outline the specific concerns he had with the latest revision of the manual. (Docket No. 1, ¶ 26.) Later that month, the consultant sent an e-mail to defendant López, the office manager of the South Florida FSDO, as well as to the San Juan office manager, requesting that Carl be removed from Air Sunshine's case due to his "flagrant animus against Adili." (Docket No. 1, ¶ 27.) López responded that Carl was doing his job. (Docket No 1, ¶ 29.) On March 22, 2009, Adili sent a letter to López, copying President Obama and other government officials, complaining about the FAA's treatment of Air Sunshine, and of Carl's conduct in particular. (Docket No. 1, ¶ 29.) On March 26, 2009, Carl initiated an investigation of Air Sunshine's furnishings of schedule service.[FN1] Plaintiffs claim that as result of Carl's conduct, Air Sunshine never received the needed certifications, and its business was "substantially destroyed." (Docket No. 1, ¶ 31.)

> FN1. Plaintiffs' complaints appear to be inconsistent on this point. In Carl's complaint, plaintiffs state that "the issuance and enforcement of [Air Sunshine's operating specifications] was outside the scope of [Carl's] authority." (Docket No. 1, ¶ 30.) However, in López's complaint, plaintiffs state that "the issuance and enforcement of such specifications was Carl's responsibility and he had not accomplished it." (09-2041, Docket No. 1, ¶ 31.) In the context of a mo-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion to **dismiss**, courts look to only well-pled allegations that are plausible on their face; therefore, these **contradictory allegations** will be ignored by the court for purposes of this motion. *See Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).*

*C-402 Certification*

Air Sunshine also operated a fleet of C-402 aircraft that was required by FAA regulations to be inspected by December 4, 2008. (Docket No. 1, ¶ 32); *see* 14 C.F.R. § 135.422(b)(2). Plaintiffs claim that they requested the mandatory inspection in July 2006, but that Carl-despite plaintiffs' repeated requests-ignored them until December 11, 2008, after the deadline had passed, when he told Adili that his assistant would conduct the requisite inspection. (Docket No. 1, ¶¶ 33-34.) Plaintiffs also claim that Carl denied Air Sunshine an extension for its inspection, and that, as a result, Air Sunshine lost its schedule authority, making it ineligible to bid for government contracts. (Docket No. 1, ¶¶ 39-42.)

\*3 In January 2009, plaintiffs hired their own airworthiness inspector and claim to have granted him the authority to perform the inspection in an e-mail to Carl. (Docket No. 1, ¶ 36.) Carl denied ever receiving the e-mail, and plaintiffs assert that despite the fact that their inspector completed the task in accordance with FAA regulations, Carl still refuses to accept the inspection pending approval of a revision that is not required by FAA regulations. (Docket No. 1, ¶ 36.) On January 22, 2009, plaintiffs claim that Adili e-mailed López requesting that Carl be removed from the Air Sunshine inspection process, but that López refused. (09-2041, Docket No. 1, ¶¶ 50-51.) As a result of Carl's actions, plaintiffs allege that Air Sunshine lost its lease on the C-402 aircraft, causing "substantial destruction" to Air Sunshine's business. (Docket No. 1, ¶ 38.)

*Ferry Permit*

On or about August 25, 2008, Adili e-mailed Carl requesting a permit to transfer by ferry one of Air Sunshine's aircraft to Fort Lauderdale for repairs. (Docket No. 1, ¶ 43.) Carl responded that FAA regulations did not permit the ferrying of the aircraft at issue, which plaintiffs claim runs contrary to FAA regulations. (Docket No. 1, ¶ 44.) In any event, plaintiffs claim that Carl refused to issue the permit until

October 2008, after physically inspecting the aircraft. (Docket No. 1, ¶ 45.) As a result of this delay, the Carl complaint states that Air Sunshine lost revenue for the months the aircraft remained unrepaired, and that the aircraft sustained corrosion damage as a result of its prolonged grounding. (Docket No. 1, ¶ 46.) Plaintiffs also claim that the aircraft is currently undergoing repair and cannot be used because Carl refuses to inspect it. (Docket No. 1, ¶ 46.)

### III. MOTION FOR SUBSTITUTION AND TO DISMISS AS A RESULT OF SUBSTITUTION

Defendants move to substitute the United States for defendants Carl, Hau-Lepera and López pursuant to the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2679; (Docket No. 31, pp. 2-6.) Defendants also claim that plaintiffs Air Sunshine, Inc. and Airsunshine de P.R., Inc. have failed to exhaust their administrative remedies, and that the court therefore lacks subject matter jurisdiction over their claims. (Docket No. 31, p. 4.) Plaintiffs counter that such a substitution is improper where-as here-a civil action brought against government employees is based in part on constitutional violations. (Docket No. 37, pp. 4-8.)

The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, amended the FTCA "to make an action against the United States the exclusive remedy for money damages for injury arising from the 'negligent or wrongful act or omission' of a federal employee 'acting within the scope of his office or employment,' ... [thus] making federal employees absolutely immune from suit for torts committed within the scope of employment." *Aversa v. United States,* 99 F.3d 1200, 1207 (1st Cir.1996) (*quoting* 28 U.S.C. § 2679(b)(1)). "[U]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon [a common law tort against a federal employee] in a United States district court shall be deemed an action against the United States ... and the United States shall be substituted as the party defendant." *Roman v. Townsend,* 224 F.3d 24, 27 n. 3 (1st Cir.2000) (*quoting* 28 U.S.C. § 2679(d)). Where parties bring claims under both constitutional and state law, courts have effected partial substitutions. *See Velez-Diaz v. Vega-Irizarry,* 421 F.3d 71, 76 (1st Cir.2005) ("the fact that this case

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

raises both state law and federal constitutional claims does not render inapplicable the Westfall Act's requirement for the substitution of the United States for the defendants with respect to the state law claims."); *Davric Me. Corp. v. United States Postal Serv., 238 F.3d 58, 65 (1st Cir.2001)* (affirming Westfall Act substitution only as to state law claims where plaintiff also asserted *Bivens* claims against federal employee); *Aversa, 99 F.3d at 1206* (same).)

*4 While certification is sufficient to substitute the United States as defendant, the certification is "provisional and subject to judicial review." See *Davric, 238 F.3d at 65* (citing *Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995)*). Where plaintiffs are able to show that an employee acted outside the scope of his or her employment, that employee may be re-substituted as a party defendant. See *Davric, 238 F.3d at 65; Aversa, 99 F.3d at 1208.*

In this case, attached to the pending motion for substitution is a certification from the United States Attorney for the District of Puerto Rico stating that Carl, López and Hau-Lepera are employees and officers of the FAA and were "acting within the scope of their federal employment as employees for the U.S. Department of Transportation under *49 U.S.C. § 44702* at the time of the incident which gave rise to the above-entitled action." [FN2] (Docket No. 31-1.) Therefore, the courts finds that the United States must be substituted for Carl, Hau-Lepera, and López as the defendant in this action with respect to plaintiffs' state law claims.

> FN2. The Attorney General has delegated his certification authority under *28 U.S.C. § 2679(d)(1)* to the United States Attorneys. *28 C.F.R. § 15.3(a).*

Defendants further argue that once the substitution takes place, claims against the United States brought by plaintiffs Air Sunshine Inc. and Air Sunshine de P.R., Inc. should be dismissed due to their failure to exhaust administrative remedies. [FN3] (Docket No. 31, p. 4.) Under the FTCA, a suit filed before administrative remedies have been exhausted is barred. See *Velez-Diaz v. United States, 507 F.3d 717, 718 (1st Cir.2007)* (citing *McNeil v. United States, 508 U.S. 106, 112-13, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993)*); *Natal-Rosario v. P.R. Police*

*Dep't, 639 F.Supp.2d 174, 182 (D.P.R.2009)* (following Westfall substitution, court dismissed without prejudice state claims against United States for plaintiffs' failure to exhaust administrative remedies). Plaintiffs do not address defendants' failure to exhaust administrative remedies argument in their opposition, and nowhere do they suggest that the Air Sunshine plaintiffs complied with the requirements of *28 U.S.C. § 2675(a)*, requiring a claimant bringing an action against the United States for money damages to have presented the claim to the appropriate federal agency and that the claim to have been denied by the agency in writing. (Docket No. 37.) Therefore, upon substitution, claims against the United States brought by plaintiffs Airsunshine, Inc. and Airsunshine de Puerto Rico, Inc. will be DISMISSED without prejudice. *Id.; See Velez-Diaz v. United States, 507 F.3d 717, 719 (1st Cir.P.R.2007)* ("The FTCA provides that when such a conversion occurs and the case is dismissed for failure to exhaust, a plaintiff is given a fresh period of 60 days within which to file an administrative complaint even if the initial period for doing so has lapsed.") (citing *28 U.S.C. § 2679(d)(5)*).

> FN3. Defendants concede that plaintiff Adili satisfied the exhaustion requirement. (Docket No. 31, p. 4.)

*State Law Claims*

Defendants argue that state law claims brought by Adili-the remaining plaintiff-should also be dismissed since, under the FTCA, a remedy against the United States

*5 is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

*28 U.S.C. § 2679(b)*; (*see Docket No. 42, pp. 1-2.*) The court finds that since the United States has been substituted as a defendant in this action, Adili's state law claims for negligence and intentional infliction of emotional distress fall under the FTCA and are therefore DISMISSED. See *Rosario v. United*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*States,* 538 F.Supp.2d 480, 489-90 (D.P.R.2008) (dismissing all negligence claims asserted against individual defendants pursuant to 28 U.S.C. § 2679(b)(1)); *Machin v. Costas,* 2009 U.S. Dist. LEXIS 106792 (S .D.Cal. Nov. 16, 2009) (substituting United States as defendant and dismissing, *inter alia,* plaintiff's claims for intentional infliction of emotional distress against individual defendant).

Adili's state law claims for tortious interference with contract, however, are dismissed for lack of subject matter jurisdiction. *See Balfour Land Co., L.P. v. United States,* 2009 U.S. Dist. LEXIS 52289, at *26-*27 (M.D. Ga. June 22, 2009). "The grant of jurisdiction and waiver of [sovereign] immunity are subject to a number of express exceptions." *Id.* (citing 28 U.S.C. § 2680). Claims that fall under one of the enumerated exceptions to the FTCA must be dismissed for lack of subject matter jurisdiction. *Id.* Under one such exception, sovereign immunity is not waived with respect to "[a]ny claim arising out of ... interference with contract rights." 28 U.S.C. § 2680(h).

Based on the foregoing, defendants' motion for substitution and dismissal (Docket No. 31) is hereby GRANTED as to Adili's state law claims. Adili's claims under Article 1802 of the Civil Code and for intentional infliction of emotional distress are hereby DISMISSED. Adili's claim for tortious interference with contract is hereby DISMISSED for lack of subject matter jurisdiction.

## IV. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A. Fed.R.Civ.P. 12(b)(6) Motion to Dismiss Standard

In *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court held that to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." *Rodriguez-Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 95-96 (1st Cir.2007) (*quoting Twombly,* 550 U.S. at 599). The court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor. *See Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 51 (1st Cir.1990). While *Twombly* does not require of plain-

tiffs a heightened fact pleading of specifics, it does require enough facts to have "nudged their claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. Accordingly, in order to avoid dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* at 555.

*6 In *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court upheld *Twombly* and clarified that two underlying principles must guide this court's assessment of the adequacy of a plaintiff's pleadings when evaluating whether a complaint can survive a Rule 12(b)(6) motion. *See Iqbal,* 129 S.Ct. at 1949-50. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." [FN4] *Iqbal,* 129 S.Ct. at 1950 (*citing Twombly,* 550 U.S. at 556). Thus, any nonconclusory factual allegations in the complaint, accepted as true, must be sufficient to give the claim facial plausibility. *Iqbal,* 129 S.Ct. at 1950. Determining the existence of plausibility is a "context-specific task" which "requires the court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]' 'that the pleader is entitled to relief.' " *Id.* (*quoting* Fed.R.Civ.P. 8(a)(2)). Furthermore, such inferences must be at least as plausible as any "obvious alternative explanation." *Id.* at 1950-51 (citing *Twombly,* 550 U.S. at 567).

> FN4. The First Circuit has recently relied on these two principles as outlined by the Supreme Court. *See Maldonado v. Fontanes,* 568 F.3d 263, 266 (1st Cir.2009).

### B. Plaintiffs' *Bivens* Claim

The *Bivens* doctrine allows plaintiffs to bring a private cause of action for damages against federal officials in their individual capacities to enforce certain constitutionally protected rights. *DeMayo v. Nugent,* 517 F.3d 11, 14 (1st Cir.2008). A claimant who

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

seeks relief under *Bivens* must prove that a federal official, acting under color of federal law, violated a constitutional right. *See Redondo-Borges v. United States HUD,* 421 F.3d 1, 6 (1st Cir.2005). However, government officials are entitled to qualified immunity unless (1) "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of [their] alleged misconduct." *Giragosian v. Bettencourt,* 614 F.3d 25, 29 (1st Cir.2010) (*quoting Pearson v. Callahan,* 555 U.S. 223, ----, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009)). A right is "clearly established" if, at the time of the alleged violation, "[t] he contours of the right ... [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Fontanes,* 568 F.3d at 269 (*quoting Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

Plaintiffs seek redress under *Bivens* for defendants' alleged violations of their constitutional rights "to substantive and procedural due process and to equal protection of the laws, in that [defendants] engaged in hostile and purposeful activity designed to deny the [p]laintiffs the normal operation of FAA regulations and procedures necessary to obtain the approvals and certifications essential to conduct the business of Air Sunshine." (Docket No. 1, ¶ 49; 09-2039, Docket No. 1, ¶ 21; 09-2041, Docket No. 1, ¶ 77 .) Plaintiffs further allege that said violations were committed in retaliation for plaintiffs' exercise of their First Amendment right to complain about unlawful treatment by FAA officials. (Docket No. 1, ¶ 51; 09-2039, Docket No. 1, ¶ 23; 09-2041, Docket No. 1, ¶ 83.)

*7 Defendants argue that plaintiffs' *Bivens* claim should be dismissed because the complaints I) fail to state the specific constitutional breaches on which plaintiffs' claims are based, ii) fail to articulate why plaintiffs have a property right interest in the FAA certifications and permits at issue, iii) do not demonstrate how defendants' treatment of plaintiffs deviated from that afforded similarly situated applicants, and iv) fail to allege under the *Pearson* standard that the alleged regulatory delay was not only unconstitutional, but so "patently" unconstitutional so as to give fair warning to a reasonable person. (Docket Nos. 31, pp. 16-18; 42, pp. 3-4.) Plaintiffs counter that the complaints sufficiently allege constitutional viola-

tions of their rights to procedural due process, substantive due process and equal protection, as well as for retaliation in violation of plaintiffs' First Amendment rights, and further that the FAA defendants are not entitled to qualified immunity. (Docket No. 37, pp. 3, 12-18.)

*Fifth Amendment Claim*

The Fifth Amendment mandates that no person shall "be deprived of life, liberty, or property, without due process of law." *Aguilar v. United States Immigration & Customs Enforcement Div. of the Dep't of Homeland Sec.,* 510 F.3d 1, 21-22 (1st Cir.2007); *see* U.S. Const. amend. V. The due process guarantee has both procedural and substantive aspects. *Amsden v. Moran,* 904 F.2d 748, 753 (1st Cir.1990). Furthermore, while the Fifth Amendment does not contain an equal protection clause *per se,* it has been interpreted to include an equal protection component. *See Cook v. Gates,* 528 F.3d 42, 60 (1st Cir.2008) (*citing Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)).

*Procedural Due Process*

Procedural due process claims require courts to determine first if plaintiffs were deprived of a liberty or property interest protected by the United States Constitution and, if so, whether the "procedures attendant upon that deprivation were constitutionally sufficient." *Gonzalez-Fuentes v. Molina,* 607 F.3d 864, 886 (1st Cir.2010). While due process is flexible, one of the essential requirements of procedural due process is adequate notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Amsden,* 904 F.2d at 753 (citation and internal quotation marks omitted). In evaluating the adequacy of the procedures employed, courts "balanc[e] a number of factors, including the nature of the private and public interests involved; the risk of erroneous deprivation accruing under the procedures used ...; and the probable benefit of demanding additional procedural safeguards." *Id.*

In this case, plaintiffs' due process claims are premised on allegations that defendants caused harm to Air Sunshine's business by purposely delaying: i) the mandatory certification process for three recently leased SAAB 340 aircraft, ii) the certification for Air Sunshine's fleet of C-402 aircraft, and iii) the issuance of a ferry permit needed to commence repair on one of Air Sunshine's aircraft. (*See* Docket No. 1, ¶¶

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

10-47.) Yet, regarding the SAAB 340 certifications and ferry permit allegations, plaintiffs' complaints fail to provide the court with any plausible basis for determining whether the alleged delays were significant enough so as to effectively deprive plaintiffs of a property interest. (Docket No. 1; 09-2039, Docket No. 1; 09-2041, Docket No. 1); *see 3004 Albany Crescent Tenants' Ass'n v. City of New York,* 1997 U.S. Dist. LEXIS 6138 (S.D.N.Y. May 5, 1997) (procedural due process claim dismissed where "complaint as drafted fails to sufficiently articulate that plaintiffs have been deprived of property right protected by the Fourteenth Amendment without the requisite procedural due process."); *Williams v. Perry,* 960 F.Supp. 534, 538 (D.Conn.1996) (dismissing, *inter alia,* procedural due process claim as complaint does not allege that plaintiff was deprived of a constitutionally protected property interest). For example, plaintiffs did not include allegations regarding: i) how long said certification and permit processes typically take, ii) whether pertinent regulations required the inspections and/or certifications to be completed by a given date, or iii) how those similarly situated have been treated by the FAA. Without any basis to make such determination, the court refuses to speculate and therefore finds that plaintiffs' procedural due process claims regarding the SAAB 340 aircraft and ferry permit hereby DISMISSED.

*8 However, regarding the C-402 certification, plaintiffs allege that Air Sunshine requested inspection of said aircraft in July 2006, but that Carl, despite plaintiffs' repeated pleas, did not schedule the inspection until after the deadline established by FAA regulations had passed, resulting in the loss of the lease and causing "substantial destruction" to Air Sunshine's business. (Docket No. 1, ¶¶ 32-42); *see 14 C.F.R. § 135.422(b)(2).* Moreover, the complaint alleges that Carl refused to grant plaintiffs an extension, as permitted by FAA regulations, resulting in the loss of Air Sunshine's schedule authority. *Id.* The court finds that such conduct-if proven-would constitute a deprivation of plaintiffs' property interest, and that plaintiffs have therefore sufficiently alleged a claim for procedural due process with respect to the C-402 certification process.

Furthermore, it is clearly established, and was at the time of the events in question, that plaintiffs had a property interest in the C-402 certification process, as Air Sunshine would not be able to use the aircraft if they were not properly certified. *See United States v. Vertol H21C,* 545 F.2d 648, 650 (9th Cir.1976) (in case where FAA temporarily seized claimant's helicopter, court found "[t]here can be no dispute" that even temporary seizure of aircraft was a deprivation of property within the meaning of the Fifth Amendment, entitling claimant to due process protections). Therefore, defendants are not entitled to qualified immunity for such a violation. *See Fontanes,* 568 F.3d at 269.

*Substantive Due Process*

Regarding plaintiffs claims under substantive due process, such claims bar certain government actions "regardless of the fairness of the procedures used to implement them." *Aguilar,* 510 F.3d at 21 (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Under substantive due process analysis, courts look to "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Aguilar,* 510 F.3d at 21 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). The "shock the conscience" standard is a high hurdle for plaintiffs, but is necessary to "preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law." *Id.* In this case, plaintiffs' allegations do not rise to the requisite level. *See, e.g., Pagan v. Calderon,* 448 F.3d 16, 31 (1st Cir.2006) (in context of Fourteenth Amendment claim, court stated that it is well-settled that other than where "truly horrendous," "substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong."). Plaintiffs' substantive due process claims are therefore DISMISSED.

*Equal Protection*

*9 The equal protection component of the Fifth Amendment guarantees that "all persons similarly situated should be treated alike." *Goichman v. N.H.,* 2010 U.S. Dist. LEXIS 114541, at * 11 (D.N.H. Oct. 1, 2010); *see Toledo v. Sanchez,* 454 F.3d 24, 33 (1st Cir.2006) (dismissing Fourteenth Amendment equal protection claim). Plaintiffs claiming violations of their equal protection rights must "first identify and relate specific instances where persons similarly situ-

ated in all relevant aspects were treated differently, instances which have the capacity to demonstrate that plaintiffs were singled out for unlawful oppression." *Buchanan v. Maine,* 469 F.3d 158, 178 (1st Cir.2006) (emphasis, alterations and internal quotations omitted). In this case, while not clearly articulated, plaintiffs appear to be basing their equal protection claim on racial discrimination grounds, stemming from a comment Carl made about an African American FAA employee. (Docket No. 1, ¶ 15.) However, plaintiffs fail to demonstrate how the treatment they received at the hands of the defendants differed from that of similarly situated persons. *See Irwin v. Miami-Dade County Pub. Sch.,* 2010 U.S.App. LEXIS 20563, at *10 (11th Cir.Fla. Oct. 4, 2010) (affirming dismissal of, *inter alia,* plaintiff's Section 1983 claim where plaintiff "[could not] establish an equal protection violation because he failed to show that others similarly situated were treated differently."); *Levine v. McCabe,* 357 F.Supp.2d 608, 621 (E.D.N.Y.2005) (equal protection claim under Section 1983 dismissed where plaintiff did not point to any other individual similarly situated to him, but more favorably treated by the defendants); *Parker v. City of Elgin,* 2005 U.S. Dist. LEXIS 18996, at *29–*30 (N.D.Ill. Aug. 30, 2005) (granting defendant's summary judgment motion as to plaintiff's equal protection claims, court found "conclusory allegation that [plaintiff] was similarly situated to [a class of employee] entirely insufficient.").[FN5] Therefore, plaintiffs claims based on a violation of their equal protection rights are hereby DISMISSED.

> FN5. While the cases cited concern § 1983 rather than *Bivens* claims, courts cite cases grounded on *Bivens* and § 1983 claims interchangeably in analyzing constitutional claims. *See Rodriguez v. Beninato,* 469 F.3d 1, 4 n. 1 (1st Cir.2006).

*First Amendment Claim*

To prevail on a First Amendment retaliation claim, a plaintiff must prove that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) (citation omitted); *see Baker v. Coxe,* 230 F.3d 470, 475 (1st Cir.2000) (holding that the delay of a land use permit in unjustifiable retaliation

for the applicant's expressions of his political views may violate the First Amendment if the plaintiff proves: i) that he was engaged in protected speech; ii) that he was qualified for the permit; and iii) that the delay was in retaliation for protected speech). Courts have held that complaining to an FAA employee's supervisors regarding an alleged constitutional violation by the employee constitutes clearly established protected speech under the First Amendment, not protected by qualified immunity. *See Capozzi v. DOT,* 135 F.Supp.2d 87, 96 (D.Mass.2001) ( "allegation that FAA employees delayed regulatory action to punish [plaintiff] for complaining about the alleged sexual harassment by [defendant FAA employee] is viable as a *Bivens* action under clearly established First Amendment jurisprudence.") (*citing Baker,* 230 F.3d at 475). In this case, plaintiffs claim that they were retaliated against due to a complaint Adili made to Carl regarding Hau-Lepera during an October 2008 meeting, as well as in response to several complaints Adili made to López about Carl and Hau-Lepera. (Docket No. 1, ¶ 14, 51; 09-2041, Docket No. 1, ¶¶ 29-30, 38-39, 50-51.) Therefore, plaintiffs have sufficiently alleged a violation of their First Amendment rights.

*Defendants*

**10** Having found that plaintiffs sufficiently set forth violations of procedural due process based on the C-402 certification process and retaliation claims under the First Amendment, the court now examines these claims as to each of the individual defendants.

*Hau-Lepera*

Plaintiffs claim that Hau-Lepera, a FAA cabin safety inspector, violated their due process rights by intentionally delaying the flight attendant certification manual for the SAAB 340 aircraft, and that she acted in retaliation for plaintiffs' exercise of their First Amendment rights to complain about their unlawful treatment at the hands of FAA employees. (09-2039, Docket No. 1, ¶¶ 21, 23-24 .) Concerning plaintiffs' due process claims, the Hau-Lepera complaint does not allege that she had any involvement in the C-402 certification process. (09-2039, Docket No. 1.) As all other due process claims have already been dismissed herein, all Fifth Amendment claims against Hau-Lepera are hereby DISMISSED.

Regarding plaintiffs' First Amendment retaliation claim, the Hau-Lepera complaint does not specifi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cally allege that plaintiffs made any complaints during the time Hau-Lepera oversaw Air Sunshine's flight attendant manual. (09-2039, Docket No. 1.) Further, to the extent plaintiffs base their First Amendment retaliation claims on comments Adili made to Carl about Hau-Lepera in an October 2008 meeting (*see* Docket No. 1, ¶ 24), those comments are irrelevant since plaintiffs do not allege that Hau-Lepera had any interaction with plaintiffs after August 2008. (09-2039, Docket No. 1.) Therefore, all claims against Hau-Lepera based on violations of the First Amendment are hereby DISMISSED.

*Carl*

The Carl complaint contains allegations that Carl, Air Sunshine's principal maintenance inspector, intentionally delayed the inspection and certification processes for Air Sunshine's newly leased SAAB 340 aircraft, the maintenance certification for the C-402 aircraft, and the issuance of a ferry permit. (Docket No. 1, ¶¶ 10-47.) As stated above, plaintiffs have sufficiently alleged a colorable procedural due process claim against Carl concerning his conduct with regard to the C-402 certification process.

Plaintiffs also allege that during an October 2008 meeting between Air Sunshine and FAA officials, Adili told Carl that Hau-Lepera had done Air Sunshine "no justice" and that the flight attendant manual certification that Hau-Lepera was responsible for remained "mired in unexplained delays." (Docket No. 1, ¶ 14.) Plaintiffs allege that Carl, a friend of Hau-Lepera, intentionally caused delays to Air Sunshine on account of this and other complaints. (Docket No. 1, ¶ 51.) Based on the foregoing, the court finds that plaintiffs have sufficiently alleged a First Amendment violation-actionable under *Bivens*-against Carl. *See Capozzi,* 135 F.Supp.2d at 96. Therefore, defendants' motion (Docket No. 31) for dismissal is hereby DENIED with respect to plaintiffs' claims under *Bivens* against Carl.

*López*

*11 Plaintiffs assert that López, the office manager of the FAA's South Florida FSDO, violated plaintiffs' due process rights in retaliation for plaintiffs' exercise of their First Amendment rights to complain about their unlawful treatment by FAA employees. (09-2041, Docket No. 1, ¶¶ 81, 83.) However, plaintiffs claims against López stem only from his role as supervisor of Hau-Lepera and Carl,

as the López complaint asserts that his failure to supervise his subordinates constitutes gross negligence. (09-2041, Docket No. 1, ¶ 81.)

Regarding supervisory liability, the Supreme Court has stated that "[b]ecause vicarious liability is inapplicable to *Bivens* ... suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 129 S.Ct. at 1948; *see Ruiz Rivera v. Riley,* 209 F.3d 24, 28 (1st Cir.2000) ("the plaintiff must state a claim for direct rather than vicarious liability; respondeat superior is not a viable theory of *Bivens* liability"). Supervisory liability therefore lies only where "(1) the behavior of [a supervisor's] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." *Pineda v. Toomey,* 533 F.3d 50, 54 (1st Cir.2008) (*quoting Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988)). The requirement of an "affirmative link" between the behavior of a subordinate and the action or inaction of his supervisor "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." *Pineda,* 533 F.3d at 54 (*quoting Hegarty v. Somerset County,* 53 F.3d 1367, 1380 (1st Cir.1995)). Deliberate indifference, moreover, "will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Id.* (internal citation and quotation marks omitted). "[P]roof of mere negligence, without more, is inadequate to ground supervisory liability." *Maldonado-Denis v. Castillo-Rodriguez,* 23 F.3d 576, 583 (1st Cir.1994).

In this case, plaintiffs allege that López's failure to supervise Carl and Hau-Lepera, among others, constituted gross negligence, stating that "in light of [López's] knowledge of the abusive and unlawful conduct of his subordinates directed toward the plaintiffs, [López] was deliberately indifferent to the constitutional violations being committed by [them.]" (09-2041, Docket No. 1, ¶ 81.) However, since supervisory liability lies only where a subordinate's conduct results in a constitutional violation, the court will only examine López's actions with regard to Carl, as all claims against HauLepera have been dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

missed herein.

**\*12** Concerning Carl, plaintiffs allege that Adili e-mailed López shortly after Carl was assigned as Air Sunshine's principal maintenance inspector to complain about Carl's "abusive conduct," but that López treated plaintiffs' concerns "dismissively." (09-2041, Docket No. 1, ¶ 29.) Plaintiffs further claim that Adili sent an e-mail to López in January 2009 requesting that Carl be removed from his position as Air Sunshine's principal maintenance inspector due to his "inconsistent, unreliable, and openly hostile conduct," but that López refused. (09-2041, Docket No. 1, ¶¶ 50-51.) The López complaint also states that in or around March 22, 2009, plaintiffs complained to López by letter, copying President Obama and other government officials, about the treatment Air Sunshine was receiving by Carl and other FAA employees under López's supervision. (09-2041, Docket No. 1, ¶ 30.)

While it is unclear at this stage in the proceedings what steps–if any–López took to investigate plaintiffs' complaints, and whether his refusal to remove Carl from the Air Sunshine certification process was justified, plaintiffs have sufficiently alleged that López had notice of Carl's alleged violations of plaintiffs' due process and First Amendment rights, and thus that his failure to reprimand Carl could constitute an impermissible condonation of those violations. *See Colon v. Davila,* 137 F.Supp.2d 39, 43 (D.P.R.2001) (motion to dismiss Section 1983 action denied as to supervising officers where complaint alleged, *inter alia,* that they failed to conduct adequate investigations of alleged officer misconduct); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 907 (1st Cir.P.R.1988) (summary judgment denied with respect to supervising doctors where record showed that they knew of, but failed to investigate, sexual harassment directed at plaintiff, and that it was reasonable to infer that this failure discredited the plaintiff and sent a message to the male offenders to continue their misconduct with impugnity). Based on the foregoing, the court finds that defendants' motion (Docket No. 31) for dismissal is hereby DENIED with respect to plaintiffs' *Bivens* claim against López.

## C. Plaintiffs' Claims Under 42 U.S.C. § 1985

Plaintiffs also claim that defendants conspired to deprive them of their civil rights in violation of 42 U.S.C. § 1985 ("Section 1985"). (Docket No. 1, ¶¶

54-59; 09-2039, ¶¶ 26-31; 09-2041, Docket No. 1, ¶¶ 86-91.) Defendants counter that, among other things, this cause of action is barred by the intracorporate conspiracy doctrine, which states that employees or agents of a single corporation or government entity cannot be found to have conspired with themselves. (Docket No. 31, p. 21.) In response, plaintiffs claim that the intracorporate conspiracy doctrine does not apply in the civil rights context. (Docket No. 37, p. 20.) The First Circuit has applied the doctrine in the context of Section 1985, but only in limited circumstances. *See Stathos v. Bowden,* 728 F.2d 15, 21 (1st Cir.1984) (finding that the "boundaries of an 'intracorporate' exception to § 1985(3) conspiracy provision should be narrower than in antitrust," the court held that the intracorporate conspiracy doctrine did not apply where "defendants' activities ... went beyond 'a single act' of discrimination.") As plaintiffs allege multiple acts committed by defendants in the delaying of I) Air Sunshine's mandatory certification for three recently leased SAAB 340 aircraft, ii) the certification for Air Sunshine's fleet of C-402 aircraft, and iii) the issuance of a ferry permit (*See* Docket No. 1, ¶¶ 10-47), the doctrine is therefore inapplicable to the instant case.

**\*13** Section 1985 prohibits "two or more persons in any State or Territory [from] conspir[ing to] ... depriv[e] ... any person or class of persons of the equal protection of the laws." *Perez-Sanchez v. Public Bldg. Auth.,* 531 F.3d 104, 107 (1st Cir.2008). To prevail on such a claim, a plaintiff must allege that (1) a conspiracy existed, (2) the defendants had "a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws," (3) the defendants committed an "overt act in furtherance of the conspiracy," and (4) the plaintiff suffered "injury to person or property, or a deprivation of a constitutionally protected right." *Perez-Sanchez,* 531 F.3d at 107. A plaintiff must also prove that the conspiracy was motivated by some "racial, or perhaps otherwise classbased, invidiously discriminatory animus." *Maymi v. P.R. Ports Auth.,* 515 F.3d 20, 31 (1st Cir.2008) (*quoting Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993)). Furthermore, the plaintiff must show that the conspiracy was "aimed at interfering with protected rights." *Donahue v. Boston,* 304 F.3d 110, 122 (1st Cir.2002) (citation omitted); *see also Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4861457 (D.Puerto Rico)
**(Cite as: 2010 WL 4861457 (D.Puerto Rico))**

In this case, plaintiffs claim that they were treated differently than similarly situated persons in their dealings with the FAA, and that defendants were motivated by a discriminatory animus. (Docket No. 1, ¶¶ 56-58); (09-2039, Docket No. 1, ¶¶ 28-30); (09-2041, Docket No. 1, ¶¶ 88-90.) However, the complaints contain no non-conclusory allegations showing that the defendants worked together to deprive plaintiffs of their constitutional rights. (Docket No. 1); (09-2039, Docket No. 1); (09-2041, Docket No. 1.) *See Arroyo-Santiago v. Garcia-Vicario,* 1999 U.S.App. LEXIS 17909, at *11 (1st Cir. July 28, 1999) (affirming dismissal of <u>Section 1985</u> claim where complaint lacked "minimum factual support of the existence of a conspiracy.") (*quoting <u>Francis-Sobel v. Univ. of Maine,</u> 597 F.2d 15, 17 (1st Cir.1979); <u>Slotnick v. Garfinkle,</u> 632 F.2d 163, 166 (1st Cir.1980)* (affirming dismissal where complaint "neither elaborates nor substantiates its bald claims that certain defendants 'conspired' with one another."). Furthermore, even making all inferences in plaintiffs' favor, the complaints lack any well-pled allegations that defendants Hau-Lepera or López were motivated by the requisite "racial, or ... otherwise class-based, invidiously discriminatory animus." <u>Iqbal,</u> 129 S.Ct. at 1949, (Docket No. 1); (09-2039, Docket No. 1); (09-2041, Docket No. 1.) For instance, while plaintiffs aver that Carl used a racial slur in reference to an African-American FAA employee, there are no allegations that Hau-Lepera or López defendant ever made a racially-charged comment, or were present at the October 2008 meeting where Carl allegedly did so. (Docket No. 1); (09-2039, Docket No. 1); (09-2041, Docket No. 1.) Thus, Carl's conduct-if true-is reprehensible, but insufficient to serve as the sole basis for a civil rights conspiracy claim.

*14 Based on the foregoing, defendants' motion for dismissal (Docket No. 31) is hereby GRANTED with regard to plaintiffs' civil conspiracy claims under <u>Section 1985.</u>

**V. CONCLUSION**
In view of the above, defendants' motion for substitution and dismissal (Docket No. 31) is GRANTED IN PART and DENIED IN PART, as follows:

1. defendants' motion for substitution is GRANTED with respect to plaintiffs' state law claims and DENIED as to claims under *Bivens* and 42 U.S.C. § 1985;

2. plaintiffs Air Sunshine Inc.'s and Air Sunshine de P.R., Inc.'s state law claims against the United States are hereby DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies;

3. plaintiff Adili's claims against the United States under Article 1802 and for intentional infliction of emotional distress are hereby DISMISSED as precluded by the FTCA;

4. plaintiff Adili's tortious interference with contract claims against the United States are hereby DISMISSED for lack of subject matter jurisdiction;

5. plaintiffs' substantive due process and equal protection claims are hereby DISMISSED as to all defendants for failure to state a claim upon which relief can be granted;

6. plaintiffs' procedural due process claims and First Amendment claims are hereby DISMISSED as to defendant Hau-Lepera for failure to state a claim upon which relief can be granted;

7. defendants' motion to dismiss *Bivens* claims is hereby GRANTED as to defendant Hau-Lepera, but DENIED as to defendants Carl and López regarding procedural due process and First Amendment claims; and

8. plaintiffs' claims for civil conspiracy pursuant to <u>42 U.S.C. § 1985</u> are hereby DISMISSED as to all defendants for failure to state a claim upon which relief can be granted.

IT IS SO ORDERED.

D.Puerto Rico,2010.
Air Sunshine, Inc. v. Carl
Slip Copy, 2010 WL 4861457 (D.Puerto Rico)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.